POLICY NUMBER: MP10570130

## ITEM THREE SCHEDULE OF COVERED AUTOS YOU OWN

| Covered Auto No. | DESCRIPTION Year, Model, Trade Name, Body Type Serial Number(S) Vehicle Identification Number (VIN) | | PURCHASED Original Cost New | Actual Cost & New (N) Used (U) | TERRITORY Town & State Where The Covered Auto Will Be Principally Garaged |
|---|---|---|---|---|---|
| 001 | 1999 OTOKA TRAILER 5713 | | $ | $ | 104 FARMINGTON NM |
| 002 | 1994 MACK TRACTOR 0174 | | $ | $ | 104 FARMINGTON NM |
| 003 | 2000 DODGE PICKUP 0405 | | $ | $ | 104 FARMINGTON NM |
| 004 | 2006 EAGER BVR TRAILER 2122 | | $ | $ | 104 FARMINGTON NM |

| Covered Auto No. | CLASSIFICATION | | | | | | | Except For Towing All Physical Damage Loss Is Payable To You And The Loss Payee Named Below As Interests May Appear At The Time Of The Loss. |
|---|---|---|---|---|---|---|---|---|
| | Radius of Operation | Business Use s = service r = retail c = commercial | Size GVW, GCW Or Vehicle Seating Capacity | Age Group | Primary Rating Factor | Secondary Rating Factor | Code | |
| | | | | | Liab. | Phy. Dam. | | |
| 001 | | | | 6 | | | 67499 | |
| 002 | 50 | | 45+ | 6 | | | 50499 | |
| 003 | 50 | S | 0-10 | 6 | | | 01499 | |
| 004 | | | | 6 | | | 67499 | |

COVERAGES -PREMIUMS, LIMITS AND DEDUCTIBLES (Absence of a deductible or limit entry in any column below means that the limit or deductible entry in the corresponding ITEM TWO column applies instead.)

| Covered Auto No. | LIABILITY | | | PERSONAL INJURY PROTECTION | | ADDED P.I.P. | | PROP. PROT. (Mich. Only) | |
|---|---|---|---|---|---|---|---|---|---|
| | Limit* | Premium | | Limit Stated In Each P.I.P. End. Minus Deductible Shown Below | Premium | Limit Stated In Each Added P.I.P. End. Premium | Limit Stated In P.P.I. End. Minus Deductible Shown Below | Premium | |
| 001 | $ | $ | 35.00 | $ | $ | $ | $ | $ | |
| 002 | $ | $ | 905.00 | $ | $ | $ | $ | $ | |
| 003 | $ | $ | 348.00 | $ | $ | $ | $ | $ | |
| 004 | $ | $ | 35.00 | $ | $ | $ | $ | $ | |
| Total Premium | | $ | | | $ | $ | | $ | |

| Covered Auto No. | AUTO MEDICAL PAYMENTS | | | MEDICAL EXPENSE AND INCOME LOSS BENEFITS (Virginia Only) | |
|---|---|---|---|---|---|
| | Limit | Premium | | Limit Stated In Each Medical Expense And Income Loss Endorsement For Each Person | Premium |
| 001 | $ | $ | $ | | $ |
| 002 | $ | $ 33.00 | $ | | $ |
| 003 | $ | $ 33.00 | $ | | $ |
| 004 | $ | $ | $ | | $ |
| Total Premium | | $ | | | $ |

| Covered Auto No. | UNINSURED MOTORIST | | | UNDERINSURED MOTORISTS | | |
|---|---|---|---|---|---|---|
| | Limit* | | Premium | Limit* | | Premium |
| 001 | $ | $ | | $ | $ | |
| 002 | $ | $ | 117.00 | $ | $ | |
| 003 | $ | $ | 117.00 | $ | $ | |
| 004 | $ | $ | | $ | $ | |
| Total Premium | | $ | | | $ | |

| Covered Auto No. | COMPREHENSIVE | | SPECIFIED CAUSES OF LOSS | | COLLISION | | TOWING & LABOR | |
|---|---|---|---|---|---|---|---|---|
| | Limit Stated In ITEM TWO Minus Deductible Shown Below | Premium | Limit Stated In ITEM TWO Minus Deductible Shown Below | Premium | Limit Stated In ITEM TWO Minus Deductible Shown Below | Premium | Limit Per Disablement | Premium |
| 001 | $ | $ | $ | $ | $ | $ | $ | $ |
| 002 | $ | $ | $ | $ | $ | $ | $ | $ |
| 003 | $ | $ | $ | $ | $ | $ | $ | $ |
| 004 | $ | $ | $ | $ | $ | $ | $ | $ |
| Total Premium | | $ | | $ | | $ | | $ |

*Split limits are presented in thousands of dollars.

CA DC 03 (Ed. 3/2006).   Contains Copyrighted Material of Insurance Services Office, Inc., (2006) with its permission. Copyright Insurance Services Office, Inc., 2006

NAICO 000100

EXHIBIT 1

POLICY NUMBER: MP10570130

**ITEM THREE** SCHEDULE OF COVERED AUTOS YOU OWN

| Covered Auto No. | DESCRIPTION Year, Model, Trade Name, Body Type Serial Number(S) Vehicle Identification Number (VIN) | | PURCHASED Original Cost New | Actual Cost & New (N) Used (U) | TERRITORY Town & State Where The Covered Auto Will Be Principally Garaged |
|---|---|---|---|---|---|
| 005 | 2007 KENWORTH TRACTOR 8080 | | $ | $100,000 | 104 FARMINGTON NM |
| 006 | 2007 SPCNS TRAILER 2851 | | $ | $ | 104 FARMINGTON NM |
| 007 | 2007 CLEMENT TRAILER 6025 | | $ | $ 23,000 | 104 FARMINGTON NM |
| 008 | 1994 FORD PICKUP 4493 | | $ | $ | 104 FARMINGTON NM |

| Covered Auto No. | CLASSIFICATION | | | | | | | | | Except For Towing All Physical Damage Loss Is Payable To You And The Loss Payee Named Below As Interests May Appear At The Time Of The Loss. |
|---|---|---|---|---|---|---|---|---|---|---|
| | Radius of Operation | Business Use s = service r = retail c = commercial | Size GVW, GCW Or Vehicle Seating Capacity | Age Group | Primary Rating Factor Liab. | Primary Rating Factor Phy. Dam. | Secondary Rating Factor | Code | | |
| 005 | 50 | | 45+ | 6 | | | | 50499 | | |
| 006 | | | | 6 | | | | 57599 | | |
| 007 | | | | 6 | | | | 67499 | FORD MOTOR CREDIT (ATLANTA | |
| 008 | 50 | S | 0-10 | 6 | | | | 01499 | | |

COVERAGES -PREMIUMS, LIMITS AND DEDUCTIBLES (Absence of a deductible or limit entry in any column below means that the limit or deductible entry in the corresponding ITEM TWO column applies instead.)

| Covered Auto No. | LIABILITY | | PERSONAL INJURY PROTECTION | | ADDED P.I.P. | | PROP. PROT. (Mich. Only) |
|---|---|---|---|---|---|---|---|
| | Limit* | Premium | Limit Stated In Each P.I.P. End. Minus Deductible Shown Below | Premium | Limit Stated In Each Added P.I.P. End. Deductible | Limit Stated In P.P.I. End. Minus Deductible Shown Below | Premium |
| 005 | $ | $ 905.00 | $ | $ | $ | $ | $ |
| 006 | $ | $ 52.00 | $ | $ | $ | $ | $ |
| 007 | $ | $ 35.00 | $ | $ | $ | $ | $ |
| 008 | $ | $ 348.00 | $ | $ | $ | $ | $ |
| Total Premium | | $ | | $ | $ | | $ |

| Covered Auto No. | AUTO MEDICAL PAYMENTS | | MEDICAL EXPENSE AND INCOME LOSS BENEFITS (Virginia Only) | |
|---|---|---|---|---|
| | Limit | Premium | Limit Stated In Each Medical Expense And Income Loss Endorsement For Each Person | Premium |
| 005 | $ | $ 33.00 | $ | $ |
| 006 | $ | $ | $ | $ |
| 007 | $ | $ | $ | $ |
| 008 | $ | $ 33.00 | $ | $ |
| Total Premium | | $ | | $ |

| Covered Auto No. | UNINSURED MOTORIST | | | UNDERINSURED MOTORISTS | | |
|---|---|---|---|---|---|---|
| | Limit* | | Premium | Limit* | | Premium |
| 005 | $ | $ | 117.00 | $ | $ | |
| 006 | $ | $ | | $ | $ | |
| 007 | $ | $ | | $ | $ | |
| 008 | $ | $ | 117.00 | $ | $ | |
| Total Premium | | $ | | | $ | |

| Covered Auto No. | COMPREHENSIVE | | SPECIFIED CAUSES OF LOSS | | COLLISION | | TOWING & LABOR | |
|---|---|---|---|---|---|---|---|---|
| | Limit Stated In ITEM TWO Minus Deductible Shown Below | Premium | Limit Stated In ITEM TWO Minus Deductible Shown Below | Premium | Limit Stated In ITEM TWO Minus Deductible Shown Below | Premium | Limit Per Disablement | Premium |
| 005 | $ 500 | $ 200.00 | $ | $ | $ 500 | $ 717.00 | $ | $ |
| 006 | $ | $ | $ | $ | $ | $ | $ | $ |
| 007 | $ 1,000 | $ 90.00 | $ | $ | $ 1,000 | $ 156.00 | $ | $ |
| 008 | $ | $ | $ | $ | $ | $ | $ | $ |
| Total Premium | | $ | | $ | | $ | | $ |

*Split limits are presented in thousands of dollars.

CA 00 03 (Ed. 3/2006)    Contains Copyrighted Material of Insurance Services Office, Inc., (2005) with its permission. Copyright Insurance Services Office, Inc., 2005

NAICO 000101

EXHIBIT 1

POLICY NUMBER: MP10570130
## ITEM THREE SCHEDULE OF COVERED AUTOS YOU OWN

| Covered Auto No. | DESCRIPTION Year, Model, Trade Name, Body Type Serial Number(S) Vehicle Identification Number (VIN) | | PURCHASED Original Cost New | Actual Cost & New (N) Used (U) | TERRITORY Town & State Where The Covered Auto Will Be Principally Garaged |
|---|---|---|---|---|---|
| 009 | 2008 STERLING TRUCK 1197 | | $ | $ 60,000 | 104 FARMINGTON NM |
| 010 | 2000 FREIGHTLNR TRUCK 9328 | | $ | $ | 104 FARMINGTON NM |
| 011 | 2005 CHEVROLET PICKUP 5495 | | $ | $ | 104 FARMINGTON NM |
| 012 | 2008 KENWORTH TRACTOR 5065 | | $ | $ 60,000 | 104 FARMINGTON NM |

| Covered Auto No. | CLASSIFICATION Radius of Operation s = service r = retail c = commercial | Business Use | Size GVW, GCW Or Vehicle Seating Capacity | Age Group | Primary Rating Factor Liab. | Secondary Rating Factor Phy. Dam. | Code | Except For Towing All Physical Damage Loss Is Payable To You And The Loss Payee Named Below As Interests May Appear At The Time Of The Loss. |
|---|---|---|---|---|---|---|---|---|
| 009 | 50 | | 45+ | 6 | | | 40479 | |
| 010 | 50 | C | 20-45 | 6 | | | 33499 | |
| 011 | 50 | S | 0-10 | 6 | | | 01499 | |
| 012 | 50 | | 45+ | 6 | | | 50499 | PACCAR FINANCIAL CORPORATI |

COVERAGES -PREMIUMS, LIMITS AND DEDUCTIBLES (Absence of a deductible or limit entry in any column below means that the limit or deductible entry in the corresponding ITEM TWO column applies instead.)

| Covered Auto No. | LIABILITY Limit* | Premium | PERSONAL INJURY PROTECTION Limit Stated In Each P.I.P. End. Minus Deductible Shown Below | Premium | ADDED P.I.P. Limit Stated In Each Added P.I.P. End. Premium | PROP. PROT. (Mich. Only) Limit Stated In P.P.I. End. Minus Deductible Shown Below | Premium |
|---|---|---|---|---|---|---|---|
| 009 | $ | $ 790.00 | $ | $ | $ | $ | $ |
| 010 | $ | $ 526.00 | $ | $ | $ | $ | $ |
| 011 | $ | $ 348.00 | $ | $ | $ | $ | $ |
| 012 | $ | $ 905.00 | $ | $ | $ | $ | $ |
| Total Premium | $ | | | $ | $ | | $ |

| Covered Auto No. | AUTO MEDICAL PAYMENTS Limit | Premium | MEDICAL EXPENSE AND INCOME LOSS BENEFITS (Virginia Only) Limit Stated In Each Medical Expense And Income Loss Endorsement For Each Person | Premium |
|---|---|---|---|---|
| 009 | $ | $ 33.00 | $ | $ |
| 010 | $ | $ 33.00 | $ | $ |
| 011 | $ | $ 33.00 | $ | $ |
| 012 | $ | $ 33.00 | $ | $ |
| Total Premium | | $ | | $ |

| Covered Auto No. | UNINSURED MOTORIST Limit* | Premium | UNDERINSURED MOTORISTS Limit* | Premium |
|---|---|---|---|---|
| 009 | $ | $ 117.00 | $ | $ |
| 010 | $ | $ 117.00 | $ | $ |
| 011 | $ | $ 117.00 | $ | $ |
| 012 | $ | $ 117.00 | $ | $ |
| Total Premium | | $ | $ | $ |

| Covered Auto No. | COMPREHENSIVE Limit Stated In ITEM TWO Minus Deductible Shown Below | Premium | SPECIFIED CAUSES OF LOSS Limit Stated In ITEM TWO Minus Deductible Shown Below | Premium | COLLISION Limit Stated In ITEM TWO Minus Deductible Shown Below | Premium | TOWING & LABOR Limit Per Disablement | Premium |
|---|---|---|---|---|---|---|---|---|
| 009 | $ 1,000 | $ 164.00 | $ | $ | $ 1,000 | $ 444.00 | $ | $ |
| 010 | $ | $ | $ | $ | $ | $ | $ | $ |
| 011 | $ | $ | $ | $ | $ | $ | $ | $ |
| 012 | $ 1,000 | $ 173.00 | $ | $ | $ 1,000 | $ 468.00 | $ | $ |
| Total Premium | $ | | $ | | $ | | $ | |

*Split limits are presented in thousands of dollars.

Contains Copyrighted Material of Insurance Services Office, Inc, (2005) with its permission. Copyright Insurance Services Office, Inc, 2005

EXHIBIT 1

POLICY NUMBER: MP10570130

## ITEM THREE SCHEDULE OF COVERED AUTOS YOU OWN

| DESCRIPTION | | PURCHASED | | TERRITORY |
|---|---|---|---|---|
| **Covered Auto No.** Year, Model, Trade Name, Body Type Serial Number(S) Vehicle Identification Number (VIN) | | Original Cost New | Actual Cost & New (N) Used (U) | Town & State Where The Covered Auto Will Be Principally Garaged |
| 013 | 2007 STERLING TRUCK 9612 | $101,461 | $ | 104 FARMINGTON NM |
| | | $ | $ | |
| | | $ | $ | |
| | | $ | $ | |

| Covered Auto No. | CLASSIFICATION | | | | | | | | Except For Towing All Physical Damage Loss Is Payable To You And The Loss Payee Named Below As Interests May Appear At The Time Of The Loss. |
|---|---|---|---|---|---|---|---|---|---|
| | Radius of Operation | Business Use s = service r = retail c = commercial | Size GVW, GCW Or Vehicle Seating Capacity | Age Group | Primary Rating Factor | Secondary Rating Factor | Code | | |
| | | | | | Liab. | Phy. Dam. | | | |
| 013 | 50 | | 45+ | 6 | | | | 40479 | CITIZENS BANK,FARMINGTON,N |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

COVERAGES -PREMIUMS, LIMITS AND DEDUCTIBLES (Absence of a deductible or limit entry in any column below means that the limit or deductible entry in the corresponding ITEM TWO column applies instead.)

| Covered Auto No. | LIABILITY | | | PERSONAL INJURY PROTECTION | | ADDED P.I.P. | | PROP. PROT. (Mich. Only) | |
|---|---|---|---|---|---|---|---|---|---|
| | Limit* | | Premium | Limit Stated In Each P.I.P. End. Minus Deductible Shown Below | Premium | Limit Stated In End. Premium | Limit Stated In P.P.I. End. Minus Deductible Shown Below | | Premium |
| 013 | $ | $ | 790.00 | $ | $ | $ | $ | | $ |
| | $ | $ | | $ | $ | $ | $ | | $ |
| | $ | $ | | $ | $ | $ | $ | | $ |
| | $ | $ | | $ | $ | $ | $ | | $ |
| **Total Premium** | | $ | 6,022.00 | | $ | $ | | | $ |

| Covered Auto No. | AUTO MEDICAL PAYMENTS | | | MEDICAL EXPENSE AND INCOME LOSS BENEFITS (Virginia Only) | |
|---|---|---|---|---|---|
| | Limit | | Premium | Limit Stated In Each Medical Expense And Income Loss Endorsement For Each Person | Premium |
| 013 | $ | $ | 33.00 | $ | $ |
| | $ | $ | | $ | $ |
| | $ | $ | | $ | $ |
| | $ | $ | | $ | $ |
| **Total Premium** | | $ | 297.00 | | $ |

| Covered Auto No. | UNINSURED MOTORIST | | | | UNDERINSURED MOTORISTS | | | |
|---|---|---|---|---|---|---|---|---|
| | Limit* | | Premium | | Limit* | | Premium | |
| 013 | $ | $ | | 117.00 | $ | $ | | |
| | $ | $ | | | $ | $ | | |
| | $ | $ | | | $ | $ | | |
| | $ | $ | | | $ | $ | | |
| **Total Premium** | | $ | | 1,053.00 | | $ | | |

| Covered Auto No. | COMPREHENSIVE | | SPECIFIED CAUSES OF LOSS | | COLLISION | | TOWING & LABOR | |
|---|---|---|---|---|---|---|---|---|
| | Limit Stated In ITEM TWO Minus Deductible Shown Below | Premium | Limit Stated In ITEM TWO Minus Deductible Shown Below | Premium | Limit Stated In ITEM TWO Minus Deductible Shown Below | Premium | Limit Per Disablement | Premium |
| 013 | $ 1,000 | $ 143.00 | $ | $ | $ 1,000 | $ 451.00 | $ | $ |
| | $ | $ | $ | $ | $ | $ | $ | $ |
| | $ | $ | $ | $ | $ | $ | $ | $ |
| | $ | $ | $ | $ | $ | $ | $ | $ |
| **Total Premium** | | $ 770.00 | | $ | | $ 2,236.00 | | $ |

*Split limits are presented in thousands of dollars.

CA EC 03 (Ed. 3/2006)
Contains Copyrighted Material of Insurance Services Office, Inc., (2005) with its permission. Copyright Insurance Services Office, Inc., 2005

NAICO 000103

EXHIBIT 1

**BA140707 - ABC Concrete: Nelson v ABC Concrete & Montano**

Dick Harrison  to: Ryan Gilmore                                                                05/04/2015 02:02 PM

From:  Dick Harrison/NAICO

To:  Ryan Gilmore/NAICO

Cc:  Pat Gilmore/NAICO@NAICO, Rick Evans/NAICO@NAICO, Tony Gulley/NAICO@NAICO, tlagere@naico.com,
James Bartodej/NAICO@NAICO, James Malone/NAICO@NAICO

---

Unless someone has a conflict, lets get together Wednesday, 9:30 AM, in Rick's
conference room (B4-3).  Please advise if you have a conflict and need to reschedule.

Dick
4349

Ryan Gilmore---05/04/2015 01:05:55 PM---Below are my initial thoughts on this claim. I should be available this
week for a meeting if you wo

From:    Ryan Gilmore/NAICO
To:    Dick Harrison/NAICO@NAICO
Cc:    Pat Gilmore/NAICO@NAICO
Date:    05/04/2015 01:05 PM
Subject:    Re: BA140707 - ABC Concrete: Nelson v ABC Concrete & Montano

---

Below are my initial thoughts on this claim. I should be available this week for a meeting if you would like to
discuss this claim, including our response to the tender of defense from the law firm hired by Scottsdale to
defend Concrete and Montano.

**Is the DIV (Mr. Montano) entitled to coverage under the NAICO policy?**

Based on the facts as described by you in a previous email, I believe that a court would conclude that
Montano was operating the covered "auto" at issue with the permission of both Septic and Concrete, and
would therefore be entitled to an unqualified defense under the NAICO policy.

**Is Concrete an insured under the Scottsdale policy?**

I agree that Concrete is an insured under Paragraph 1.d. of the Scottsdale policy issued to Septic. This is
because Concrete is a lessor of a covered "auto" that is leased to Septic under a written agreement that
does not require Concrete to hold Septic harmless, and the covered "auto" at issue was being used in
Septic's business as a "motor carrier" for hire. Concrete would also likely qualify as insured under Paragraph
1.e. of the policy as someone liable for the conduct of an "insured."

**Is the coverage afforded under the Scottsdale policy primary or excess over the the insurance
afforded under the NAICO policy?**

Although there may arguments to the contrary, I believe that a court would likely conclude that the Scottsdale
policy is excess over the NAICO policy. This is because I believe that, unlike Septic, Concrete is not a "motor
carrier" for hire. In order to be a "motor carrier" under the Scottsdale policy, Concrete has to be a person or
organization providing transportation by "auto" in the furtherance of a commercial enterprise (the definition of
"motor carrier" in the policy). Unlike Septic, Concrete is not in the business of transporting persons or
property. Rather, Concrete has someone else (Septic) transport its products. Thus, although the NAICO

EXHIBIT 1

NAICO 000681

policy issued to Concrete has several tractors and trailers listed, Concrete may not be a "motor carrier" as defined by the Scottsdale policy. Moreover, even if there were no dispute that Concrete is a "motor carrier" under the Scottdale policy, Concrete would still need to qualify as a "motor carrier" *for hire* (a phrase that is undefined in the Scottsdale policy). **It should also be noted that unlike the Scottsdale policy (issued to Septic), the NAICO policy (issued to Concrete) contains neither a Form F endorsement nor an MCS 90 endorsement**. This is likely because Concrete is not required to have motor carrier authority. If Concrete was not required to have motor carrier authority, it may be difficult to argue that Concrete is a "motor carrier" for hire under the Scottsdale policy. However, if Concrete is a motor carrier for hire, I agree with you that the both the NAICO policy and the Scottsdale policy provide primary coverage to Concrete.

Ryan Gilmore

(405) 258-4263
P.O. Box 9
Chandler, OK 74834

Dick Harrison---04/27/2015 11:30:44 AM---Ryan, This supplements my e-mails of 4/22/15 & 4/24/15.  We have now received a copy of Scottsdale's

From:    Dick Harrison/NAICO
To:      Ryan Gilmore/NAICO@NAICO
Cc:      Pat Gilmore/NAICO@NAICO
Date:    04/27/2015 11:30 AM
Subject:   BA140707 - ABC Concrete: Nelson v ABC Concrete & Montano

Ryan,

This supplements my e-mails of 4/22/15 & 4/24/15.  We have now received a copy of Scottsdale's policy.  Attached is a copy that I have bookmarked & highlighted.

The policy covers scheduled autos only.  The involved vehicle is scheduled as vehicle #3.

The key to our analysis of coverage will be the determination of whether or not ABC Concrete falls within the definition of "motor carrier" in the Motor Carrier Coverage Form (CA 00 20 10 13).  The definition reads as follows:  "Motor Carrier" means a person or organization providing transportation by "auto" in the furtherance of a commercial enterprise.  Since the policy that NAICO issued to Concrete has several tractors & trailers listed, I think Concrete would fall within the definition of a "motor carrier"

Concrete would be an insured under paragraph d of Who Is An Insured.  The (1)(a) & (1)(b) exceptions for "motor carriers" do not appear to apply to this situation.  Therefore, I think Concrete is an insured under Scottsdale's policy.

Under paragraph b of Other Insurance, Scottsdale's policy would be primary if Concrete is a "motor carrier".  If Concrete is not a "motor carrier", Scottsdale's policy would be excess based on paragraph e of Other Insurance.

EXHIBIT 1

If Concrete is a "motor carrier" as defined,  I believe Concrete would be insured by both policies and that both coverages would be primary.  Therefore, they would apply on a 50/50 basis based on the limits.

Please review and advise your thoughts regarding the coverage issues and the primary/excess issues.  If you think we need additional information, please advise and I will forward the request to the file handler.

Thanks,

Dick
4349

[attachment "BA140707 - 20131105 LTO0015269 (Scottsdale).pdf" deleted by Ryan Gilmore/NAICO]

EXHIBIT 1

NAICO 000683



**N**ATIONAL
**A**MERICAN
**I**NSURANCE
**C**OMPANY

darlene pls check ownership
report is different than
named insured report

*"Setting the standard that others strive for..."* ™

March 12, 2013

> **REVIEWED**
> *By anita marshall at 12:40 pm, Mar 26, 2013*

Mr. Doug Murray
A B C Concrete Manufacturing Company, Inc.
1004 South Lake Street
Farmington, NM 87401-5660

RE:   MP10570030  PR14100030 – 2/9/14

Dear Mr. Murray:

This is to confirm my March 11 telephone contact and thank you for taking the time to discuss the operations at A B C Concrete Manufacturing Company, Inc.  The purpose of my call was to obtain information for our underwriting file and determine where I might be of assistance in your efforts to control costly accidents.

During our visit we discussed your operation, reviewed the loss control activities currently in place, and discussed the past loss record.

As a result of my survey, I have no loss control recommendations to offer at this time.

I have enclosed for your use a copy of our safety video/DVD catalog.  We encourage you to take advantage of this free service for use in your safety program.

Thank you for your time and cooperation.  If I can be of any service, feel free to contact me at 1-800-822-7802 ext. 4506.

Sincerely,

Jimmie Mileham
Loss Control Consultant

cb
enclosure
cc:   Woods Insurance Service, Inc.

*Our reports are based on observations or information available to us at the time surveys are conducted which may not discover all hazards.  We cannot warrant safety, health, or compliance with any rule or regulation.  We can only assist you in fulfilling your responsibility in controlling accidents.*

1010 Manvel Avenue □ P.O. Box 9 □ Chandler, Oklahoma 74834
(405)258-0804 □ WATS 1-800-822-7802

NAICO 003099

EXHIBIT 1

Loss Control
Report Cover

| Account Name and P.O. Address<br>A B C Concrete Manufacturing Co., Inc.<br>1004 South Lake Street<br>Farmington, NM  87401-5660 | | | | | | | Location(s) - Plants, Divisions, Other | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Coverage | Checklist LC No. | Date of Report | | | Surveyed By | Office OK Only | Total Hours | Policy Number (or "Prospective") | Expiration Date | | | Requested By | Distribution of Loss Control Report: | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | No. | Sent To: |
| GL | NARR | 3 | 11 | 13 | JM | OK | | MP10570030 | 2 | 9 | 14 | 055 | | |
| AU | LC826 | | | | | | | | | | | | 1 | LCF |
| PROP | | | | | | | | PR14100030 | | | | | 1 | UW |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

| Person Contacted (Name and Title)<br>Doug Murray, Owner | Producing Agent<br>Woods Insurance | Service Status<br>NFS |
|---|---|---|

OWNERSHIP:  ☐ INDIVIDUAL   ☐ PARTNERSHIP   ☒ CORPORATION   ☐ OTHER (DESCRIBE):   ☒ PROFIT   ☐ NON-PROFIT)

a) IN BUSINESS: **35** YEARS          b) AT THIS ADDRESS:          YEARS          c) UNDER PRESENT OWNERSHIP:          YEARS

INSURED IS   ☐ TENANT   ☐ GENERAL LESSEE   ☐ OWNER.     IS 90% OF THE PREMISES LEASED TO AND UNDER CONTROL OF A SINGLE LESSEE?   ☐ YES   ☐ NO

COMMENT IN NARRATIVE AND ATTACH APPROPRIATE CHECKLIST(S) OR REPORT FORM(S).

A. Nature and Size of Account (Briefly state nature of operations and indicate size; e.g., no. of employees, vehicles, etc):

The company is owned by Doug Murray – 49% and Juanita Murray – 51% (husband and wife). They operate as a pre-cast concrete product company and manufacture over 200 items including manholes, septic tanks, highway barriers, cattle guards, etc. This accounts for approximately 95% of their business. They also do ready mix concrete. The ready mix operation hauls sand, gravel, and cement to their customers' locations and it is mixed there for use on location. Pre-cast products are said to be sold in 46 states. They do no overseas sales.

Subcontractors are used very rarely and certificates of insurance are required.

On occasion the customer will be allowed on their yard, however, he must wear appropriate personal protective equipment and be escorted by a member of management.

The company currently employs 11 of which two drive – the owner and his son. Their busy season is from April through November and employees may reach 20 at that time.

Vehicles consist of five trailers, two pickups, three truck tractors, and two mixer trucks.

B. Summary of Loss Potential
  1. Provide BRIEF comments on the strengths and/or weaknesses of present control measures, management and supervisory controls.
  2. Provide BRIEF comments on significant loss problems and/or potentials. Delineate any exposures needing further evaluation.
  3. List recommendations to correct substandard conditions noted in checklists (Indicate importance and probability of favorable action).
  4. Explain any situation noted above where it is felt that conditions will not be brought to "standard risk" level.

LC820

☐ Additional Comments Attached

CONFIDENTIAL - FOR COMPANY USE ONLY

NAICO 003100

EXHIBIT 1

1. Policyholder has several years of experience in this type of operation, having been in business since 1978. The company is managed daily in a hands-on manner by the owner. Policyholder was found to have a good attitude toward safety and accident prevention and appears to be very proactive in his safety program. It appears that management does a good job of vehicle maintenance with proper documentation said to be maintained.

2. Policyholder has had no significant loss problems in the past.

3. None.

4. None.

C.  Loss Control Service Plan
    1.  Outline specific service plan to further evaluate and/or correct any conditions noted in B 1 or B 2.
    2.  Show service contact months and indicate what follow-up activity is planned for recommendations.

1. & 2.  Due to size of account, no future loss control service is planned unless requested by underwriting. This appears to be a standard risk for size and type of operation.

**Loss Control**
**Small or Incidental Fleet Survey Guide**
(To be attached to LC820 - Report Cover)

| Account Name: | A B C Concrete Manufacturing Company, Inc. | Policy No. | MP10570030 |
|---|---|---|---|
| Surveyed By: | JM | Report Date: | 3 11 13 |

## 1.0   Vehicles

1.1.   Number of Vehicles

| | Private Passenger | Pickups | Vans | Trucks | Tractors | Semi-Trailers | Trailers | Other Special Equipment |
|---|---|---|---|---|---|---|---|---|
| Owned | | 3 | | 5 | | | 5 | |
| Leased | | | | | | | | |

1.2.   Are vehicles used for hauling?   ☑ Yes   ☐ No      If yes, provide nature of cargo:

Raw material and products.

1.3.   Is hauling done for hire?   ☐ Yes   ☑ No

    If yes, percentage of time? ____%      Specialized Equipment: _____

    If yes, is hauling done for one firm only?   ☐ Yes   ☐ No

1.4.   Normal radius of operations:   150 miles   Vehicles taken out of State?   ☐ Yes   ☐ No   Major cities: _____

Comments:

Policyholder is located in Farmington, NM, and will travel to Colorado, Arizona, and Utah.

## 2.0   Maintenance

2.1.   How often is regular maintenance performed?      By mileage per manufacturer's recommendations

2.2.   Are records kept?   ☑ Yes   ☐ No

2.3.   Who is responsible for having maintenance performed?      Owner

2.4.   Who performs maintenance?   Owner

2.5.   Any physical damage to vehicle(s)?   ☐ Yes   ☑ No

    If yes, explain:

2.6.   Where are vehicles kept in evenings?   At insured's yard in Farmington

    If in lot, what type of security is in place?   Six foot chain link fence with razor wire & gated

    Sufficient lighting?   ☑ Yes   ☐ No   Key control:   Yes

Comments:

## 3.0   Drivers

3.1.   Are vehicles driven home by employees?   ☐ Yes   ☑ No

3.2.   Are employees allowed other personal use of vehicles?   ☐ Yes   ☑ No

3.3.   Are employee's family members allowed use of vehicles?   ☐ Yes   ☑ No

    Youthful Drivers?   ☐ Yes   ☑ No

3.4.   Any drivers with accidents or traffic violations?   ☐ Yes   ☑ No

NAICO 003102

**EXHIBIT 1**

3.5.  Hiring Practices for drivers:

|  | | |
|---|---|---|
| MVRs checked? | ☑ Yes | ☐ No |
| Drug Testing? | ☑ Yes | ☐ No |
| Check of past work record? | ☐ Yes | ☐ No |
| Driver Turnover: | Very little | |
| Physicals? | ☑ Yes | ☐ No |

| | | |
|---|---|---|
| 3.6.  Are annual MVRs obtained on all drivers? | ☑ Yes | ☐ No |
| 3.7.  Company use of personal vehicles? | ☐ Yes | ☑ No |
| If yes, certificates obtained? | ☐ Yes | ☐ No |
| Limits required: | | |
| 3.8.  Are all drivers properly licensed? | ☑ Yes | ☐ No |
| 3.9.  Total number of drivers? | 2 | |
| 3.10. Number of drivers with Commercial Driver Licenses: | 2 | |
| 3.11. Are any drivers under the age of 25 or over 60? | ☐ Yes | ☑ No |
| 3.12. Driver Qualification files? | ☑ Yes | ☐ No |

Comments:

Currently only the owner and his son are driving.

3.13. Describe driver training / orientation procedures:

Informal driver training

| | | |
|---|---|---|
| 3.14. Policies on vehicle use? | ☑ Yes | ☐ No |
| 3.15. Loss records? | ☑ Yes | ☐ No |

3.16.  Comments regarding previous losses / trends:

Policyholder has had no large losses or trends.

NAICO 003103

EXHIBIT 1

**Nichole Cottington**
**<Nichole@woodsins.com>**

12/19/2012 05:20 PM

| | |
|---|---|
| To | "amarshall@naico.com" <amarshall@naico.com> |
| cc | Lyle Love <Lyle@woodsins.com>, Bev Owen <Bev@woodsins.com> |
| bcc | |
| Subject | RE: ABC Concrete Mfg Co - status |

02/09/08-12/11/12 Loss runs attached. The client's website was very outdated, so they've recently updated it with their current operations.

Nichole Cottington, CISR
Commercial Service Representative
Woods Insurance Service, Inc.
Farmington, NM 87401

-----Original Message-----
From: amarshall@naico.com [mailto:amarshall@naico.com]
Sent: Tuesday, December 18, 2012 11:50 AM
To: Nichole Cottington
Subject: RE: ABC Concrete Mfg Co - status

hahah, but still out there on the internet. if you get me the loss runs,
just add a note about the outdated information and advise no longer providing any overseas products

Anita Marshall, CIC, AU, CISR, AIS
SR UNDERWRITER

800-822-7802 EXT 4326

FAX: 405-258-5415

From: Nichole Cottington
To: "amarshall@naico.com" ,
Date: 12/18/2012 11:23 AM
Subject: RE: ABC Concrete Mfg Co - status

EXHIBIT 1

NAICO 003126

# ACORD™ BUSINESS AUTO SECTION

OP ID: NC

DATE (MM/DD/YY): 1/29/2013

| PRODUCER | | APPLICANT | |
|---|---|---|---|
| PHONE (A/C, No, Ext): 505-326-1111 | | (First Named Insured) | ABC Concrete Mfg. Co. |
| FAX NO. (A/C, No, Ext): 505-326-3130 | | | |

Woods Insurance Service, Inc.
P.O. Box 3830
Farmington, NM 87499
Beverly Owen

| EFFECTIVE DATE | EXPIRATION DATE | | DIRECT BILL | PAYMENT PLAN | AUDIT |
|---|---|---|---|---|---|
| 02/09/13 | 02/09/14 | X | AGENCY BILL | | |

CODE:    SUB CODE:

FOR COMPANY USE ONLY

AGENCY CUSTOMER ID: ABCC001

## COVERAGES/LIMITS

| COVERAGES | COVERED AUTO SYMBOLS | LIMITS | | COVERAGES | COVERED AUTO SYMBOLS | LIMITS |
|---|---|---|---|---|---|---|
| LIABILITY | X 1   4   9 / 2   7 / 3   8 | X CSL BI EA PER $ 1,000,000 / BI EACH ACCIDENT $ / PROPERTY DAMAGE $ | | | | |
| PERSONAL INJURY PROTECTION | 5 / 7 | OR EQUIVALENT NO-FAULT COVERAGE $ | DEDUCTIBLE | | PHYSICAL DAMAGE | |
| ADDITIONAL P.I.P. | 5 / 7 | TOTAL   W/C $ / $   M/E $ | | TOWING & LABOR | 3 / 7 | $ |
| MEDICAL PAYMENTS | X 2   4   8 / 3   7 | EACH PERSON $ 5,000 | | COMPREHENSIVE | 2   4   8 / 3   7 | |
| UNINSURED MOTORIST | X 2   6 / 3   7 / 4 | X CSL BI EA PER $ 1,000,000 / BI EACH ACCIDENT $ / PROPERTY DAMAGE $ | | SPECIFIED CAUSES OF LOSS | 2   4   8 / 3   7 | |
| UNDERINSURED MOTORIST | X 2   6 / 3   7 / 4 | X CSL BI EA PER $ 1,000,000 / BI EACH ACCIDENT $ / PROPERTY DAMAGE $ | | COLLISION | 2   4   8 / 3   7 | |
| HIRED/BORROWED LIABILITY | STATES NM | COST OF HIRE X IF ANY BASIS $ | | | STATES   # DAYS   # VEH | COVERAGE/DEDUCTIBLE COMP. $ / SPEC C OF L $ / COLL $ |
| NON-OWNED LIABILITY | STATES NM | GROUP TYPE X EMPLOYEES / VOLUNTEERS / PARTNERS | NUMBER OF 10 | HIRED PHYSICAL DAMAGE | | |
| | | | | | COVERAGE IS: | PRIMARY   SECONDARY |

ENDORSEMENTS, FORMS, CONDITIONS

PIP Per/Acc Limits:

| COVERED AUTO SYMBOLS | (1) ANY AUTO (2) ALL OWNED AUTOS (3) OWNED PRIVATE PASSENGER AUTOS | (4) OWNED AUTOS OTHER THAN PRIVATE PASSENGER (5) ALL OWNED AUTOS WHICH REQUIRE NO-FAULT COVERAGE (6) OWNED AUTOS SUBJECT TO COMPULSORY U.M LAW | (7) AUTOS SPECIFIED ON SCHEDULE (8) HIRED AUTOS (9) NON-OWNED AUTOS |
|---|---|---|---|

## DRIVER INFORMATION (include drivers who frequently use own vehicles)

| DRIVER # | NAME (include address, if required) | DATE OF BIRTH | YEAR LIC | DRIVERS LICENSE NUMBER/ SOCIAL SECURITY NUMBER | STATE LIC | USE VEH # | % USE |
|---|---|---|---|---|---|---|---|
| 001 | Doug Murray | 09/27/55 | | 012186177 | NM | | |
| 002 | John Cienin | 05/08/48 | | 029433224 | NM | | |
| 003 | Jim Blevins | 02/12/59 | | 030424107 | NM | | |
| 004 | Keith Bradley | 09/28/68 | | 503430606 | NM | | |
| 005 | Edward Dickson | 05/16/68 | | 101926371 | NM | | |

## VEHICLE DESCRIPTION

| VEH # | YEAR | MAKE: CPS | BODY TYPE: TRAILER | | SYM/AGE | COST NEW |
|---|---|---|---|---|---|---|
| 001 | 2000 | MODEL: Bellydump | V.I.N.: 4Z41116227P002979 | | | 25,400 |

| CITY, STATE, ZIP WHERE GARAGED | TERR | GVW/GCW | CLASS | SIC | FACTOR | SEAT CP | RADIUS | FARTHEST TERM |
|---|---|---|---|---|---|---|---|---|
| Farmington NM 87401 | | | 68499 | | | | | |

| DRIVE TO WORK/SCHOOL | USE | | CHECK COVERAGES | | | | | DEDUCTIBLES | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | X | COMM'L | ADD'L PIP | X | UNDRINS MOTOR | | F | LSP | ACV | X COMP SPEC C OF L |
| UNDER 15 MILES | PLEASURE | RETAIL | X LIAB | X | MED PAY | | FT | X COMP | AA | ST AMT | $ 500 |
| 15 MILES OR OVER | FARM | SERVICE | PIP | X | UNINS MOTOR | | FTW | X COLL | $ | | $ 500 COLL |

ACORD 127 (2/96)      PLEASE COMPLETE REVERSE SIDE      © ACORD CORPORATION 1993

NAICO 003740

EXHIBIT 1

ABCC001  OP ID: NC

## VEHICLE DESCRIPTION (continued)

| VEH # | YEAR | MAKE: Otoka | | BODY TYPE: TRAILER | | | | | | SYM/AGE | COST NEW |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 002 | 1999 | MODEL: Lowboy | | V.I.N.: 1A9L64522XA245713 | | | | | | $ | |
| CITY, STATE, ZIP WHERE GARAGED | | Farmington NM  87401 | TERR | GVW/GCW | | CLASS 68499 | SIC | FACTOR | SEAT CP | RADIUS | FARTHEST TERM |

| DRIVE TO WORK/SCHOOL | USE | | | CHECK COVERAGES | | ADD'L PIP | X | UNDRINS MOTOR | | F | | LSP | | DEDUCTIBLES | | ACV | | COMP | | SPEC C OF L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UNDER 15 MILES | PLEASURE | | COMM'L X | RETAIL | X LIAB X | MED PAY | | TOWING & LABOR | | FT | | COMP | | AA | | ST AMT | | $ | | |
| 15 MILES OR OVER | FARM | | SERVICE | PIP | X | UNINS MOTOR | | SPEC C OF L | | FTW | | COLL | | | | $ | | | | COLL |

| VEH # | YEAR | MAKE: Mack | | BODY TYPE: TRUCK | | | | | | SYM/AGE | COST NEW |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 003 | 1994 | MODEL: | | V.I.N.: 1M1AA13Y1RW030174 | | | | | | $ | 15,000 |
| CITY, STATE, ZIP WHERE GARAGED | | Farmington NM  87401 | TERR | GVW/GCW | | CLASS 36499 | SIC | FACTOR | SEAT CP | RADIUS | FARTHEST TERM |

| DRIVE TO WORK/SCHOOL | USE | | | CHECK COVERAGES | | ADD'L PIP | X | UNDRINS MOTOR | | F | | LSP | | DEDUCTIBLES | | ACV | X | COMP | | SPEC C OF L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UNDER 15 MILES | PLEASURE | | COMM'L X | RETAIL | X LIAB X | MED PAY | | TOWING & LABOR | X | FT | | COMP | | AA | | ST AMT | | $ 500 | | |
| 15 MILES OR OVER | FARM | | SERVICE | PIP | X | UNINS MOTOR | | SPEC C OF L | | FTW | X | COLL | | | | $ 500 | | | | COLL |

| VEH # | YEAR | MAKE: Dodge | | BODY TYPE: TRUCK | | | | | | SYM/AGE | COST NEW |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 004 | 2000 | MODEL: Dakota | | V.I.N.: 1B7GL22XXYS680405 | | | | | | $ | 5,000 |
| CITY, STATE, ZIP WHERE GARAGED | | Farmington NM  87401 | TERR | GVW/GCW | | CLASS 01499 | SIC | FACTOR | SEAT CP | RADIUS | FARTHEST TERM |

| DRIVE TO WORK/SCHOOL | USE | | | CHECK COVERAGES | | ADD'L PIP | X | UNDRINS MOTOR | | F | | LSP | | DEDUCTIBLES | | ACV | X | COMP | | SPEC C OF L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UNDER 15 MILES | PLEASURE | | COMM'L X | RETAIL | X LIAB X | MED PAY | | TOWING & LABOR | | FT | | COMP | | AA | | ST AMT | | $ 500 | | |
| 15 MILES OR OVER | FARM | | SERVICE | PIP | X | UNINS MOTOR | | SPEC C OF L | | FTW | | COLL | | | | $ 500 | | | | COLL |

| VEH # | YEAR | MAKE: Eager | | BODY TYPE: TRAILER | | | | | | SYM/AGE | COST NEW |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 005 | 2006 | MODEL: Beaver | | V.I.N.: 112H8V3277L072122 | | | | | | $ | 18,530 |
| CITY, STATE, ZIP WHERE GARAGED | | Farmington NM  87401 | TERR | GVW/GCW | | CLASS 68499 | SIC | FACTOR | SEAT CP | RADIUS | FARTHEST TERM |

| DRIVE TO WORK/SCHOOL | USE | | | CHECK COVERAGES | | ADD'L PIP | X | UNDRINS MOTOR | | F | | LSP | | DEDUCTIBLES | | ACV | X | COMP | | SPEC C OF L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UNDER 15 MILES | PLEASURE | | COMM'L X | RETAIL | X LIAB X | MED PAY | | TOWING & LABOR | | FT | | COMP | | AA | | ST AMT | | $ 500 | | |
| 15 MILES OR OVER | FARM | | SERVICE | PIP | X | UNINS MOTOR | | SPEC C OF L | | FTW | | COLL | | | | $ 500 | | | | COLL |

## ADDITIONAL INTERESTS/CERTIFICATE RECIPIENTS (ATTACH acord 45 FOR ADDITIONAL NAMES)

| INTEREST | RANK: | NAME AND ADDRESS | REFERENCE #: | | CERTIFICATE REQUIRED | INTEREST IN ITEM NUMBER |
|---|---|---|---|---|---|---|
| X | ADDITIONAL INSURED | Ford Motor Credit (Atlanta) | | | FORDM02 | LOCATION:      BUILDING: |
| | LOSS PAYEE | | | | | VEHICLE:  008   BOAT: |
| | MORTGAGEE | | | | | SCHEDULED ITEM NUMBER: |
| | LIENHOLDER | P.O. Box 105704 | | | | OTHER |
| | EMPLOYEE AS LESSOR | Atlanta, GA 30348 | | | | |
| | | ITEM DESCRIPTION: | | | | |

## GENERAL INFORMATION

| EXPLAIN ALL "YES" RESPONSES | YES | NO | |
|---|---|---|---|
| | | | 7. DO OPERATIONS INVOLVE TRANSPORTING HAZARDOUS MATERIAL? |
| 1. WITH THE EXCEPTION OF ENCUMBRANCHES, ARE ANY VEHICLES NOT SOLELY OWNED BY AND REGISTERED TO THE APPLICANT? | | X | 8. ANY HOLD HARMLESS AGREEMENTS? |
| | | | 9. ANY VEHICLES USED BY FAMILY MEMBERS? IF SO, IDENTIFY IN REMARKS. |
| 2. DO OVER 50% OF THE EMPLOYEES USE THEIR AUTOS IN THE BUSINESS? | | X | 10. DOES THE APPLICANT OBTAIN MVR VERIFICATIONS? |
| 3. IS THERE A VEHICLE MAINTENANCE PROGRAM IN OPERATION? | X | | 11. DOES THE APPLICANT HAVE A SPECIFIC DRIVER RECRUITING METHOD? |
| 4. ARE ANY VEHICLES LEASED TO OTHERS? | | X | 12. ARE ANY DRIVERS NOT COVERED BY WORKERS COMPENSATION? |
| 5. ARE ANY VEHICLES CUSTOMIZED, ALTERED OR HAVE SPECIAL EQUIPMENT? | | X | 13. ANY VEHICLES OWNED BUT NOT SCHEDULED ON THIS APPLICATION? |
| 6. ARE ICC, PUC OR OTHER FILINGS REQUIRED? | X | | 14. ANY DRIVERS WITH MOVING TRAFFIC VIOLATIONS? |

Right column YES/NO answers:
- 7. X (NO)
- 8. X (NO)
- 9. X (NO)
- 10. X (YES)
- 11. X (NO)
- 12. X (NO)
- 13. X (NO)
- 14. X (NO)

| DESCRIPTION OF GARAGE/STORAGE LOCATIONS | MAXIMUM DOLLAR VALUE SUBJECT TO LOSS |
|---|---|

**REMARKS**

## UNINSURED AND UNDERINSURED MOTORISTS COVERAGES (Check the appropriate box(es) below and sign where applicable)

DO NOT USE IN AR, AZ, CA, CT, DE, FL, GA, IA, IL, MD, NJ, NV, OK, OR, PA, RI, SC, WV; USE SPECIFIC STATE SUPPLEMENT.  MINIMUM UM LIMITS REQUIRED IN DC, ME, MN, MO, VT, VA, WA, WI.

| I UNDERSTAND AND ACKNOWLEDGE THAT UNINSURED MOTORIST (UM) AND UNDERINSURED MOTORISTS (UIM) COVERAGES HAVE BEEN EXPLAINED TO ME. I HAVE BEEN OFFERED THE OPTIONS OF: | X | SELECTING UM AND UIM LIMITS EQUAL TO MY LIABILITY LIMITS, SELECTING UM AND UIM LIMITS LOWER THAN MY LIABILITY LIMITS, OR REJECTING COVERAGE ENTIRELY. |
|---|---|---|

| I UNDERSTAND THAT THE COVERAGE SELECTION AND LIMIT CHOICES INDICATED HERE WILL APPLY TO ALL FUTURE POLICY RENEWALS, CONTINUATIONS AND CHANGES UNLESS I NOTIFY YOU OTHERWISE IN WRITING. | 1. I SELECT UM AND UIM LIMITS INDIC IN THIS APP _____ (APPLICANT'S SIGNATURE) |
|---|---|
| | 2. I REJECT UM BODILY INJURY COVERAGE _____ (APPLICANTS SIGNATURE) |
| | 3. I REJECT UM BODILY INJURY COVERAGE _____ (APPLICANT'S SIGNATURE) |
| | 4. I REJECT UM PROPERTY DAMAGE COVERAGE _____ (APPLICANT'S SIGNATURE) |
| | 5. I REJECT UM PROPERTY DAMAGE COVERAGE _____ (APPLICANT'S SIGNATURE) |

ACORD 127 (2/96)                    ATTACH TO APPLICANT INFORMATION SECTION

NAICO 003741

EXHIBIT 1

PR#119220          RAY, GLAETTA          2/28/2017

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NATIONAL AMERICAN INSURANCE
COMPANY,

          Plaintiff,

vs.                          No. 1:15-CV-01169-KG-KBM

ABC CONCRETE MFG., CO., INC.;
ABC CONCRETE MFG. CO., INC.
d/b/a ABC SEPTIC SYSTEMS,
INC.; NICHOLAS MONTANO;
SCOTTSDALE INSURANCE COMPANY
and NATIONAL CASUALTY COMPANY,
          Defendants.

DEPOSITION OF GLAETTA RAY
TAKEN ON BEHALF OF THE DEFENDANTS
ON FEBRUARY 28, 2017 AT 8:39 AM
IN OKLAHOMA CITY, OKLAHOMA

APPEARANCES
On behalf of the PLAINTIFF:
James H. Johansen
BUTT, THORNTON & BAEHR, P.C.
4101 Indian School Road, NE, Suite 300
Albuquerque, New Mexico  87110
505.884.0777
jhjohansen@btblaw.com
On behalf of the PLAINTIFF:
R. Patrick Gilmore
NATIONAL AMERICAN INSURANCE COMPANY
1010 Manvel Avenue
Chandler, Oklahoma  74834
405.258.4262
pgilmore@naico.com
(Appearances continued on Page 2.)
REPORTED BY:   Jody Graham, CSR, RPR, RMR, CRR

1

EXHIBIT 2

PR#119220              RAY, GLAETTA              2/28/2017

**Page 18**

1  New Mexico to Arizona, would that be long-haul
2  trucking business for you?
3      A   Depends on what it's for.  If it's something
4  that they do on a regular basis or if they're doing it
5  for hire for others.  It would depend on the nature of
6  the business.
7      Q   Okay.  Let me just go back for a minute.  So
8  would you define long-haul for me, please.
9      A   Long-haul?
10     Q   I want to know how the company or how you
11 understand how NAICO defines the term "long-haul" in the
12 context of your long-haul trucking --
13     A   Program?
14     Q   -- business.
15     A   Well, the long --
16     MR. JOHANSEN:  Object to the form.  Are you
17 asking her whether -- how she defines it or how the
18 company defines it?
19     MR. McMICKLE:  How she understands the
20 company defines it.
21     MR. JOHANSEN:  Okay.
22     THE WITNESS:  Okay.  Well, I mean,
23 long-haul -- I mean, definition of long-haul's
24 anything that's over 200 miles.
25     Q   (BY MR. McMICKLE) Where did you get that

**Page 19**

1  definition?
2      A   That definition is from the Insurance
3  Services Organization.
4      Q   The ISO?
5      A   Yes, ISO which is what we follow.
6      Q   Okay.  And what do you classify -- or how do
7  you define interstate?
8      A   Interstate, crossing one state line to the
9  other.
10     Q   Okay.  And how do you define for-hire?
11     A   When they haul for people other than
12 themselves.
13     Q   Okay.  And when you were writing long-haul
14 trucking business, did you rate for-hire motor
15 carriers differently than private carriers?
16     A   Yes.
17     Q   How did you rate them?  What was the
18 difference?
19     A   It was just a classification issue.
20     Q   Okay.  Was one cheaper than the other?
21     A   Yes, I believe it was a little bit cheaper.
22     Q   Which one was cheaper?
23     A   The one that they -- for themselves.
24     Q   Private?
25     A   Yes.

**Page 20**

1      Q   And when you were writing long-haul trucking
2  business, did you oversee that business from an
3  underwriting perspective?
4      A   For a short -- for a short period of time.
5      Q   Okay.  And you understand that to cross
6  state lines in a tractor-trailer -- which I'll define
7  as a vehicle with a gross vehicle weight of over
8  26,000 pounds -- that whatever entity is operating the
9  truck has to have some sort of authority from the
10 federal government?
11     A   Yes, sir.
12     Q   Okay.  So, in other words, a private motor
13 carrier crossing state lines, it's your understanding,
14 still has to have authority from the federal
15 government?
16     A   Yes.
17     Q   Okay.  Now, when you would write long-haul
18 trucking business, I assume you would write some
19 private carriers and some for-hire carriers?
20     A   I believe that we did.  I think the majority
21 of what we have is actual for-hire.
22     Q   Okay.  Do you ever recall writing a private
23 carrier?
24     A   Not -- no, not myself, I didn't.
25     Q   Okay.  Do you ever recall limiting coverage

**Page 21**

1  or precluding coverage for a private carrier by the
2  addition of something like a for-hire exclusion or an
3  exclusion that would preclude coverage if the motor
4  carrier was acting in a for-hire capacity?
5      MR. JOHANSEN:  Object to the form.
6      THE WITNESS:  No, sir.
7      Q   (BY MR. McMICKLE) Have you ever heard or
8  seen of anything like that?
9      A   Not that I recall.
10     Q   Okay.  Now, in this case with regard to this
11 policy -- and I'm talking about the NAICO policy from
12 February of '14 to whenever it was canceled.  Maybe it
13 was the next one was canceled.  But from February of
14 '14 to the -- February of '15 and the one that
15 preceded that; okay?
16     A   Okay.
17     Q   If you had known that Concrete, your named
18 insured, operated an interstate commerce as a private
19 motor carrier, would you have issued the policy?
20     A   No, sir.
21     Q   Okay.  So whether they operated within a
22 normal radius of 150 miles wouldn't have meant
23 anything to you?
24     A   No.
25     Q   Okay.  I show you what's been marked as

EXHIBIT 2

**Page 54**

1  words, there was some sort of agreement that NAICO
2  and Concrete reached that is either not memorialized
3  in here or improperly memorialized in here. I'm
4  referring again to the policy. What I want to know
5  is what is that -- what was that mutual mistake, to
6  your knowledge?
7       MR. JOHANSEN: Object to the form.
8  Foundation.
9       THE WITNESS: The mistake that we -- that I
10 see, I mean, from now -- look -- with the knowledge
11 that we have now is that there was some trucking
12 exposure that -- services that they were doing that we
13 were not aware of and was not the intent of writing
14 the policy.
15      Q   (BY MR. McMICKLE) Would that be things
16 like Concrete operating an interstate commerce?
17      MR. JOHANSEN: Object to the form.
18      THE WITNESS: Could be.
19      Q   (BY MR. McMICKLE) Okay. What I'm trying
20 to figure out is what was the agreement between
21 NAICO and Concrete that you contend that exists that
22 is not present in this policy or is improperly
23 memorialized in this policy? Can you tell me that?
24      MR. JOHANSEN: Object to the form.
25 Foundation.

54

**Page 55**

1       THE WITNESS: No. Because I don't really
2  know what you're asking me.
3       Q   (BY MR. McMICKLE) Okay. Is there any
4  agreement that you're aware of between NAICO and
5  Concrete that is not present in the policy that is
6  Exhibit C -- Z, excuse me?
7       MR. JOHANSEN: Object to the form.
8  Foundation.
9       THE WITNESS: The only -- I mean, the
10 trucking -- the for-hire trucking exposure is not part
11 of that policy which is -- isn't a part of the
12 agreement.
13      Q   (BY MR. McMICKLE) Would you agree with me
14 that, as written, this policy would cover really any
15 trucking operation of Concrete?
16      MR. JOHANSEN: Object to the form.
17 Foundation.
18      THE WITNESS: That's not what the intent
19 when we issued the policy was. We did not --
20      Q   (BY MR. McMICKLE) Go ahead.
21      A   -- anticipate having any coverage for the
22 trucking exposure.
23      Q   Okay. What I'm trying to say is "as is".
24 And I'm not trying to argue with you. I'm just trying
25 to say this policy, as written, would you agree with

55

**Page 56**

1  me that it does provide coverage for Concrete's
2  trucking operations?
3       A   Well, it --
4       MR. JOHANSEN: Object to the form.
5  Foundation.
6       THE WITNESS: Yes, it does.
7       Q   (BY MR. McMICKLE) Okay. And you're
8  telling me that there's some sort of mistake or
9  mutual mistake between NAICO and Concrete that is
10 not included in the policy?
11      A   Yes, sir.
12      Q   And can you write those down, tell me what
13 the first mistake was?
14      MR. JOHANSEN: Object to the form.
15 Foundation. Go ahead.
16      THE WITNESS: After the fact that we did not
17 know when we wrote the policy, was that they did have
18 the trucking services. That's why we asked to cancel
19 it, or for them to move the coverage and cancel it.
20 It's also why we changed the symbols to 7, 8 and 9.
21 It was not the intent to cover all those trucking
22 operations. It's our understanding that was written
23 separately on a different policy and different
24 operation.
25      Q   (BY MR. McMICKLE) Okay. Now, you're

56

**Page 57**

1  aware that NAICO specifically scheduled
2  tractor-trailers in its policy?
3       A   Yes, sir.
4       Q   Okay. And that in and of itself is not a
5  trucking operation, as far as you're concerned?
6       A   No. We write lots of accounts like that.
7       Q   Okay. To be a trucking operation, it would
8  have to include things like, say, crossing state
9  lines; is that right?
10      MR. JOHANSEN: Object to the form.
11 Foundation.
12      Q   (BY MR. McMICKLE) I'm sorry. You can
13 answer.
14      A   I don't really understand what you're
15 asking. Will you ask it a different way?
16      MR. McMICKLE: Will you read the question
17 back, please.
18      (Whereupon the record was read: To be a
19 trucking operation, it would have to include things
20 like crossing state lines; is that right?)
21      THE WITNESS: It could include that.
22      Q   (BY MR. McMICKLE) Okay. What about
23 operating -- well, let me ask you this: Doug Murray
24 testified in his deposition that Concrete trucks
25 under Concrete authority, okay, went for numerous

57

**PR#119220**          **RAY, GLAETTA**          **2/28/2017**

---

Page 58

1   trips from Farmington, New Mexico, to Fort Bliss,
2   Texas, about 400 miles each way, give or take
3   20 miles; okay?  He says in his deposition -- and
4   deposition says what it says, but I'm just repeating
5   it for you -- that he intended for that trucking
6   operation, if you will, to be covered under the
7   NAICO policy; okay?  That's what he says.
8       A   Okay.
9       Q   Did you at NAICO intend for that type of
10  operation to be covered?
11      A   No.  That's not what we understood.
12      Q   Okay.  So there wasn't a mistake, if you
13  will, because on the one hand you've got Doug saying
14  he expected it to be discovered and on the other hand
15  you're saying you did not expect it to be covered?
16      A   Yes, sir.
17      Q   So would you agree that that's not a mutual
18  mistake between NAICO and Concrete?
19      A   We --
20          MR. JOHANSEN:  Object to the form.
21  Foundation.
22      Q   (BY MR. McMICKLE) I'm sorry?
23      A   No.
24      Q   You would agree with that statement?
25      A   No, I wouldn't think it was -- I mean, it

---

Page 59

1   was a mistake, yes.  I mean, whether it's mutual, I
2   don't know.  That's a fact.
3       Q   Okay.  Does it appear to you that it's not a
4   mutual mistake?
5           MR. JOHANSEN:  Object to the form.
6   Foundation.
7       Q   (BY MR. McMICKLE) You can still answer.
8       A   Well, he understood it one way and we
9   understood it a different way.
10      Q   Okay.
11      A   So I wouldn't think that was mutual.
12      Q   All right.
13          MR. JOHANSEN:  We've been at it more than an
14  hour.  Let's take a quick break.
15          MR. McMICKLE:  So how do we -- I go all
16  around the country and some lawyers say that when a
17  lawyer talks to a witness in between a -- in a break
18  in a deposition that's not a privileged
19  conversation.  I don't care how we handle this, but I
20  just want it to be consistent.
21          MR. JOHANSEN:  No.
22          MR. McMICKLE:  Do you --
23          MR. JOHANSEN:  Ms. Ray's my client.
24  Everything that we discuss is protected by
25  attorney/client privilege.

---

Page 60

1           MR. McMICKLE:  Oh, no.  I tend to take that
2   position, but I've had it taken otherwise.  So, okay,
3   we'll play by that rule.  Thank you.
4           THE WITNESS:  Thank you.
5           MR. JOHANSEN:  Thank you.
6           (A recess was taken from 9:39 AM to
7   9:56 AM.)
8       Q   (BY MR. McMICKLE) Ma'am, what is Exhibit
9   OO?
10          MR. JOHANSEN:  Look through that.
11          THE WITNESS:  It's just an email from the
12  agent binding the February 9th, '13 property, GL,
13  auto, crime and umbrella policies.
14      Q   (BY MR. McMICKLE) Okay.
15      A   Applications attached.  And some signed
16  terrorism forms, UM forms, a contractor's
17  supplemental.
18      Q   So this is an email with attached documents
19  from the agent at Woods to Nichole Cottington?
20      A   From her to Anita.
21      Q   Marshall, okay.  I'm sorry.
22      A   Yes -- yes, sir.
23      Q   And it looks like the email is on February
24  12th and you're binding coverage -- you're backdating
25  coverage for three days; is that right?

---

Page 61

1       A   Yes, sir.
2       Q   It that typical at NAICO?
3       A   It is at times.  The -- sometimes the agents
4   just call us and say, "We haven't got all the
5   documents together to formally send an email, but we
6   want to renew the policy so" --
7       Q   Okay.
8       A   So it's common.
9       Q   I'm not sure if this was a renewal or a new
10  policy.  Do you know?
11      A   I believe it was a renewal.  I'm pretty sure
12  it was a renewal.
13      Q   Okay.  And, like, if you'll look at the next
14  page.
15      A   No, it wasn't.  Maybe it wasn't.  This may
16  have been a new policy.
17      Q   I think it was the new one.
18      A   I think this is the first year that we wrote
19  it.  It was, I believe.
20      Q   Okay.  If you'll look at page 2 of that
21  document.
22      A   (Witness complies.)
23      Q   Looks like the applicant is CAB Concrete
24  with a mailing address at ABC Septic Systems?
25      A   Yes, sir.

EXHIBIT 2

**PR#119220**          **RAY, GLAETTA**          **2/28/2017**

1  MR. JOHANSEN: Object to the form.
2  Foundation.
3  THE WITNESS: It was not our intent.
4  Q  (BY MR. McMICKLE) I understand what your
5  intent was, but what I'm -- your lawyers have made
6  an allegation to a Court, and I'm trying to find out
7  if that allocation is true. Okay? I understand
8  what your intent was, but the allegation talks about
9  the intent of both NAICO and Concrete. Okay?
10  A  I don't know what the intent of Concrete
11  was.
12  Q  Okay. And is that because there was no sort
13  of mutual understanding between NAICO and Concrete?
14  MR. JOHANSEN: Object to the form.
15  Foundation.
16  THE WITNESS: The information that we had
17  was that they were doing local radius; and then after
18  the loss control, that they were going into -- hauling
19  into other states.
20  Q  (BY MR. McMICKLE) So did NAICO, to your
21  knowledge, know anything about ABC Septic when it
22  underwrote the policy at issue?
23  A  No.
24  Q  Go to paragraph 50, if you don't mind, on
25  page 718.

78

1  A  (Witness complies.)
2  Q  If I were to take out the word "for-hire"
3  out of the allegation in paragraph 50, would that be a
4  false statement?
5  MR. JOHANSEN: Object to the form.
6  THE WITNESS: No.
7  Q  (BY MR. McMICKLE) Okay. What about it
8  would be false?
9  MR. JOHANSEN: She said no to your question.
10  THE WITNESS: It would not be false.
11  Q  (BY MR. McMICKLE) Oh, all right. Maybe I
12  asked a bad question. So if I took out the word
13  "for-hire" and it read, "Neither NAICO nor ABC
14  Concrete contemplated that NAICO would insure ABC
15  Manufacturing for any long-haul trucking
16  activities," do you think that would be a correct
17  statement?
18  MR. JOHANSEN: Object to the form.
19  Foundation.
20  THE WITNESS: No, I don't -- I don't think
21  that's -- that would be -- that would still be a
22  correct statement.
23  Q  (BY MR. McMICKLE) So, in other words, if
24  I were to say this: Is it true that at the time
25  this policy was issued, it is your contention that

79

1  neither NAICO nor Concrete contemplated that NAICO
2  would insure Concrete for any long-haul trucking
3  activities?
4  A  It was not our -- no, we did not intend to
5  cover long-haul trucking, no.
6  Q  Okay. Okay. Paragraph 51 says, "When it
7  issued the contract with NAICO, ABC MFG believed ABC
8  Septic was a separate entity." Do you see that?
9  A  Yes, sir.
10  Q  What did NAICO believe at the time?
11  A  Well, we weren't aware of the Septic, but we
12  did believe that they had a separate operation and
13  legal entity.
14  Q  So from the text we saw in the email about
15  separate operation, you concluded that that meant a
16  separate legal entity?
17  A  Yes, sir.
18  Q  Okay. Go to paragraph 54, please.
19  A  (Witness complies.)
20  Q  When the policy was issued or at least when
21  the loss control survey came in --
22  A  Uh-huh.
23  Q  -- did NAICO intend to insure Concrete for
24  interstate trucking operations?
25  A  There were some interstate operations, yes.

80

1  Q  Okay. So the first sentence in paragraph 54
2  of the complaint is not entirely true; is that
3  correct?
4  A  It was not for hire.
5  Q  Okay. I'm sorry. You need to answer that
6  question. Then you can explain.
7  A  Yes.
8  Q  Is it correct to say that paragraph -- or
9  the first sentence of paragraph 54 as stated is not
10  entirely correct?
11  MR. JOHANSEN: Object to the form.
12  Foundation.
13  THE WITNESS: Yes.
14  Q  (BY MR. McMICKLE) Okay. So what you're
15  telling me is that -- and I've heard you say this
16  several times -- that what really mattered to you
17  was for-hire?
18  A  Okay.
19  Q  What to you was the material difference in
20  risk between, say, a for-hire motor carrier and a
21  private motor carrier?
22  A  Well, the for-hire is one that they travel
23  all over the country hauling all different kinds of
24  merchandise.
25  Q  Okay. Any other material distinctions

81

EXHIBIT 2

**Page 82**

1    between for-hire and private motor carriers?
2         A    A private carrier could do the same.  I
3    mean, they could go all over the country, as well.
4         Q    So what I'm trying to ask you is -- I'd like
5    for you to describe to the Court what you as the
6    underwriting manager believe to be the material
7    distinctions, if any, from a risk perspective.
8         A    Well, the long-haul exposure going all over
9    the country was potential --
10        Q    Okay.
11        A    -- and the for-hire.
12        Q    Well, so we're on a comparison and contrast
13   endeavor at the moment.  And I want to tell me
14   what it is about for-hire motor carriage that presents
15   a greater risk, if you will, to NAICO than private
16   motor carriage.
17        A    Well, for-hire, you're -- they're hiring a
18   lot of drivers that are not employees of the company
19   and, in our opinion -- or my opinion, creates a larger
20   risk to insure.
21        Q    So you're saying that you believe that
22   for-hire carriers only hire owner/operators and that
23   private motor carriers don't hire owner/operators?
24        A    No, they could.
25        Q    Okay.  So tell me -- again, we're trying

**Page 83**

1    to -- I just need to understand what NAICO believes
2    the material distinctions, if any, might be between a
3    for-hire motor carrier and a private motor carrier.
4         MR. JOHANSEN:  Object to the form.
5    Foundation.
6         Q    (BY MR. McMICKLE) And we've kind of
7    started a couple and then retracted.  And so I
8    just -- what I need to know is I need a list of all
9    material distinctions between a for-hire motor
10   carrier and a private motor carrier.
11        MR. JOHANSEN:  Object to the form.
12   Foundation.
13        Q    (BY MR. McMICKLE) From a risk
14   perspective.
15        A    A risk perspective?  Well, the distinct -- I
16   don't -- I don't really know what you're looking for
17   here, but our largest -- our largest concern is the
18   amount of travel over the road.
19        Q    Like the number of miles?
20        A    Yes, the number of miles traveled.
21        Q    Do you have any reason to believe that
22   private carriers haul or log less miles than for-hire
23   motor carriers?
24        A    I don't know.
25        Q    Okay.  Anything else?

**Page 84**

1         A    No.
2         Q    Okay.  So you indicate in paragraph 54 --
3    and we've talked about the first sentence, but Had
4    you -- and the second sentence says had you known the
5    true facts, you would have issued a specifically
6    described auto policy; right?  Do you see that?
7         A    Yes, I see it.
8         Q    Now, specifically described autos in a
9    business auto form is just symbol 7; right?
10        A    Yes, sir.
11        Q    So what NAICO's telling the Court there is
12   that, "Had we known the true facts, we would have
13   issued a symbol 7 policy"?
14        A    Right.
15        Q    Okay.  And it says you would not have
16   included vehicles involved in for-hire, long-haul
17   trucking.
18        A    Correct.
19        Q    How would you do that?
20        A    How would you insure them?
21        Q    How would you not have included vehicles
22   involved in for-hire, long-haul trucking?
23        A    Well, they would have been specifically
24   described on the policy by symbol 7.
25        Q    Okay.  Well, this insured told you in an

**Page 85**

1    application that it wanted you to insure tractors and
2    trailers that were capable of operating over the road;
3    correct?
4         A    Yes.
5         Q    If the insured had asked you to schedule
6    those trucks, wouldn't they be covered in any
7    situation whether or not they were for-hire or
8    private?
9         A    I believe there's some definitions in the
10   "Who is an insured" that would exempt for-hire.
11        Q    Okay.  Let's look at those.  Exhibit Z is
12   that policy.
13        A    Oh.
14        Q    Are you talking about the "Who is an
15   insured" in the business auto thing?
16        A    Yes, sir.
17        Q    Did you find it there?  Is there anything in
18   there about for-hire?
19        A    No, but it does stipulate that anyone using
20   a covered auto you own, the owner is -- except the
21   owner of anyone else who you hire or borrow covered
22   auto.
23        Q    Okay.  Now, you, which would be Concrete, is
24   always an insured for a covered auto; correct?
25        A    Yes.

EXHIBIT 2

PR#119220             RAY, GLAETTA             2/28/2017

---

**Page 98**

1  answer to that question?
2      A   I haven't seen anything.
3      Q   Okay.
4      A   We never got a request or a copy of the
5  authority so I don't know that we did.
6      Q   Okay.  So what I'm hearing you say is that
7  she was looking into the authority question.  You're
8  just not sure what questions she asked and what
9  information she received?
10     A   Well, we never received anything requesting
11 the filing.
12     Q   Okay.  Is it correct to say that from what
13 you're seeing here that you believe that Anita
14 Marshall was looking into Concrete's authority?
15     A   Yes.
16     Q   Okay.  And she was asking questions about
17 it?
18     A   She asked the question, yes.
19     Q   Okay.  And do you know who she would have
20 asked the question to?
21         MR. JOHANSEN:  Object to the form.
22 Foundation.
23         THE WITNESS:  I don't know.  Whoever she was
24 working with at the agency.
25     Q   (BY MR. McMICKLE) But you expect that she

---

**Page 100**

1  controls the interpretation of your policy?
2         MR. JOHANSEN:  Object to the form.
3  Foundation.
4         THE WITNESS:  No.
5      Q   (BY MR. McMICKLE) If Doug Murray signed
6  the application for this policy the first time after
7  the effective date of the policy, would that have
8  been a breach of NAICO's protocols?
9      A   No.
10         MR. JOHANSEN:  Object to the form.
11 Foundation.
12         MR. McMICKLE:  Okay.  All right.  I think
13 I'm done.  Give me about three minutes, if you will,
14 to sort of go back through some notes.  I don't want
15 you to sit here and have to watch me do that.
16         THE WITNESS:  Okay.
17         MR. JOHANSEN:  Yeah.  Let's take a break,
18 then.
19         (A recess was taken from 10:50 AM to
20 10:58 AM.)
21     Q   (BY MR. McMICKLE) I show you what's been
22 marked as Exhibit PP.  And I just want you to look
23 at page 8.
24     A   (Witness complies.)
25     Q   Do you see number 20 there?

---

**Page 99**

1  would have asked somebody at Woods?
2      A   Yes, sir.
3         MR. JOHANSEN:  Object to the form.
4  Foundation.
5      Q   (BY MR. McMICKLE) Okay.  And do you have
6  any -- is there any information in what we've looked
7  at that would suggest what the answer was?
8         MR. JOHANSEN:  Object to the form.
9  Foundation.
10         THE WITNESS:  No.
11         MR. McMICKLE:  I'll give you a continuing
12 objection to everything.
13         MR. JOHANSEN:  I know.  But thank you.
14     Q   (BY MR. McMICKLE) When did -- I'll ask
15 that later of someone else.  There was an affidavit
16 that was sent to Concrete after this loss occurred
17 trying to get Mr. Murray to sign an affidavit that
18 said certain things.  Do you have any familiarity
19 with that affidavit?
20     A   No, sir.
21     Q   Did you draft it or participate in a
22 discussion about drafting it?
23     A   No.
24     Q   Okay.  Is it your position that what the
25 insured intends to be covered under your policy

---

**Page 101**

1      A   Yes.
2      Q   Read that if you will.
3      A   "Admit that" --
4      Q   You don't have it read it out loud.
5      A   Oh, okay.
6      Q   So what this is is I asked -- request to
7  admit to your company -- and so that request is my
8  request and I'm just saying, hey, admit or deny
9  whatever's there.
10     A   Okay.
11     Q   And it was denied.  What I need to know from
12 you is as you sit here today, do you believe that the
13 denial of that request was correct?
14     A   Yes.
15     Q   Okay.  So NAICO had no intention of covering
16 trucks operating under ABC's authority as a private
17 interstate carrier?
18     A   Correct.
19     Q   I'm going to show you Exhibit QQ.  Can you
20 tell me what that is?
21     A   It's a rate comparison from one year to
22 another and premiums -- premium comparison --
23     Q   Okay.  And so --
24     A   -- for the different vehicles.
25     Q   -- it looks like there she's -- or

---

26  (Pages 98 to 101)

EXHIBIT 2

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


NATIONAL AMERICAN INSURANCE COMPANY,

        Plaintiff,

-vs-                    No. 1:15-CV-01169 KG-KBM


ABC CONCRETE MFG. CO., INC.;
ABC CONCRETE MFG. CO., INC. d/b/a
ABC SEPTIC SYSTEMS, INC.,
NICHOLAS MONTANO;
SCOTTSDALE INSURANCE COMPANY;
and NATIONAL CASUALTY COMPANY,

        Defendants.


        DEPOSITION OF DOUGLAS MURRAY
        October 25, 2016
        8:52 a.m.
        105 North Orchard Avenue
        Farmington, New Mexico


    PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:   MR. BRETT C. EATON
        ATTORNEY FOR THE PLAINTIFF


REPORTED BY:  CAROLYN B. McKEE, CSR, RPR, CM -  NO. 173
        518 County Road 4990
        Bloomfield, New Mexico  87413

National American Insurance Company v. ABC Concrete MFG, Co., Inc., et al.
Douglas Murray

October 25, 2016
1:15-CV-01169 KG-KBM

Page 34

1      Q. And when I say "your products", do you understand
2  me to mean ABC Concrete Manufacturing?
3      A. Yes, sir.
4      Q. Did ABC Septic ship other products in long haul
5  or interstate transportation --
6      A. Yes, sir.
7      Q. -- aside from ABC Concrete?
8      A. Yes, sir.
9      Q. Okay.
10         MR. BURNS: Can we take a break for just one
11  moment?
12         MR. EATON: Sure.
13      (Break taken from 9:31 a.m. to 9:33 a.m.)
14      A. Okay, I'm ready.
15      Q. (By Mr. Eaton) We're done with E for now.
16      A. Okay.
17         (Deposition Exhibits F and G
18         were marked for identification.)
19      Q. I'm going to hand you two. The first one we'll
20  mark as Exhibit F is the Commercial Insurance
21  Application dated 10/24/2012.
22      And then the second one, which we'll mark as
23  Exhibit G, is the insurance application -- Commercial
24  Insurance Application dated November 8th, 2012.
25      A. Okay, sir.

Page 35

1      Q. Looking at Exhibit F, who's identified in the
2  applicant information? And just for the record, this is
3  Woods Bates number 0734.
4      A. ABC Septic Systems, Incorporated. Then under
5  that is ABC Concrete, Incorporated.
6      Q. And again, do you know why both were listed in
7  this case?
8      A. No, sir.
9      Q. And would this -- again at the top under the
10  agency, who is the agent listed in the agency box?
11      A. Woods Insurance Service, Incorporated.
12      Q. Then moving over to the right, it's Carrier.
13  Who's the carrier listed in that box?
14      A. Cochrane & Company.
15      Q. Under -- about two boxes underneath it says:
16  Indicate - Sections Attached". Which two sections were
17  checked off in that section?
18      A. Business auto and transportation/motor truck
19  cargo.
20      Q. Underneath the applicant information, it has the
21  FEIN or social security number. What number is listed
22  there?
23      A. 012186177.
24      Q. Now jumping over to Exhibit G, who's the
25  applicant? Under the applicant information, what's the

Page 36

1  name of the applicant there?
2      A. ABC Concrete Manufacturing Company, Incorporated.
3      Q. Then under the FEIN or social security number,
4  what number's listed?
5      A. 85-0456807.
6      Q. Do you know why two different tax numbers are
7  listed on these forms?
8      A. Because they're two separate companies.
9      Q. So is it your understanding --
10         MR. McMICKLE: Where's that other one?
11         MR. EATON: Did I give you both?
12      (A discussion was held off the record.)
13      Q. Were you paying taxes -- in 2012, were you paying
14  taxes for ABC Septic Systems?
15      A. You need to clarify the question.
16         MR. McMICKLE: Separate tax returns.
17      Q. Separate tax returns, thank you. Did you have
18  separate tax returns for ABC Septic Systems --
19      A. No.
20      Q. -- and ABC Concrete Manufacturing in 2012?
21      A. No.
22      Q. Were you filing a single tax return for both
23  companies?
24      A. I believe -- yes, I believe so.
25      Q. Based on these documents here, does it appear

Page 37

1  that there were two separate tax IDs?
2      A. Yes.
3      Q. And one of them was for ABC Septic Systems and
4  one was for ABC Concrete Manufacturing?
5      A. That is correct.
6      Q. I just want to compare the two insurance
7  coverage -- or types of insurance coverage that were
8  being sought in each.
9      In Exhibit F, Woods Bates number 734, you've
10  identified you were seeking business auto and
11  transportation/motor truck cargo.
12      What were you seeking for ABC Concrete
13  Manufacturing Company on Exhibit G, which is Bates
14  number Woods 677?
15      A. Business auto, commercial general liability,
16  equipment floaters, and property insurance.
17      Q. Is there a reason why you were no longer seeking
18  transportation/motor truck cargo?
19      A. ABC Concrete does not have the authority to
20  back-haul.
21      Q. When you say they don't have the authority, what
22  do you mean?
23      A. We have -- we are a one-way haul under ABC
24  Concrete. We can haul our own products only.
25      Q. And where would the authority come from to allow

10 (Pages 34 to 37)

EXHIBIT 3

c0878923-b549-437b-b228-08b62fa10972

National American Insurance Company v. ABC Concrete MFG, Co., Inc., et al.
Douglas Murray
October 25, 2016
1:15-CV-01169 KG-KBM

---

Page 66

1       (Deposition Exhibit O
2       was marked for identification.)
3       Q.  Mr. Murray, do you remember seeing this --
4   getting this letter from Jimmy Mileham at NAICO?
5       A.  No, sir, I don't remember it.
6       Q.  Okay.  Is it possible that you did get this
7   letter, you just don't recall it?
8       A.  Yes, sir, it's possible.
9       Q.  Okay.  I knew there was something in here I
10  wanted to go over with you and I've since forgotten it.
11  I'm sorry.
12      What I'll purport to you is that this is a letter
13  memorializing the March 11, 2013, conversation you had
14  with Mr. Mileham about the operations of ABC Concrete.
15      Do you recall having any kind of conversation
16  with somebody at NAICO over the phone about that time
17  about your operations?
18      A.  I don't, but --
19      Q.  Okay.  Well, this was produced to us by NAICO.  I
20  wasn't there in the conversation.  All I can tell you is
21  that there's a document in their files indicating they
22  sent a letter to you that's there in front of you with
23  some attachments.
24      Would you flip to page 3102 there at the back or
25  on the bottom right.

---

Page 67

1       A.  Okay.
2       Q.  It says on number 1.4 there, do you see that?
3       A.  Yes, sir, I do.
4       Q.  It says Normal Radius of Operations is 150 miles?
5       A.  That's correct.
6       Q.  Okay.  And earlier today you said that you told
7   Woods and that you told NAICO that your radius would be,
8   for ABC Concrete, would be about 150 miles?
9       MR. EATON:  Objection, form.
10      A.  That is not correct.
11      Q.  Okay.  How is that not correct?
12      A.  I did not inform NAICO.  I informed Woods solely.
13      Q.  Okay.  Understood.  And you expected Woods to
14  communicate that to NAICO; is that correct?
15      A.  I expected my insurance policy to be the way I
16  wanted it.
17      Q.  Okay.  And at least as far as this document's
18  concerned, it appears that you communicated to
19  Mr. Mileham that your normal radius of operations was
20  150 miles.
21      A.  That has always been my verbal radius to our
22  insurance people.
23      Q.  Okay.  And it also says here "Policyholder," ABC
24  Concrete, "is located in Farmington, New Mexico, and
25  will travel to Colorado, Arizona, Utah."

---

Page 68

1       A.  That is correct.
2       Q.  Okay.  So when we talk about ABC Concrete hauling
3   products, those are products that you manufacture or
4   that you sell to third parties?  Government entities,
5   things like that?
6       A.  That we manufacture, sir.
7       Q.  Yeah.
8       A.  Solely manufacture.
9       Q.  Right.
10      A.  Okay.
11      Q.  So, and in the trucking world, what I -- I will
12  call somebody a private hauler and a for-hire hauler.
13      A.  That's correct.
14      Q.  You want to be -- ABC Concrete, it's my
15  understanding, was a private hauler.
16      A.  Correct.
17      Q.  Okay.  And they would haul things across state
18  lines and interstate commerce, but it was all -- it was
19  limited to ABC Concrete's manufactured product.
20      A.  That is correct.
21      Q.  Okay.  And that is what you communicated to
22  Woods, and that's what you expected to be covered under
23  the NAICO policy; is that correct?
24      A.  150-mile radius, ABC Concrete's products --
25      Q.  All right.

---

Page 69

1       A.  -- is correct.
2       Q.  And you indicated that you also had told them
3   that there would be occasional stepping out beyond the
4   150-mile radius?
5       A.  That is correct.
6       Q.  And you expected, when you had one of these
7   occasional stepping out incidences of hauling ABC
8   Concrete product, that that would be covered under the
9   NAICO policy.
10      A.  That is correct.
11      Q.  Okay.  So if you sell goods -- what's a customer
12  that's about 200 miles away that you've sold products
13  to?  It can be 250, somewhere in that range.
14      A.  (No response.)
15      Q.  Or what's a city that's 250 miles?
16      A.  Albuquerque.  You know, if you go on the north
17  side of -- or south side of Albuquerque, you're barely
18  outside that radius.
19      Q.  Yeah.  What about Durango or --
20      A.  Durango's 50 miles.
21      Q.  Okay.
22      A.  Now you're talking a radius.
23      Q.  I understand.
24      A.  Not a direct route.  So --
25      Q.  Well, that's a good question.  When you say

---

18 (Pages 66 to 69)

EXHIBIT 3

National American Insurance Company v. ABC Concrete MFG, Co., Inc., et al.
Douglas Murray
October 25, 2016
1:15-CV-01169 KG-KBM

Page 70

**radius in this context, are you talking about an air radius or a driving radius?**
A. I put a point in Farmington, take a circumference of 150 miles and draw a circle. That is a radius to me.
**Q. Okay. And some people, I would call that an air radius, but I understand exactly what you're saying, sir.**
**What's a city that you deliver ABC Concrete products to, say, 150 miles away in either Utah, Arizona, or Colorado?**
A. We go on the reservation. Possibly Kayenta would fall within that.
**Q. Okay.**
A. Just outside of Kayenta, we may step outside 20 miles and you're outside that radius.
**Q. Okay.**
A. As a for instance.
**Q. And you would still expect that to be covered under the NAICO policy.**
A. We would, sir.
**Q. Okay. And in essence, we've seen some examples in these documents where, and I think you even said, you're a one-way hauler. And when you said that, you're referring to ABC Concrete; is that right?**
A. Correct.

Page 71

**Q. And what you mean by that is that you would haul your manufactured products, yours being ABC Concrete, from Farmington to wherever the destination was. Might be the locations that you just mentioned.**
**And then you said you needed authority, which I assumed was DOT, FMCSA authority, to act as a for hire carrier on the way back.**
MR. EATON: Objection, form.
**Q. Is that correct?**
A. No, sir, that's not.
**Q. Tell me how that's not correct.**
A. If it's specifically ABC Concrete, we would send it on another truck. We would haul it to that destination and return empty.
**Q. Well, let's look at a couple things. Like Exhibit F, do you have the original Exhibit F there?**
A. Yes, I'm sure. Yes, sir.
**Q. Look there at the bottom. Can I call you Doug?**
A. Yes, you can.
**Q. All right.**
A. Yes, sir.
**Q. It says "For hire trucking company, own product out, 99 percent."**
A. Correct.
**Q. "Commercial/government brokers hire for loads coming back."**

Page 72

A. Correct.
**Q. So if you send a truck, one of your ABC -- or an ABC Concrete truck out to deliver your product to wherever the destination might be.**
A. Okay.
**Q. Okay? Just a hypothetical. Back in 2012, would you typically look for a back-haul to put freight on that truck to get it back to Farmington?**
MR. EATON: Objection, form.
A. You've asked me two separate questions.
**Q. Okay.**
A. When we were talking about the 150-mile radius, we were referring to one. Now you're referring to another one. So which answer do you want?
**Q. Let me ask you this. You talk about government/commercial brokers hire for loads coming back.**
A. Correct.
**Q. That is what I would typically call a back-haul.**
A. That's correct.
**Q. All right. So is it correct to say that there were instances where you would ship product out for ABC Concrete and then look for a for-hire load, if you will, for a back-haul back to Farmington or at least close to this area?**

Page 73

A. Not to my knowledge.
**Q. Okay. So that never happened?**
A. Not to my knowledge. They may have got their tickets messed up, but their logs should have said Septic going out, Septic coming back.
**Q. Okay. So you would agree with me that you, when you're hauling ABC Concrete products, you would be hauling under private authority given to ABC Concrete from the FMCSA.**
A. Depending on where it's going.
**Q. Okay. Well, the private authority given to you by the FMCSA to ABC Concrete allowed you to go to all 50 states, didn't it?**
A. Correct.
**Q. Or 48 let's say.**
A. Correct. But we also had that authority way before we ever started doing back-hauls. We had ABC's authority for a long time before we had the Septic authority.
**Q. I understand.**
A. Okay.
**Q. I'm not, I'm not --**
A. So the dividing line is do I need money for them trucks to come 150 miles is not advantageous for us to

19 (Pages 70 to 73)

Trattel Court Reporting & Videography
505-830-0600

EXHIBIT 3

c0878923-b549-437b-b228-08b62fa10972

National American Insurance Company v. ABC Concrete MFG, Co., Inc., et al.
Douglas Murray

October 25, 2016
1:15-CV-01169 KG-KBM

---

Page 94

1    A. Twelve, sir.
2    Q. So if one would just do rough math, 150 to 200
3  loads went for Fort Bliss approximately 395 miles away
4  from Farmington in 2014?
5    A. Yes, sir. And, you know, to be honest, we didn't
6  care who covered it. We just knew we weren't getting
7  loads coming home. We had plenty of insurance covered
8  under either one.
9        So our guys were usually, they would log it
10 probably under ABC Concrete because we weren't getting
11 logs coming home. I mean loads coming home, I'm sorry.
12   Q. Okay.
13   A. And a lot of our drivers were registered under
14 both companies.
15   Q. What does that mean, "registered"?
16   A. Well, you know, you have to keep separate DOT
17 files, so...
18   Q. I was gonna get to that. I call them the DQ
19 file?
20   A. I don't know what they are. We call them
21 driver's file.
22   Q. So driver file, DQ file, whatever you want to
23 call it. You had, like, for example, for Montano, the
24 driver involved in this accident, did you have a DQ file
25 for him for Concrete and Septic?

---

Page 95

1    A. That one I'm not sure. Okay? I do not know.
2    Q. But typically, would you have --
3    A. Not all of them.
4    Q. All right.
5    A. No, sir.
6    Q. What percentage of the drivers? 50 percent?
7    A. I know I was. I know I was on both of them. In
8  '14, I'm not sure we had a lot of drivers in '14. I
9  just don't remember.
10   Q. So you understand -- let me tell you what I
11 understand NAICO is trying to do in this lawsuit.
12        They're asking a court to rewrite this policy
13 issued to Concrete to not cover any shipments
14 transported by ABC Concrete beyond a 50-mile radius.
15        MR. EATON: Objection, form.
16   Q. All right? We'll go through the Complaint and
17 we'll do that. All right?
18        Let's say that there's a loss that you don't know
19 about that comes up for one of these 200 trips to Fort
20 Bliss.
21        Are you okay with NAICO not covering that loss by
22 virtue of this lawsuit and reforming the policy?
23        MR. EATON: Objection, form.
24        MR. BURNS: You can answer it.
25   A. No. We pay our insurance in two separate

---

Page 96

1  entities. We expect our insurance companies to cover
2  them.
3    Q. So in 2015, were the operations of ABC Concrete
4  similar to the operations of ABC Concrete in 2014 in
5  terms of the use of trucks and those sort of things?
6    A. Yes, sir.
7    Q. Okay. So in 2015, you reported 10,000 -- or
8  excuse me, 210,000 miles to the DOT for ABC Concrete; is
9  that correct?
10   A. That's what the form says.
11   Q. And back in '13, you reported 55,000 miles for
12 ABC Concrete Mfg Company, Inc., d/b/a ABC Septic Systems
13 in Exhibit S.
14   A. Okay.
15   Q. Would the mileage that was reported in '14 and
16 '15 for, let's call it Septic, would that have been
17 roughly the same, to your knowledge?
18   A. Same amount of miles?
19   Q. Yeah.
20   A. I don't know.
21   Q. Roughly 55,000? To the best of your
22 recollection.
23        MR. EATON: Objection, form.
24   A. To the best I know. I'm not sure of that one,
25 sir.

---

Page 97

1    Q. Okay. Fair enough. So would you look at Exhibit
2  T with me.
3    A. Okay.
4    Q. And if you'll look at the last -- well, the
5  second to last page.
6    A. Yes, sir.
7    Q. It looks to me like -- well, I'll tell you what
8  that is. That's an inspection history page.
9    A. Okay.
10   Q. Okay? And we're asking the FMCSA to send us the
11 2014, so we'll have that later. But this goes back to
12 August of '15. Okay?
13        And, I mean, you know generally what DOT
14 inspections are.
15   A. Yes.
16   Q. And do you agree with me that this is a listing
17 of different DOT inspections of eight tractors and
18 trailers being operated under the private authority of
19 ABC Concrete?
20   A. That I cannot say it's under the private
21 authority.
22   Q. Okay.
23   A. But that's what this is.
24   Q. Would you agree that it's part of the report for
25 ABC Concrete?

---

25 (Pages 94 to 97)

National American Insurance Company v. ABC Concrete MFG, Co., Inc., et al.
Douglas Murray

October 25, 2016
1:15-CV-01169 KG-KBM

Page 98

1    A. Yes, sir.
2    Q. Okay. And if you look at the bottom there,
3  8/19/15, do you see that?
4    A. Yes, sir.
5    Q. There's a truck there that was stopped one, two,
6  three, four times in about a one-month period; three
7  times in Arizona and one time in New Mexico. Do you
8  recognize that license plate number?
9    A. No. But I'm sure it's one of ours, sir.
10       (Deposition Exhibit U
11          was marked for identification.)
12    Q. Okay. Now, I'm gonna show you a police report
13  for this case which is Exhibit U.
14       And if you'll look, Doug, right here, this is
15  where it talks about ABC Concrete.
16    A. Yes, sir.
17    Q. It says 2007 Freightliner tractor green and it's
18  got a license number?
19    A. Yes, sir.
20    Q. Okay. Does that appear to be the same license
21  number that's referenced on that page of Exhibit T that
22  we were just referencing?
23    A. It does, sir.
24    Q. Okay. So it's correct to say that the tractor
25  involved in this accident that occurred on -- what's the

Page 99

1  date of the accident? August 5 of 2014? Is that right?
2       MR. EATON: I think it's the 7th.
3    A. 8/5 is what this -- the report date.
4    Q. Yeah, I think it is 8/7. I think you're right.
5  But the accident in California involving Mr. Montano.
6  Okay?
7       Would you agree with me that the tractor that he
8  was operating in California on the August 7th, 2014,
9  accident was also a tractor that was operating at least
10  in August of 2015 on behalf of ABC Concrete under its
11  private authority in Arizona?
12    A. No, sir.
13    Q. What's wrong with that statement?
14    A. I can't say. Even though the inspection says so,
15  I can't say for sure it was.
16    Q. Okay. Do you have any reason to believe that
17  this SAFER report data that we're looking at is false?
18    A. I have a reason to believe it's incorrect.
19    Q. Okay. And is the reason that the tractor
20  involved in this accident would have never been used to
21  transport ABC Manufacturer's products under ABC
22  Concrete's private authority?
23    A. No, that is not true, sir.
24    Q. Okay. Well, tell me what the reason is.
25    A. A lot of times when the DOT would do their

Page 100

1  inspection, they would look at ABC Concrete's name on
2  the side and not the DOT number that it was leased to.
3       So they would put ABC Concrete on there instead
4  of ABC Septic like they should have. Same thing in this
5  report of your crash.
6    Q. Well, let's just stay there a second. It says
7  Owner's Name, ABC Concrete Manufacturing Company.
8    A. Mm-hmm.
9    Q. It's correct to say that ABC Concrete
10  Manufacturing Company, Inc., owned the tractor and
11  trailer.
12    A. That is correct.
13    Q. Did they own the trailer as well? ABC Concrete.
14    A. Yes, sir. Yes, sir.
15    Q. Okay. Did ABC Septic Systems, Inc., to the
16  extent it is a separate entity from ABC Concrete, own
17  any property, whether it's equipment or real property?
18    A. No, sir.
19    Q. Everything that was owned and utilized by ABC
20  Septic and ABC Concrete in '13-14 time frame would have
21  been owned by ABC Concrete.
22    A. Owned by ABC Concrete, leased to ABC Septic.
23    Q. Gotcha. Okay. So you're telling me that you're
24  not sure about these DOT inspection reports in Exhibit T
25  because sometimes the investigating officer, the DOT

Page 101

1  officer, would see "ABC Concrete" on the truck, but not
2  look at the DOT number?
3    A. That is correct.
4    Q. Okay. And did you train your drivers to tell the
5  DOT officers "Hey, I'm hauling this under Septic's
6  authority instead of Concrete's authority"?
7    A. Their -- that's correct. Their logs would not
8  match. That's when they'd have to pull out their lease
9  and start showing it to them.
10    Q. Okay.
11       (Deposition Exhibit V
12          was marked for identification.)
13    Q. I'm going to show you Exhibit V as in "Victor".
14    A. Okay.
15    Q. This is a Truckers Application from ABC Septic
16  Systems to National Casualty Company.
17    A. Yes, sir.
18    Q. And it says here on number 4 "Has there been any
19  change in the nature of operations, ownership,
20  management, or the name of the operation during the last
21  five years?"
22    A. Okay.
23    Q. And it says "No." Is that an accurate statement?
24    A. As best of my knowledge, sir.
25    Q. Okay. Flip to the next page.

26 (Pages 98 to 101)

EXHIBIT 3

c0878923-b549-437b-b228-08b62fa10972

National American Insurance Company v. ABC Concrete MFG, Co., Inc., et al.
Douglas Murray

October 25, 2016
1:15-CV-01169 KG-KBM

---

Page 114

1    A. I'm not sure.
2    **Q. Okay.**
3    A. Okay?
4    **Q. Paragraph 28 says ABC Manufacturing failed to**
5    **disclose to NAICO that ABC Manufacturing was registered**
6    **with the USDOT, and then it has a DOT number which is**
7    **the Septic DOT number.  Did you fail to disclose that to**
8    **NAICO?**
9    A. What's the necessity?  I didn't realize we had to
10   disclose anything.
11   **Q. Okay.  Would you agree with me that if NAICO had**
12   **just taken a look at the SAFER system, that they would**
13   **have figured this out?**
14        MR. EATON:  Objection, form.
15   A. That's the agency's responsibility, not mine.
16   **Q. Okay.**
17   A. I mean I didn't -- all right.
18   **Q. Would you agree with me that the trips to Fort**
19   **Bliss, the 395 miles each way, I mean would you call**
20   **that interstate hauling?**
21   A. I would, sir.
22   **Q. You would?**
23   A. It's across state lines.
24   **Q. Okay.  And would you also call that long haul**
25   **trucking or hauling?**

---

Page 115

1    A. It could be either way.
2    **Q. Okay.  And I think we can agree that it would not**
3    **be for hire carriage.**
4    A. That is correct.
5    **Q. All right.  Paragraph 33 --**
6        MR. BURNS:  You can go on.
7        (Mr. Burns leaves the deposition room briefly)
8    **Q. Hang on.  So in paragraph 28 they say you never**
9    **told them about Septic.**
10   A. Okay.
11   **Q. Paragraph 33, they say it was the intent of ABC**
12   **Manufacturing that Septic would pay for its own**
13   **automobile liability coverage.  Do you see that?**
14   A. I see it.
15   **Q. If NAICO did not know anything about Septic, how**
16   **could there be some sort of mutual understanding between**
17   **you and NAICO about that ABC Septic would pay for its own**
18   **liability coverage?**
19        MR. EATON:  Objection, form.
20   **Q. That seems impossible, doesn't it?**
21        MR. EATON:  Objection, form.
22   A. It does to me.
23   **Q. All right.  And would you agree with me that the**
24   **tractor operated by Mr. Montano at the time of the**
25   **August 7, 2014, accident, that it's at least possible**

---

Page 116

1    **that he may have transported with that tractor or that**
2    **trailer an ABC Manufactured load that was hauled under**
3    **an ABC -- under ABC Concrete's authority at some time**
4    **around the time of the accident?**
5        MR. EATON:  Objection, form.
6    A. I can't answer that.  I'd have to refer to his
7    logs.
8    **Q. Okay.  Would you have his logs for, say, all of**
9    **2014?**
10   A. He only worked for us for a short time, sir.
11   **Q. Okay.  Would you have his logs for the entire**
12   **time period that he worked for you?**
13   A. I think we've produced them already.
14   **Q. Okay.**
15   A. If not, we should have them.
16   **Q. Okay.**
17   A. '14, '15, '16.
18   **Q. What is your log retention policy?**
19   A. One year.
20   **Q. Okay.  And after a year passes, do you throw them**
21   **away?**
22   A. (Witness nods head.)  That's all we're required
23   by law.
24   **Q. All right.  When you were asked in the tort suit,**
25   **the liability lawsuit, to produce logs, did you produce**

---

Page 117

1    **everything you had?**
2    A. We produced what they asked us for.  When I say
3    "they", what the lady attorney out of California asked
4    us for at that time, before the suit was settled.
5    **Q. Okay.**
6        MR. McMICKLE:  I'll send you an e-mail or --
7    just if you can ask.  Or obviously if it's something
8    different, I'd appreciate you getting it to me.
9        MR. BURNS:  Okay.
10   **Q. So in other words, you would agree with me that**
11   **there were at least instances in 2014 where trucks that**
12   **were leased to Septic hauled goods for ABC Concrete**
13   **under ABC Concrete's private authority in that radius.**
14   **A. Yes.**
15        MR. EATON:  Objection, form.
16   **Q. I'm sorry?**
17   **A. Yes.**
18   **Q. That would have had to have happened?**
19   **A. I'm sure it did.**
20   **Q. Okay.  Flip to page 6 of Exhibit Y.  Look at**
21   **number 40.  Tell me, do you have any knowledge of that**
22   **or is that true?**
23   A. That I'm not sure of, sir.  I'm not sure what
24   this is saying really, number 40.
25   **Q. Did you understand that your NAICO policy covered**

---

30 (Pages 114 to 117)

c0878923-b549-437b-b228-08b62fa10972

National American Insurance Company v. ABC Concrete MFG, Co., Inc., et al.
Douglas Murray

October 25, 2016
1:15-CV-01169 KG-KBM

---

Page 122

1    MR. McMICKLE: No, that's fine. I mean, you
2    asked and I'm just sort of telling you why I guess I
3    think that's important. I think they've got it
4    backwards. But anyway, so I'll leave it alone.
5    Q. (By Mr. Mickle) So let's look to paragraph 54.
6    It says "Both NAICO and ABC Manufacturing labored under
7    the same erroneous conception that the NAICO policy
8    would not be insuring for-hire long haul or interstate
9    trucking operations for ABC Manufacturing."
10    And you've already told me today that you
11    expected that NAICO would cover interstate trips taken
12    by ABC Concrete transporting ABC Concrete product,
13    correct?
14    A. That's correct.
15    Q. Okay. So this statement that both NAICO and ABC
16    were laboring under the same erroneous conception, that
17    is a false statement.
18    A. Yes. We're 35 miles to the Durango, Colorado,
19    border. It doesn't make sense I would cover -- write
20    insurance like that.
21    Q. It says in the second sentence in paragraph 54
22    "Had NAICO known the true facts, it would have issued a
23    policy of insurance that provided insurance only for
24    specifically described autos, and would not have
25    included vehicles involved in for-hire long haul

---

Page 123

1    trucking." Did anybody ever tell you that?
2    A. No.
3    Q. So they say that they would have issued a new
4    policy that would not have included vehicles involved in
5    for-hire long haul trucking.
6    A. They may have issued it, but that don't mean I
7    would have bought it.
8    Q. Okay.
9    A. That's why we've got free enterprise.
10    (Deposition Exhibit AA
11    was marked for identification.)
12    Q. I'm going to show you what's been marked AA. And
13    I'm gonna indicate that I believe these to be Mr.
14    Montano's logs for whatever dates are stated there.
15    A. Okay.
16    Q. Does that appear to be accurate?
17    A. Yes, sir.
18    Q. All right. Now, you see there at the top on the
19    first page, and it carries on, it says "ABC" and then
20    something's --
21    A. Right.
22    Q. -- struck out.
23    A. Mm-hmm.
24    Q. Is it "Concrete" that's struck out?
25    A. Yes, sir.

---

Page 124

1    Q. All right. And you see it says #110 and #112 for
2    the equipment?
3    A. Yes, sir.
4    Q. Would that have been the tractor and the trailer
5    referenced in the police report?
6    A. Yes, sir.
7    Q. All right. And for example, on the trips where
8    ABC Concrete drivers would haul under ABC Concrete's
9    authority to and from Fort Bliss in 2014, would those
10    drivers use logs like what we're seeing in Exhibit AA?
11    A. No, sir. These are logs I gave him. These are
12    my personal logs.
13    Q. Okay. Would a driver that's driving across state
14    lines -- I assume Fort Bliss is across state lines.
15    A. It is.
16    Q. Is that Colorado?
17    A. No. It's New Mex -- Texas.
18    MR. BURNS: El Paso.
19    A. El Paso.
20    Q. Okay. Wouldn't the drivers have needed logs to
21    get across state lines?
22    A. Yes, sir.
23    Q. Okay. Would they have used logs that look
24    generally like what's in Exhibit AA?
25    A. Generally like it. It would not have had this

---

Page 125

1    already imprinted. "ABC" and all this information would
2    not have been imprinted. These are my personal logs
3    that I had done for me. He didn't have any logs, so I
4    gave him these.
5    Q. Okay. You recall that for this specific time
6    frame?
7    A. No one else uses these but me, sir.
8    Q. Okay.
9    A. These are my logs.
10    Q. And when you say they're your logs, the ones with
11    the scratched out "Concrete"?
12    A. No. No. I had these special printed for me.
13    Q. Just so it's all on one page?
14    A. This is special printed in there for me, "ABC
15    Concrete." All of this is special printed for me. This
16    is not handwritten. These are my logs --
17    Q. Gotcha. Understand.
18    A. -- that were made for me.
19    Q. But other logs similarly compliant with the
20    federal regs would have been used by ABC Concrete
21    drivers going to and from Fort Bliss.
22    A. We require long form, sir. This is a long form
23    log.
24    Q. All right.
25    A. Three copies.

---

32 (Pages 122 to 125)

EXHIBIT 3

National American Insurance Company v. ABC Concrete MFG, Co., Inc., et al.       October 25, 2016
Douglas Murray                                                                    1:15-CV-01169 KG-KBM

Page 126

1    Q. And ABC Concrete would have endeavored to satisfy
2    any other applicable federal regulations for those Fort
3    Bliss shipments; is that right?
4    A. Yes, sir.
5    Q. All right. So there was a time where NAICO and
6    Woods asked you to sign an affidavit regarding this
7    policy. Do you recall that?
8    A. There's some stuff that came to my office, sir. I
9    don't recall specifically. I know there was some I
10   would not sign.
11       (Deposition Exhibit BB
12        was marked for identification.)
13   Q. Right. I'm going to show you Exhibit BB.
14   A. Okay.
15   Q. Now it looks like this is a letter to somebody
16   named Jackie at Woods Insurance Services. And the
17   second page is an affidavit and then some e-mails that
18   follow.
19   A. Okay.
20   Q. Okay? So for your purposes, I'm just going to
21   have you look at the affidavit. Okay?
22   Is that the affidavit that you recall someone
23   sending to you?
24   A. Yes, sir.
25   Q. All right. And that's the affidavit you refused

Page 127

1    to sign.
2    A. My specific words said "You could stick this
3    where the sun doesn't shine." That's my specific words.
4    Q. I like that. So, and the reason that you -- or
5    at least one of the reasons that you didn't sign this
6    affidavit was that you believed it would take NAICO out
7    of the picture completely.
8    A. I believed two things. Number one is that they
9    were trying to get off of something that they should
10   have addressed before they ever wrote this policy.
11       Number two is, is that now they were trying to
12   get out of it after the fact.
13       And number three is, we didn't look at the
14   insurance company that a way as much as we did at Woods.
15   They should have told us what was going on. They were
16   our representative.
17       (Deposition Exhibit CC
18        was marked for identification.)
19   Q. I'm going to send you Exhibit CC, or give you
20   Exhibit CC. We're gonna come back to the affidavit.
21       But Exhibit CC, at least the first few pages, it
22   looks like that's somebody at NAICO named James
23   Malone is trying to get you to sign the affidavit.
24   A. Mm-hmm. He called me.
25   Q. And there's conversation that's depicted here.

Page 128

1    I'm not gonna go through it all. But at the end or at
2    the top, at least what I've been provided, says "This
3    letter takes your company out of the picture
4    completely."
5    A. What? That's, that's -- I think that's what I
6    wrote.
7    Q. Yeah, that's what you wrote.
8    A. Right. I cannot sign this letter.
9    Q. All right. So you were telling somebody at NAICO
10   "I'm not signing this affidavit because it takes your
11   company out of the picture completely."
12   A. I don't know what was done in-between here, but
13   that was my -- that's coming from my iPad it says right
14   there.
15   Q. Right. All right. And you recall saying
16   something like that?
17   A. I wasn't very polite with him.
18   Q. So over the phone is where the "sunshine" thing
19   came out?
20   A. Yes, sir.
21   Q. All right.
22   A. Looks like it was two separate e-mails.
23   Q. Okay.
24       MR. McMICKLE: All right. Why don't we take
25   a, just a couple minute break. And then what I'd like

Page 129

1    to do is -- I'll bet you're going to have a few more
2    questions.
3        MR. EATON: Yes.
4        MR. McMICKLE: I'm going to try and figure
5    out what I have to do right now and then, you know, we
6    can hopefully speed through, be another 20, 30 minutes
7    at the most.
8        MR. BURNS: Okay.
9        THE WITNESS: Okay.
10       MR. McMICKLE: I hope so. Lawyers always
11   say that.
12       (Break taken from 12:14 p.m. to 12:48 p.m.)
13       (Deposition Exhibit DD
14        was marked for identification.)
15   Q. (By Mr. McMickle) All right. So I've given you
16   Exhibit DD. And is that a letter you recall receiving
17   from somebody at Woods?
18   A. They probably sent this over or sent it to me in
19   the mail. It looks like the same one that --
20   Q. Do you recall any conversations with Edie
21   Darrell?
22   A. I don't. But --
23   Q. Do you recall any conversations about this
24   affidavit with anybody at Woods other than the "sun
25   doesn't shine" thing we talked about?

33 (Pages 126 to 129)

National American Insurance Company v. ABC Concrete MFG, Co., Inc., et al.
Douglas Murray

October 25, 2016
1:15-CV-01169 KG-KBM

Page 142

1    MR. McMICKLE:  Let me see what you've got.
2    A. Exhibit C?
3    Q. Exhibit C, yes, sir.
4    A. Okay.
5    Q. Under paragraph 6, this is on page 2 of the
6    lease, paragraph 6a, it states "Customer has exclusive
7    possession and control of equipment."  Is that an
8    accurate reading?
9    A. Yes.
10   Q. And I'm looking on page 1.  Is ABC Septic Systems
11   listed as the customer for this lease?
12   A. Yes.
13   Q. So even if a vehicle that was owned by
14   ABC Concrete was leased to ABC Septic, while ABC Septic
15   was operating that truck, according to the lease, they
16   were in exclusive possession and control of that
17   tractor; is that correct?
18   MR. McMICKLE:  Object to the form.  Thanks.
19   A. According to the lease, yes.
20   Q. I'm going to jump to Exhibit Y.  This is the
21   Complaint that was filed in this case.
22   On page 7, we're going to look at paragraph 54.
23   And you had stated that --
24   MR. BURNS:  Do you mean the Amended
25   Complaint?

Page 143

1    MR. EATON:  Yeah.  This was the first --
2    yeah, this is the First Amended Complaint.
3    MR. BURNS:  Okay.
4    Q. (By Mr. Eaton)  Paragraph 54.  You had indicated
5    that this statement is inaccurate.  And I just want to
6    kind of break it down real quick.
7    So ABC Concrete was a private hauler, correct?
8    A. Yes.
9    Q. It was not authorized to provide for-hire
10   transport?
11   A. That is correct.
12   Q. And NAICO was just -- or NAICO only provided
13   coverage for ABC Concrete.  That's your understanding,
14   correct?
15   A. (No response.)
16   Q. That NAICO only provided coverage to ABC
17   Concrete?
18   A. That is correct.
19   Q. So would it be accurate to say that the NAICO
20   policy would not be insuring for-hire long haul trucking
21   operations for which ABC Manufacturing was not
22   authorized to perform?
23   A. Not totally.
24   Q. Which part of that is inaccurate?
25   A. The truck was leased to ABC Concrete -- I mean

Page 144

1    the truck was owned by ABC Concrete.  And this is my
2    understanding after all this has been going on.
3    The truck's owned by ABC Concrete.  ABC Septic
4    had its own insurance.  I'm the owner of both.  I own
5    the Concrete division; I own the Septic division.
6    So who's the insurance here to cover.  Does it
7    cover me?  Then both of you have a liability.
8    Q. But your understanding is that NAICO was only
9    providing coverage for ABC Manufacturing, correct?
10   A. Correct.
11   Q. And ABC Manufacturing was not authorized under
12   the DOT to provide for-hire --
13   A. That's correct.
14   Q. -- transport.  And we discussed today, this is
15   something I learned today, was that ABC did perform some
16   we'll call it long haul trucking beyond 150 miles as
17   long as it was just ABC Manufacturing's product.
18   A. That's correct.
19   Q. So your intent was that NAICO would only be
20   insuring ABC Concrete Manufacturing when it was shipping
21   its own product when discussing long haul shipping.
22   A. Okay.  You're really confusing me.
23   Q. Okay.  So I'm trying to make -- sorry.  I'm just
24   trying to clarify --
25   A. I know what you're trying to get at.  My intent

Page 145

1    is to cover our companies.  That's my job.  Your jobs
2    are to break it down now.  Okay?
3    So as long as my trucks were covered and my
4    people were covered and I was covered, I'm happy.
5    Q. So would you agree that it was your intent that
6    National Casualty Company did provide insurance for ABC
7    Septic for its long haul for-hire or even for if it was
8    hauling for ABC Manufacturing?
9    A. As long as it was listed under that, yes.  As
10   long as it was on their logs hauled that way.
11   Q. So it was your intent that ABC Septic was covered
12   under that policy.
13   A. That was my intent.
14   Q. But your intent was also that NAICO was only
15   insuring ABC Manufacturing.
16   A. Insuring my trucks, yes.
17   Q. When you say your trucks, what do you mean?
18   A. Anything that ABC Concrete owns.  As long as
19   they're listed on the policy.
20   Why don't you ask me that question another way
21   and you'll get the right answer.
22   Q. I mean all day you've testified that you'd only
23   intended NAICO to insure ABC Manufacturing.
24   A. Correct.
25   MR. McMICKLE:  Object to the form.  Just go

37 (Pages 142 to 145)

EXHIBIT 3

c0878923-b549-437b-b228-08b62fa10972

10/24/2016

SAFER Web - Company Snapshot ABC CONCRETE MANUFACTURING CO INC

○ USDOT Number   ○ MC/MX Number   ○ Name

Enter Value: 340457

[ Search ]

**Company Snapshot**

**ABC CONCRETE MANUFACTURING CO INC**
USDOT Number: 340457

**ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating**

**Carriers:** If you would like to update the following ID/Operations Information, please complete and submit form MCS-150 which can be obtained online or from your State FMCSA office. If you would like to challenge the accuracy of your company's safety data, you can do so using FMCSA's DataQs system.

**Carrier and other users:** FMCSA provides the Company Safety Profile (CSP) to motor carriers and the general public interested in obtaining greater detail on a particular motor carrier's safety performance then what is captured in the Company Snapshot. To obtain a CSP please visit the CSP order page or call (800)832-5660 or (703)280-4001 (Fee Required).

For help on the explanation of individual data fields, click on any field name or for help of a general nature go to SAFER General Help.

**The information below reflects the content of the FMCSA management information systems as of 10/23/2016.**

| Other Information for this Carrier |
|---|
| ▼ SMS Results |
| ▼ Licensing & Insurance |

| | | | |
|---|---|---|---|
| **Entity Type:** | CARRIER | | |
| **Operating Status:** | ACTIVE | **Out of Service Date:** | None |
| **Legal Name:** | ABC CONCRETE MANUFACTURING CO INC | | |
| **DBA Name:** | | | |
| **Physical Address:** | 1004 S LAKE ST FARMINGTON, NM 87401 | | |
| **Phone:** | (505) 325-8289 | | |
| **Mailing Address:** | 1004 S LAKE ST FARMINGTON, NM 87401 | | |
| **USDOT Number:** | 340457 | **State Carrier ID Number:** | |
| **MC/MX/FF Number(s):** | | **DUNS Number:** | 61-275-408 |
| **Power Units:** | 7 | **Drivers:** | 8 |
| **MCS-150 Form Date:** | 04/26/2016 | **MCS-150 Mileage (Year):** | 210,000 (2015) |

**Operation Classification:**

| | | |
|---|---|---|
| Auth. For Hire | Priv. Pass.(Non-business) | State Gov't |
| Exempt For Hire | Migrant | Local Gov't |
| x Private(Property) | U.S. Mail | Indian Nation |
| Priv. Pass. (Business) | Fed. Gov't | |

**Carrier Operation:**

| | | |
|---|---|---|
| x Interstate | Intrastate Only (HM) | Intrastate Only (Non-HM) |

**Cargo Carried:**

| | | |
|---|---|---|
| General Freight | Liquids/Gases | Chemicals |
| Household Goods | Intermodal Cont. | Commodities Dry Bulk |
| Metal: sheets, coils, rolls | Passengers | Refrigerated Food |
| Motor Vehicles | Oilfield Equipment | Beverages |
| Drive/Tow away | Livestock | Paper Products |
| Logs, Poles, Beams, Lumber | Grain, Feed, Hay | Utilities |
| Building Materials | Coal/Coke | Agricultural/Farm Supplies |
| Mobile Homes | Meat | Construction |
| Machinery, Large Objects | Garbage/Refuse | Water Well |
| Fresh Produce | US Mail | X METAL AND CONCRE |

Murray

McKEE REPORTING, INC.

**ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating**

http://safer.fmcsa.dot.gov/query.asp

**EXHIBIT 4**

1/2

10/24/2016

SAFER Web - Company Snapshot ABC CONCRETE MANUFACTURING CO INC

**US Inspection results for 24 months prior to: 10/23/2016**

Total Inspections: 19
Total IEP Inspections: 0

Note: Total inspections may be less than the sum of vehicle, driver, and hazmat inspections. Go to Inspections Help for further information.

Inspections:

| Inspection Type | Vehicle | Driver | Hazmat | IEP |
|---|---|---|---|---|
| Inspections | 8 | 19 | 0 | 0 |
| Out of Service | 2 | 0 | 0 | 0 |
| Out of Service % | 25% | 0% | % | 0% |
| Nat'l Average % (2014- 2015) | 20.34% | 4.96% | 3.91% | N/A |

**Crashes reported to FMCSA by states for 24 months prior to: 10/23/2016**

Note: Crashes listed represent a motor carrier's involvement in reportable crashes, without any determination as to responsibility.

Crashes:

| Type | Fatal | Injury | Tow | Total |
|---|---|---|---|---|
| Crashes | 0 | 0 | 0 | 0 |

ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating

**Canadian Inspection results for 24 months prior to: 10/23/2016**

Total Inspections: 0

Note: Total inspections may be less than the sum of vehicle and driver inspections. Go to Inspections Help for further information.

Inspections:

| Inspection Type | Vehicle | Driver |
|---|---|---|
| Inspections | 0 | 0 |
| Out of Service | 0 | 0 |
| Out of Service % | 0% | 0% |

**Crashes results for 24 months prior to: 10/23/2016**

Note: Crashes listed represent a motor carrier's involvement in reportable crashes, without any determination as to responsibility.

Crashes:

| Type | Fatal | Injury | Tow | Total |
|---|---|---|---|---|
| Crashes | 0 | 0 | 0 | 0 |

ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating

*The Federal safety rating does not necessarily reflect the safety of the carrier when operating in intrastate commerce.*

Carrier Safety Rating:

The rating below is current as of: 10/23/2016

Review Information:

| Rating Date: | 04/16/2012 | Review Date: | 01/26/2012 |
|---|---|---|---|
| Rating: | Conditional | Type: | Compliance Review |

SAFER Home | Feedback | Privacy Policy | USA.gov | Freedom of Information Act (FOIA) | Accessibility | OIG Hotline | Web Policies and Important Links | Plug-Ins

Federal Motor Carrier Safety Administration
1200 New Jersey Avenue SE, Washington, DC 20590 • 1-800-832-5660 • TTY: 1-800-877-8339 • Field Office Contacts

http://safer.fmcsa.dot.gov/query.asp


EXHIBIT 4

2/2

10/24/2016
Safety Measurement System - Complete SMS Profile (U.S. DOT# 340457)



**SMS** Safety
Measurement
System

## ABC CONCRETE MANUFACTURING CO INC
U.S. DOT#: 340457
Address: 1004 S LAKE ST
FARMINGTON, NM 87401
Number of Vehicles: 7
Number of Drivers: 8
Number of Inspections: 19

## Safety Rating & OOS Rates
(As of 10/23/2016 updated daily from SAFER )

**CONDITIONAL**
(Rating Date: 04/16/2012)

### Out of Service Rates

| Type | OOS % | National Avg % |
|------|-------|----------------|
| Vehicle | 25.0 | 20.3 |
| Driver | 0.0 | 5.0 |
| Hazmat | | 3.9 |

## Licensing and Insurance
(As of 10/23/2016 updated hourly from L&I )

### Active For-Hire Authority

| Type | Yes/No MC#/MX# |
|------|----------------|
| Property | No |
| Passenger | No |
| Household Goods | No |
| Broker | No |

U.S. DOT# 340457 has no current for-hire operating authority with FMCSA.

**See how the proposed enhancements impact carrier results. Visit the SMS Preview Website**

## BASIC Status (Public Property Carrier View) ?
Behavior Analysis & Safety Improvement Categories (BASICs)

Based on a 24-month record ending September 23, 2016

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| | Not Public | Hours-of-Service Compliance | | Controlled Substances and Alcohol | Not Public Hazardous Materials Compliance | |
| Unsafe Driving | Crash Indicator | | Vehicle Maintenance | | | Driver Fitness |

## On-Road Performance

| 0 Measure | NOT PUBLIC | 0.51 Measure | 8.62 Measure | 0 Measure | NOT PUBLIC | 0 Measure |
|---|---|---|---|---|---|---|

### On-Road Performance Detail

| Driver Inspections with Unsafe Driving Violations: 0 | | Driver Inspections: 19 with HOS Compliance Violations: 3 | Vehicle Inspections: 8 with Vehicle Maint. Violations: 7 | Driver Inspections: 19 with Drugs/Alcohol Violations: 0 | | Driver Inspections: 19 with Driver Fitness Violations: 0 |
|---|---|---|---|---|---|---|
| Safety Event Group: No Safety Event Grouping | NOT | Safety Event Group: 11-20 | Safety Event Group: 5-10 | Safety Event Group: No | NOT | Safety Event Group: 11-20 |

EXHIBIT 4

1/4

| Avg. PU × UF: 10.5 | PUBLIC | relevant driver inspections | relevant vehicle inspections | Safety Event Grouping | PUBLIC | relevant driver inspections |

**Segment:**
Straight Carrier

## Investigation Results

| No Acute/Critical Violations Discovered | N/A | No Acute/Critical Violations Discovered | No Acute/Critical Violations Discovered | No Acute/Critical Violations Discovered | NOT PUBLIC | No Acute/Critical Violations Discovered |

Select a BASIC icon above to get details, or view your **Complete SMS Profile**.

### VIOLATION SUMMARY

Violations: 24

| Violations | Description | # Violations | # OOS Violations | Violation Severity Weight | BASIC |
|---|---|---|---|---|---|
| 395.3A2-PROP | Driving beyond 14 hour duty period (Property carrying vehicle) | 1 | 0 | 7 | HOS Compliance |
| 395.8 | Driver's record of duty status (general/form and manner) | 2 | 0 | 1 | HOS Compliance |
| 392.2WC | Wheel (Mud) Flaps missing or defective | 1 | 0 | 1 | Vehicle Maint. |
| 393.19 | Inoperative/defective hazard warning lamp | 1 | 0 | 6 | Vehicle Maint. |
| 393.201(a) | Frame cracked / loose / sagging / broken | 1 | 1 | 2 | Vehicle Maint. |
| 393.207(a) | Axle positioning parts defective/missing | 1 | 1 | 7 | Vehicle Maint. |
| 393.45 | Brake tubing and hose adequacy | 1 | 0 | 4 | Vehicle Maint. |
| 393.45UV | Brake Tubing and Hose Adequacy Under Vehicle | 1 | 1 | 4 | Vehicle Maint. |
| 393.47(e) | Clamp/Roto-Chamber type brake(s) out of adjustment | 1 | 0 | 4 | Vehicle Maint. |
| 393.48(a) | Inoperative/defective brakes | 1 | 1 | 4 | Vehicle Maint. |
| 393.53(b) | Automatic brake adjuster CMV manufactured on or after 10/20/1994 - air brake | 1 | 0 | 4 | Vehicle Maint. |
| 393.60(c) | Damaged or discolored windshield | 1 | 0 | 1 | Vehicle Maint. |
| 393.75(a) | Flat tire or fabric exposed | 1 | 1 | 8 | Vehicle Maint. |
| 393.75(c) | Tire — other tread depth less than 2/32 of inch | 1 | 0 | 8 | Vehicle Maint. |
| 393.83(g) | Exhaust leak under truck cab and/or sleeper | 1 | 0 | 1 | Vehicle Maint. |
| 393.84 | Inadequate floor condition | 1 | 0 | 2 | Vehicle Maint. |
| 393.9 | Inoperative required lamps | 1 | 0 | 2 | Vehicle Maint. |
| 396.3(a)(1) | Inspection/repair and maintenance parts and accessories | 1 | 0 | 2 | Vehicle Maint. |

EXHIBIT 4

Safety Measurement System - Complete SMS Profile (U.S. DOT# 340457)

| | | | | Vehicle | 0 | Measure | Vehicle |
|---|---|---|---|---|---|---|---|
| 3A1B | Brakes (general) | | | | | Severity Weight (SW) | Vehicle Maint. Weight (TiW) |
| 396.3A1DSUJ Universal Joint Loose / Broken / Missing Component | | | | Plate State | 1 | Type B | Vehicle Maint. |
| 396.5(b) | Oil and/or grease leak | | | 3 | 0 | 3 | Vehicle Maint. |

## INSPECTION HISTORY

Total Inspections: 19

| | Report | | | Vehicle | | Measure | |
|---|---|---|---|---|---|---|---|
| Inspection Date | Number | State | Plate Number | Plate State | Type | Severity Weight (SW) | Time Weight (TiW) |
| 3/30/2016 | NM3606100934 | NM | IRH9768 | NM | TRUCK TRACTOR | | 3 |
| 2/25/2016 | AZ0YFC000255 | AZ | IRH9768 | NM | TRUCK TRACTOR | | 2 |
| HOS Compliance Violation: 395.8 Record of Duty Status violation (general/form and manner) | | | | | | 1 | |
| Vehicle Maint. Violation: 393.9 Inoperable Required Lamp | | | | | | 2 | |
| 2/18/2016 | NM3249108049 | NM | IRJ7508 | NM | TRUCK TRACTOR | | 2 |
| 2/12/2016 | NM3248104100 | NM | IRH9768 | NM | TRUCK TRACTOR | | 2 |
| Vehicle Maint. Violation: 393.19 Inoperative/Defective Hazard Warning Lamp | | | | | | 6 | |
| 2/10/2016 | AZ0Y0X000103 | AZ | IRH9768 | NM | TRUCK TRACTOR | | 2 |
| Vehicle Maint. Violation: 392.2WC Wheel (Mud) Flaps missing or defective | | | | | | 1 | |
| Vehicle Maint. Violation: 393.60(c) Damaged or discolored windshield | | | | | | 1 | |
| 1/25/2016 | NM3643101254 | NM | WD111453 | NM | TRUCK TRACTOR | | 2 |
| 11/30/2015 | NM3670101027 | NM | IRH9768 | NM | TRUCK TRACTOR | | 2 |
| Vehicle Maint. Violation: 393.45 Brake tubing and hose adequacy | | | | | | 4 | |
| 11/24/2015 | NM3743100784 | NM | IRJ7508 | NM | TRUCK TRACTOR | | 2 |
| 11/20/2015 | AZ0YEM000867 | AZ | IRH9768 | NM | TRUCK TRACTOR | | 2 |
| Vehicle Maint. Violation: 396.3A1B Brakes (general) Explain: | | | | | | 4 | |
| Vehicle Maint. Violation: 396.5(b) Oil and/or grease leak | | | | | | 3 | |
| 10/28/2015 | NM3231107321 | NM | IRH9768 | NM | TRUCK TRACTOR | 4 | 2 |
| Vehicle Maint. Violation: 393.47(e) Clamp or Roto type brake out-of-adjustment | | | | | | 4 | |
| Vehicle Maint. Violation: 393.45UV Brake Tubing and Hose Adequacy Under Vehicle (OOS) | | | | | | 4 + 2 (OOS) | |
| Vehicle Maint. Violation: 393.207(a) Axle positioning parts defective/missing (OOS) | | | | | | 7 + 2 (OOS) | |
| Vehicle Maint. Violation: 393.201(a) Frame cracked / loose / sagging / broken (OOS) | | | | | | 2 + 2 (OOS) | |
| Vehicle Maint. Violation: 393.48(a) Inoperative/defective brakes (OOS) | | | | | | 4 + 2 (OOS) | |
| Vehicle Maint. Violation: 396.5(b) Oil and/or grease leak | | | | | | 3 | |
| Vehicle Maint. Violation: 393.84 Inadequate floor condition | | | | | | 2 | |
| Vehicle Maint. Violation: 393.83(g) Exhaust leak under truck cab and/or sleeper | | | | | | 1 | |
| Vehicle Maint. Violation: 393.75(a) Flat tire or fabric exposed (OOS) | | | | | | 8 + 2 (OOS) | |
| Vehicle Maint. Violation: 393.53(b) CMV manufactured after 10/19/94 has an automatic airbrake adjustment system that fails to compensate for wear | | | | | | 4 | |
| 10/5/2015 | NM3670100722 | NM | IRH9768 | NM | TRUCK TRACTOR | | 2 |
| HOS Compliance Violation: 395.8 Record of Duty Status violation (general/form and manner) | | | | | | 1 | |
| 10/5/2015 | AZ0YDG000501 | AZ | IRH9768 | NM | TRUCK TRACTOR | | 2 |
| 9/28/2015 | AZ0YEJ000845 | AZ | IRH9768 | NM | TRUCK TRACTOR | | 2 |
| Vehicle Maint. Violation: 396.3A1DSUJ Universal Joint Loose / Broken / Missing Component (OOS) | | | | | | 3 + 2 (OOS) | |
| Vehicle Maint. Violation: 396.3(a)(1) Inspection, repair and maintenance of parts & accessories | | | | | | 2 | |
| Vehicle Maint. Violation: 393.75(c) Tire-other tread depth less than 2/32 of inch | | | | | | 8 | |
| Vehicle Maint. Violation: 396.5(b) Oil and/or grease leak | | | | | | 3 | |
| 9/25/2015 | AZ0000779240 | AZ | 1RJ5601 | NM | STRAIGHT TRUCK | | 2 |
| 9/24/2015 | NM3670100662 | NM | IRH9768 | NM | TRUCK TRACTOR | | 2 |
| HOS Compliance Violation: 395.3A2-PROP Driving beyond 14 hour duty period (Property carrying vehicle) | | | | | | 7 | |
| 9/21/2015 | AZ0YEJ000832 | AZ | IRH9768 | NM | TRUCK TRACTOR | | 1 |
| 9/20/2015 | NM3583104388 | NM | IRH9768 | NM | TRUCK TRACTOR | | 1 |
| 8/28/2015 | AZ0000775601 | AZ | IRH9768 | NM | TRUCK TRACTOR | | 1 |
| 8/19/2015 | AZ0YEM000820 | AZ | IRH9768 | NM | TRUCK TRACTOR | | 1 |

EXHIBIT 4

**CRASH ACTIVITY DETAIL (VEHICLES INVOLVED IN CRASHES)**                    Number of Crashes: 0

This carrier has no crashes to display.

**INVESTIGATION RESULTS**                                        Acute/Critical Violations: 0

This carrier has no Acute/Critical violations to display.

## Summary of Activities

The summary includes information on the 5 most recent investigations and 24 months of inspections and crash history.

Most Recent Investigation: 1/26/2012 (Compliance Review)
Total Inspections: 19
    Total Inspections without Violations used in SMS: 10
    Total Inspections with Violations used in SMS: 9
Total Crashes* : 0

*Crashes listed represent a motor carrier's involvement in reportable crashes, regardless of the carrier's or driver's role in the crash. Continue for details.

## Carrier Registration

Subject to General Threshold

## Penalties History

(Six years as of 10/23/2016 updated daily from FMCSA )

| CLOSED DATE | CASE # |
|---|---|
| 10/9/2012 US1057 | NM-2012-0033- |

              392.9a(a)
    Violation: (1)      $0.00
              382.305(b)
    Violation: (1)      $3,460.00
              382.401(c)
    Violation: (6)      $790.00

## USE OF SMS DATA/INFORMATION

### FAST Act of 2015:

Readers should not draw conclusions about a carrier's overall safety condition simply based on the data displayed in this system. Unless a motor carrier has received an UNSATISFACTORY safety rating under part 385 of title 49, Code of Federal Regulations, or has otherwise been ordered to discontinue operations by the Federal Motor Carrier Safety Administration, it is authorized to operate on the Nation's roadways.

### Safety Measurement System:

The data in the Safety Measurement System (SMS) is performance data used by the Agency and Enforcement Community. A ⚠ symbol, based on that data, indicates that FMCSA may prioritize a motor carrier for further monitoring.

The ⚠ symbol is not intended to imply any federal safety rating of the carrier pursuant to 49 USC 31144. Readers should not draw conclusions about a carrier's overall safety condition simply based on the data displayed in this system. Unless a motor carrier in the SMS has received an UNSATISFACTORY safety rating pursuant to 49 CFR Part 385, or has otherwise been ordered to discontinue operations by the FMCSA, it is authorized to operate on the nation's roadways.

Motor carrier safety ratings are available at http://safer.fmcsa.dot.gov and motor carrier licensing and insurance status are available at http://li-public.fmcsa.dot.gov/.

10/24/2016

SAFER Web - Company Snapshot ABC CONCRETE MFG CO INC

○ USDOT Number  ○ MC/MX Number  ● Name

Enter Value: ABC SEPTIC SYSTEMS IN(

[ Search ]

**Company Snapshot**
**ABC CONCRETE MFG CO INC**
USDOT Number: 778953

**ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating**

Other Information for this Carrier
▼ SMS Results
▼ Licensing & Insurance

**Carriers:** If you would like to update the following ID/Operations information, please complete and submit form MCS-150 which can be obtained online or from your State FMCSA office. If you would like to challenge the accuracy of your company's safety data, you can do so using FMCSA's DataQs system.

**Carrier and other users:** FMCSA provides the Company Safety Profile (CSP) to motor carriers and the general public interested in obtaining greater detail on a particular motor carrier's safety performance then what is captured in the Company Snapshot. To obtain a CSP please visit the CSP order page or call (800)832-5660 or (703)280-4001 (Fee Required).

For help on the explanation of individual data fields, click on any field name or for help of a general nature go to SAFER General Help.

**The information below reflects the content of the FMCSA management information systems as of 10/23/2016. Carrier Registration Information Outdated. Carrier VMT Outdated.**

| | | | |
|---|---|---|---|
| **Entity Type:** | CARRIER | | |
| **Operating Status:** | NOT AUTHORIZED | Out of Service Date: | None |
| **Legal Name:** | ABC CONCRETE MFG CO INC | | |
| **DBA Name:** | ABC SEPTIC SYSTEMS INC | | |
| **Physical Address:** | 1004 SOUTH LAKE ST FARMINGTON, NM 87401 | | |
| **Phone:** | (505) 325-8289 | | |
| **Mailing Address:** | 1004 SOUTH LAKE ST FARMINGTON, NM 87401 | | |
| **USDOT Number:** | 778953 | State Carrier ID Number: | |
| **MC/MX/FF Number(s):** | MC-348533 | DUNS Number: | – |
| **Power Units:** | 2 | Drivers: | 3 |
| **MCS-150 Form Date:** | 04/22/2014 | MCS-150 Mileage (Year): | 55,579 (2013) |

**Operation Classification:**

x Auth. For Hire | Priv. Pass.(Non-business) | State Gov't
Exempt For Hire | Migrant | Local Gov't
Private(Property) | U.S. Mail | Indian Nation
Priv. Pass. (Business) | Fed. Gov't

**Carrier Operation:**

x Interstate | Intrastate Only (HM) | Intrastate Only (Non-HM)

**Cargo Carried:**

x General Freight | Liquids/Gases | Chemicals
x Household Goods | Intermodal Cont. | Commodities Dry Bulk
x Metal: sheets, coils, rolls | Passengers | Refrigerated Food
Motor Vehicles | x Oilfield Equipment | Beverages
Drive/Tow away | Livestock | Paper Products
x Logs, Poles, Beams, Lumber | x Grain, Feed, Hay | Utilities
 | Coal/Coke | Agricultural/Farm Supplies
x Building Materials | Meat | x Construction
Mobile Homes | Garbage/Refuse | Water Well
x Machinery, Large Objects | US Mail |
Fresh Produce | |

Murray S — McKEE REPORTING, INC.

10/24/2016

SAFER Web - Company Snapshot ABC CONCRETE MFG CO INC

**US Inspection results for 24 months prior to: 10/23/2016**

Total Inspections: 1
Total IEP Inspections: 0

Note: Total inspections may be less than the sum of vehicle, driver, and hazmat inspections. Go to Inspections Help for further information.

Inspections:

| Inspection Type | Vehicle | Driver | Hazmat | IEP |
|---|---|---|---|---|
| Inspections | 1 | 1 | 0 | 0 |
| Out of Service | 0 | 0 | 0 | 0 |
| Out of Service % | 0% | 0% | % | 0% |
| Nat'l Average % (2014-2015) | 20.34% | 4.96% | 3.91% | N/A |

**Crashes reported to FMCSA by states for 24 months prior to: 10/23/2016**

Note: Crashes listed represent a motor carrier's involvement in reportable crashes, without any determination as to responsibility.

Crashes:

| Type | Fatal | Injury | Tow | Total |
|---|---|---|---|---|
| Crashes | 0 | 0 | 0 | 0 |

**ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating**

**Canadian Inspection results for 24 months prior to: 10/23/2016**

Total inspections: 0

Note: Total inspections may be less than the sum of vehicle and driver inspections. Go to Inspections Help for further information.

Inspections:

| Inspection Type | Vehicle | Driver |
|---|---|---|
| Inspections | 0 | 0 |
| Out of Service | 0 | 0 |
| Out of Service % | 0% | 0% |

**Crashes results for 24 months prior to: 10/23/2016**

Note: Crashes listed represent a motor carrier's involvement in reportable crashes, without any determination as to responsibility.

Crashes:

| Type | Fatal | Injury | Tow | Total |
|---|---|---|---|---|
| Crashes | 0 | 0 | 0 | 0 |

**ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating**

*The Federal safety rating does not necessarily reflect the safety of the carrier when operating in intrastate commerce.*

Carrier Safety Rating:

**The rating below is current as of: 10/23/2016**

Review Information:

| Rating Date: | 04/16/2012 | Review Date: | 01/26/2012 |
|---|---|---|---|
| Rating: | Conditional | Type: | Compliance Review |

SAFER Home | Feedback | Privacy Policy | USA.gov | Freedom of Information Act (FOIA) | Accessibility | OIG Hotline | Web Policies and Important Links | Plug-Ins

Federal Motor Carrier Safety Administration
1200 New Jersey Avenue SE, Washington, DC 20590 • 1-800-832-5660 • TTY: 1-800-877-8339 • Field Office Contacts

EXHIBIT 5

http://safer.fmcsa.dot.gov/query.asp?searchtype=ANY&query_type=queryCarrierSnapshot&query_param=USDOT&original_query_param=NAME&query_strin...   2/2

# FMCSA Motor Carrier



**USDOT Number:** **778953**
**Docket Number:** **MC348533**
**Legal Name:** **ABC SEPTIC SYSTEMS, INC.**

DBA (Doing-Business-As) Name

---

**Addresses**

**Business Address:** **1004 SOUTH LAKE ST**
**FARMINGTON, NM 87401**

**Business Phone:** **(505) 325-8289**     **Business Fax:**
**Mail Address:**

**Mail Phone:**                **Mail Fax:**           **Undeliverable Mail:** **NO**

---

**Authorities:**

| | | | |
|---|---|---|---|
| Common Authority: **NONE** | Application Pending: **NO** | | |
| Contract Authority: **INACTIVE** | Application Pending: **NO** | | |
| Broker Authority: **NONE** | Application Pending: **NO** | | |
| Property: **YES** | Passenger: **NO** | Household Goods: | **NO** |
| Private: **NO** | Enterprise: **NO** | | |

---

**Insurance Requirements:**

| | | |
|---|---|---|
| BIPD Exempt: **NO**   BIPD Waiver: **NO** | BIPD Required: **$750,000** | BIPD on File: **$0** |
| Cargo Exempt: **NO** | Cargo Required: **NO** | Cargo on File: **NO** |
| BOC-3: **YES** | Bond Required: **NO** | Bond on File: **NO** |
| Blanket Company: **TRUCK PROCESS AGENTS OF AMERICA, INC** | | |

---

**Comments: 09/11/06 NAME CHANGE ASSIGNED TO WILLIE.**

---

**Active/Pending Insurance:**

| Form: | Type: | | Posted Date: | | |
|---|---|---|---|---|---|
| Policy/Surety Number: | | Coverage From: | **$0** | To: | **$0** |
| Effective Date: | | Cancellation Date: | | | |

---

**Rejected Insurances:**

| Form: | Type: | | | | |
|---|---|---|---|---|---|
| Policy/Surety Number: | | Coverage From: | **$0** | To: | **$0** |
| Received: | | Rejected: | | | |
| Rejected Reason: | | | | | |

---

EXHIBIT 5

# FMCSA Motor Carrier



**SDOT Number:** **778953**
**Docket Number:** **MC348533**
**Legal Name:** **ABC SEPTIC SYSTEMS, INC.**

DBA (Doing-Business-As) Name

---

**Insurance History:**

| | | | |
|---|---|---|---|
| **Form:** 91X | **Type:** BIPD/Primary | | |
| **Policy/Surety Number:** CTP0000026 | Coverage From | $0 **To:** | $1,000,000 |
| **Effective Date From:** 11/06/1998 | **To:** 07/16/1999 | **Disposition:** Cancelled | |

Insurance Carrier  FARWEST INSURANCE COMPANY(FAR WEST)
Attn:  NATALIE A. WEST
Address:  P.O. BOX 4500
WOODLAND HILLS, CA  91367 US
Telephone:  (818) 871 - 2000   Fax:

| | | | |
|---|---|---|---|
| **Form:** 91X | **Type:** BIPD/Primary | | |
| **Policy/Surety Number:** CTP0000026 | Coverage From | $0 **To:** | $1,000,000 |
| **Effective Date From:** 11/06/1998 | **To:** 11/06/1998 | **Disposition:** Replaced | |

Insurance Carrier  FARWEST INSURANCE COMPANY(FAR WEST)
Attn:  NATALIE A. WEST
Address:  P.O. BOX 4500
WOODLAND HILLS, CA  91367 US
Telephone:  (818) 871 - 2000   Fax:

| | | | |
|---|---|---|---|
| **Form:** 91X | **Type:** BIPD/Primary | | |
| **Policy/Surety Number:** BAW (07) 52911357 | Coverage From | $0 **To:** | $1,000,000 |
| **Effective Date From:** 02/09/2006 | **To:** 10/29/2006 | **Disposition:** Replaced | |

Insurance Carrier  WEST AMERICAN INSURANCE CO.
Attn:  DENISE MACKENDRICK
Address:  9450 SEWARD RD.
FAIRFIELD, OH  45014 US
Telephone:  (513) 867 - 3828   Fax:

| | | | |
|---|---|---|---|
| **Form:** 91X | **Type:** BIPD/Primary | | |
| **Policy/Surety Number:** TN505638 | Coverage From | $0 **To:** | $750,000 |
| **Effective Date From:** 10/29/2006 | **To:** 10/30/2011 | **Disposition:** Replaced | |

Insurance Carrier  NORTHLAND INSURANCE COMPANY
Attn:
Address:  385 WASHINGTON STREET MAIL CODE 103
ST. PAUL, MN  55102-1309 US
Telephone:  (651) 310 - 4100   Fax:  (651) 310 - 4949

---

# FMCSA Motor Carrier

USDOT Number: **778953**
Docket Number: **MC348533**
Legal Name: **ABC SEPTIC SYSTEMS, INC.**

DBA (Doing-Business-As) Name



**F M C S A**

---

## Insurance History:

| Form: | **91X** | Type: | **BIPD/Primary** | | | | |
|---|---|---|---|---|---|---|---|
| Policy/Surety Number: | **LTO0002480** | | Coverage From | **$0** | To: | | **$750,000** |
| Effective Date From: | **10/30/2011** | To: | **12/06/2012** | Disposition: **Cancelled** | | | |

| Insurance Carrier | NATIONAL CASUALTY COMPANY |
|---|---|
| Attn: | ROBERT L WELCH |
| Address: | 8877 N. GAINEY CTR DR,PO BOX 4110 |
| | SCOTTSDALE, AZ  85261 US |
| Telephone: | (480) 948 - 0505      Fax: |

| Form: | **91X** | Type: | **BIPD/Primary** | | | | |
|---|---|---|---|---|---|---|---|
| Policy/Surety Number: | **LTO0007622** | | Coverage From | **$0** | To: | | **$750,000** |
| Effective Date From: | **12/06/2012** | To: | **12/16/2014** | Disposition: **Cancelled** | | | |

| Insurance Carrier | NATIONAL CASUALTY COMPANY |
|---|---|
| Attn: | ROBERT L WELCH |
| Address: | 8877 N. GAINEY CTR DR,PO BOX 4110 |
| | SCOTTSDALE, AZ  85261 US |
| Telephone: | (480) 948 - 0505      Fax: |

---

## Authority History:

| Sub No. | Authority Type | Original Action | | Disposition Action | |
|---|---|---|---|---|---|
| | MOTOR PROPERTY CONTRACT CARRIER | REINSTATED | 10/24/2006 | REVOKED | 12/22/2014 |
| | MOTOR PROPERTY CONTRACT CARRIER | GRANTED | 01/19/1999 | REVOKED | 10/01/1999 |

---

## Pending Application:

| Authority Type | Filed | Status | Insurance | BOC-3 |
|---|---|---|---|---|
| | | | | |

---

## Revocation History:

| Authority Type | 1st Serve Date | 2nd Serve Date | Reason |
|---|---|---|---|
| CONTRACT | 11/19/2014 | 12/22/2014 | INVOLUNTARY REVOCATION |
| CONTRACT | 08/11/1999 | 10/01/1999 | INVOLUNTARY REVOCATION |

---

EXHIBIT 5

10/24/2016                      Safety Measurement System - Complete SMS Profile (U.S. DOT# 778953)

 **SMS** Safety
                Measurement
                System

## ABC CONCRETE MFG CO INC

**DBA: ABC SEPTIC SYSTEMS INC**

U.S. DOT#: 778953
Address: 1004 SOUTH LAKE ST
FARMINGTON, NM 87401
Number of Vehicles: 2
Number of Drivers: 3
Number of Inspections: 2

### Safety Rating & OOS Rates
(As of 10/23/2016 updated daily
from SAFER )

**CONDITIONAL**
(Rating Date: 04/16/2012)

### Out of Service Rates

| Type | OOS % | National Avg % |
|---|---|---|
| Vehicle | 0.0 | 20.3 |
| Driver | 0.0 | 5.0 |
| Hazmat | | 3.9 |

### Licensing and Insurance
(As of 10/23/2016 updated hourly
from L&I )

**Active For-Hire Authority**

| Type | Yes/No MC#/MX# |
|---|---|
| Property | No |
| Passenger | No |
| Household Goods | No |
| Broker | No |

U.S. DOT# 778953 has no current for-hire operating authority with FMCSA.

**See how the proposed enhancements impact carrier results. Visit the SMS Preview Website**

## BASIC Status (Public Property Carrier View) ?

Behavior Analysis & Safety Improvement Categories (BASICs)                 Based on a 24-month record ending September 23, 2016

      

| Unsafe Driving | Crash Indicator | Hours-of-Service Compliance | Vehicle Maintenance | Controlled Substances and Alcohol | Hazardous Materials Compliance | Driver Fitness |
|---|---|---|---|---|---|---|
| | Not Public | | | | Not Public | |

## On-Road Performance

| 0 Measure | NOT PUBLIC | 0 Measure | 0 Measure | 0 Measure | NOT PUBLIC | 0 Measure |
|---|---|---|---|---|---|---|

### On-Road Performance Detail

| Driver Inspections with Unsafe Driving Violations: 0 | NOT | Driver Inspections: 2 with HOS Compliance Violations: 0 | Vehicle Inspections: 2 with Vehicle Maint. Violations: 0 | Driver Inspections: 2 with Drugs/Alcohol Violations: 0 | NOT | Driver Inspections: 2 with Driver Fitness Violations: 0 |
|---|---|---|---|---|---|---|
| Safety Event Group: No Safety Event Grouping | | Safety Event Group: No | Safety Event Group: No | Safety Event Group: No | | Safety Event Group: No Safety |

EXHIBIT 5

| Avg. PU × UF: 2 | Report PUBLIC | Safety Event | Safety Event Vehicle | Safety Event | PUBLIC Measure Event Grouping | |
|---|---|---|---|---|---|---|
| Segment Inspection Date Combination Carrier | Number | Grouping State | Grouping Plate Number | Grouping Plate State | Grouping Type | Severity Weight (SW) | Time Weight (TiW) |

## Investigation Results

| No Acute/Critical Violations Discovered | N/A | No Acute/Critical Violations Discovered | No Acute/Critical Violations Discovered | No Acute/Critical Violations Discovered | NOT PUBLIC | No Acute/Critical Violations Discovered |
|---|---|---|---|---|---|---|

Select a BASIC icon above to get details, or view your **Complete SMS Profile**.

## VIOLATION SUMMARY                                             Violations: 0

This carrier has no violations to display.

## INSPECTION HISTORY                                          Total Inspections: 2

| Report | | | Vehicle | | | Measure | |
|---|---|---|---|---|---|---|---|
| Inspection Date | Number | State | Plate Number | Plate State | Type | Severity Weight (SW) | Time Weight (TiW) |
| 7/31/2015 | AZ0YEL001469 | AZ | IRG9309 | NM | TRUCK TRACTOR | | 1 |
| 10/22/2014 | TNTCDK000660 | TN | IRG9309 | NM | TRUCK TRACTOR | | 1 |

## CRASH ACTIVITY DETAIL (VEHICLES INVOLVED IN CRASHES)          Number of Crashes: 0

This carrier has no crashes to display.

## INVESTIGATION RESULTS                                  Acute/Critical Violations: 0

This carrier has no Acute/Critical violations to display.

## Summary of Activities

The summary includes information on the 5 most recent investigations and 24 months of inspections and crash history.

Most Recent Investigation: 1/26/2012 (Compliance Review)
Total Inspections: 2
   Total Inspections without Violations used in SMS: 2
   Total Inspections with Violations used in SMS: 0
Total Crashes* : 0

## Carrier Registration

## Flags

Subject to General Threshold

## Penalties History

(Six years as of 10/23/2016 updated daily from FMCSA)

**CLOSED DATE        CASE #**
10/9/2012     NM-2012-0034-US1057
   Violation: 391.51(a)    $790.00
   Violation: 382.115(a)   $1,210.00

**EXHIBIT 5**

2/3

*Crashes listed represent a motor carrier's involvement in <u>reportable crashes</u>, regardless of the carrier's or driver's role in the crash. <u>Continue for details</u>.

## USE OF SMS DATA/INFORMATION

### FAST Act of 2015:

Readers should not draw conclusions about a carrier's overall safety condition simply based on the data displayed in this system. Unless a motor carrier has received an UNSATISFACTORY safety rating under part 385 of title 49, Code of Federal Regulations, or has otherwise been ordered to discontinue operations by the Federal Motor Carrier Safety Administration, it is authorized to operate on the Nation's roadways.

### Safety Measurement System:

The data in the Safety Measurement System (SMS) is performance data used by the Agency and Enforcement Community. A ⚠ symbol, based on that data, indicates that FMCSA may prioritize a motor carrier for further monitoring.

The ⚠ symbol is not intended to imply any federal safety rating of the carrier pursuant to 49 USC 31144. Readers should not draw conclusions about a carrier's overall safety condition simply based on the data displayed in this system. Unless a motor carrier in the SMS has received an UNSATISFACTORY safety rating pursuant to 49 CFR Part 385, or has otherwise been ordered to discontinue operations by the FMCSA, it is authorized to operate on the nation's roadways.

Motor carrier safety ratings are available at http://safer.fmcsa.dot.gov and motor carrier licensing and insurance status are available at http://li-public.fmcsa.dot.gov/.

EXHIBIT 5



# AGENCY/COMPANY AGREEMENT



love

I I

MᶜKEE REPORTING, INC.

EXHIBIT 6

The Company and the Agent agree as follows:

## I.                             AGENT'S AUTHORITY

A.    The Agent has the authority to solicit, receive and transmit applications for insurance contracts for which a commission is specified in the prevailing Commission Schedule.

B.    The Agent agrees to:

   1.   Bind and execute insurance contracts subject to the underwriting rules and regulations of the Company; and

   2.   Forward to the Company copies of all binders, policies, certificates, and endorsements issued by the Agent within three (3) business days of inception of coverage.

## II.    COLLECTION, ACCOUNTING, AND PAYMENT OF PREMIUMS

For premium collection, accounting and payment purposes, the Agency and the Company shall designate policies as either agency bill or direct bill.  The rules governing premium collection, accounting and payment are contained in the attached Addendum A.  All premiums which the Agent receives for business that it places with the Company are the property of the Company and will be held by the Agent as a fiduciary in an account as required by law.

## III.                          COMMISSIONS

The Agent shall earn commissions at the percentage rates set forth in the prevailing Commission Schedule, or as otherwise negotiated and agreed.

## IV.          AMENDMENTS TO THIS AGREEMENT

A.    This Agreement may be amended at any time by a written agreement signed by both the Agent and the Company.

B.    This Agreement may be amended by the Company after giving the Agent ninety (90) days advance written notice, except that no advance notice is required of the Company to:

   1.   increase commission rates; or

   2.   add lines of business to the Commission Schedule.

C.    Individual commission rates will remain in effect for not less than one year. Changes in commission rates will apply to policies or endorsements with effective dates after the change in commission becomes effective.

EXHIBIT 6

## V.                                    CLAIMS

    A.    The Agent shall immediately report all claims and losses and forward all legal process involving the Company to the appropriate Company claims office.

    B.    Unless otherwise authorized by the Company in writing, the Agent may not commit the Company to any liability in connection with any claim or loss.

## VI.                               ARBITRATION

The Agent and the Company may, by mutual consent, agree to arbitrate any controversy arising out of this Agreement. Their agreement to arbitrate shall be indicated by their executing the Company's Consent to Arbitration Form.

## VII.                            INDEMNIFICATION

Whenever any lawsuit is filed against the Agent which allegedly arises out of the Company's act or omission ("Suit"):

    A.    The Company shall indemnify the Agent and hold it harmless against liability for damages and reasonable expenses incurred in the investigation and defense of the Suit, including reasonable legal fees, except to the extent that the Agent:

        1.    Caused, compounded, or contributed to the Company's act or omission, or

        2.    Assumes any liability or makes any payment by way of compromise or settlement or incurs any expense with regard to the Suit without the Company's prior written consent.

    B.    The Agent shall immediately notify the Company in writing of the Suit and shall fully cooperate with the Company. If the Agent fails to do so, the Company shall be relieved of any obligations to indemnify and hold the Agent harmless.

    C.    The Company shall have the right to assume or associate itself in the defense of the Suit.

## VIII.                           SUSPENSION

If the Agent violates any of the terms of this Agreement, including any Company rules or regulations, the Company may suspend the Agent's authority to bind any new or renewal business and to increase coverage(s) on any policy. The suspension shall take effect when the Company provides the Agent written notice of the suspension. If the suspension is because the Agent is delinquent in accounting for, or in payment of, monies due, the Company may also place policyholders on direct bill premium collection.

EXHIBIT 6

## IX.    TERMINATION

A.   The Agreement may be terminated at any time by either party's giving ninety (90) days prior written notice to the other, subject to applicable regulatory requirements.

B.   The Company may terminate this Agreement immediately upon giving written notice to the Agent if:

1.   The Agent's authority to engage in the business of insurance is canceled, suspended, revoked or not renewed;

2.   The Agent materially breaches any provision of this Agreement, including any Company rules or regulations, or any other agreement between the Agent and the Company;

3.   The Agent commits fraud, gross negligence or willful misconduct related to the business of insurance or trust fund money;

4.   The Agent abandons its business or becomes insolvent or is placed in receivership or a petition is filed proposing the adjudication of the Agent as bankrupt; or

5.   The Agent or any of the Agent's principals are convicted of a crime for activity related to the business of insurance or that of trust fund money.

C.   The Company, at its sole discretion, may offer the Agent a written plan of rehabilitation prior to giving a notice of termination.  Such written plan of rehabilitation may include:

1.   The identification by the Company of the specific problem areas;

2.   Performance objectives and specific dates for accomplishment;

3.   Periodic meetings at which time the performance objectives will be mutually reviewed; and

4.   The specific length of the rehabilitation plan.

## X.   AFTER NOTICE OF TERMINATION

A.   If this Agreement is terminated, then, unless and until the Company notifies the Agent in writing to the contrary, the Agent shall:

1.   Continue to service policies which are in force on the effective date of termination and renewals;

2.   Refrain from increasing or extending the Company's liability under, or alter the terms of, any policy without the Company's prior written consent;

EXHIBIT 6

  

3.    Continue to abide by the Addendum A collection, accounting and payment rules in effect as of the effective date of termination, except that the Company in its sole discretion may place policyholders on direct bill premium collection; and

4.    Continue to receive commissions at the rates prevailing on the effective date of termination, unless otherwise notified in writing by the Company.

B.    If this Agreement is terminated, the Company may cancel or nonrenew any insurance policy for any reason allowed by law.

## XI.            OWNERSHIP OF EXPIRATIONS

The records of the Agent and the use and control of expirations on business written by the Company shall remain the property of the Agent and will be left in the Agent's undisturbed possession so long as the Agent has accounted for and paid to the Company all premiums collected or held for the Company. If the Agent fails to fulfill all of these obligations, then the title, use and control of the Agent's records and expirations on business written by the Company immediately vest in the Company with the right to sell, assign or transfer, and the Company has the right to require from the Agent the immediate delivery of all relevant records; but the Company will refrain from exercising its right to sell, assign or transfer if the Agent promptly furnishes security acceptable to the Company for the payment of the Agent's debt to the Company.

## XII.            SALE OF AGENT'S BUSINESS; ASSIGNMENT

The Agent shall not sell the book of business it has with the Company, or assign or otherwise transfer this Agreement, without giving the Company prior written notice so that the Company can determine whether it wishes to appoint the successor agency or otherwise do business with the successor agency regarding the assigned, transferred or sold insurance business. When providing such notice to the Company, the Agent will provide information and documentation (such as the Company normally requires when considering the appointment of an agent) regarding the successor agency and the proposed sale, assignment or transfer at least ninety (90) days prior to the effective date of the sale, assignment or transfer. If the Agent fails to comply with these requirements, then the Agent shall be deemed to have elected to terminate this Agreement as of the sale, assignment or transfer.

## XIII.            NOTICES

Any notice which is required by this Agreement must be written. It shall be deemed given as of the date it is delivered to or delivery is refused at the addresses given on the last page of this Agreement, or any other addresses of which the parties give written notice to the other.

EXHIBIT 6

## XIV.  GENERAL PROVISIONS

A.   This Agreement is not a contract of employment and does not create the relationship of employer and employee between the Company and Agent. The Agent is an independent contractor with regard to the performance of the duties imposed and rights conferred by this Agreement.

B.   All forms, materials and other supplies furnished to the Agent shall remain the property of the Company.  The Agent shall return all unused forms, materials and supplies to the Company immediately upon the Company's request.

C.   The Agent shall pay all of the expenses which it incurs pursuant to this Agreement.

D.   Other than premium disputes which the Agent has contested, in writing, in accordance with Addendum A, the Company has the right to offset any amount owed to the Agent under this Agreement or any other agreement between the Agent and the Company against any amount the Agent owes the Company, regardless of whether the Agent owes the amounts pursuant to this Agreement.

E.   The Company has the right to inspect and audit the records maintained by the Agent on business the Agent places with the Company.  The Company may exercise the right as often as necessary during normal business hours, upon giving the amount of notice which is reasonable under the circumstances.

F.   The Agent shall carry appropriate amounts of Professional Liability insurance throughout the term of this Agreement.

G.   The failure of the Company or the Agent to insist on strict compliance with this Agreement, or to exercise any right or remedy, shall not constitute a waiver of any rights contained in this Agreement, stop the parties from demanding full and complete compliance, or prevent the parties from exercising such remedy in the future.

H.   This Agreement amends, restates and supersedes any prior agency agreement, whether written or oral, between the Company and the Agent or their predecessors with respect to commercial insurance business.  It constitutes the full and final agreement between the parties as to the subject matter hereof.

I.   If any provision of this Agreement should be invalid under or in conflict with governing laws, this Agreement shall be deemed amended to comply with the requirements of those laws without affecting the remaining provisions of this Agreement.

J.   This Agreement shall be interpreted according to the laws of the state where the Agent has its principal place of business.

EXHIBIT 6

This Agreement is effective as of ___January 31,_____, 19 _96_ , by and between
___Woods Insurance Service, Inc._____ (the "Agent") and National American
Insurance Company (the "Company").


**AGENT**

BY: _____

TITLE: _____ 1 / 30 / 96 _____

DATE: ___ PRESIDENT _____

WITNESS: ___ Mona Tappan _____

**COMPANY**

BY: ___ Brent LaHere _____

TITLE: ___ Chairman & CEO _____

DATE: ___ 2-23-96 _____

WITNESS: ___ Valene Nedina _____


Notices shall be sent to the Company at:
P.O. Drawer 9, 1010 Manvel, Chandler, Ok 74834

EXHIBIT 6

# NATIONAL AMERICAN INSURANCE COMPANY



### ADDENDUM A TO AGENCY/COMPANY AGREEMENT
PREMIUM COLLECTION, ACCOUNTING AND PAYMENT RULES
(Agency Bill and Direct Bill)

A.   **DIRECT BILL** - For policies designated as "direct bill", the Company shall assume responsibility for premium collection. Each month the Company will mail to the Agent a commission check and a statement based on the gross premiums recorded by the Company for the Agent's account during the prior month. The Company shall determine and pay commissions within thirty (30) days after the end of the month in which such premiums are received and recorded by the Company, less any commission on return premiums. No commission shall be due or payable to the Agent on items which the Company determines have become doubtful accounts. Whenever the Company refunds or returns premiums to a policyholder, the Company will offset against commissions otherwise payable to the Agent that portion of the commission which is unearned because of the return or refund. The Agent will return any net amount due the Company within thirty (30) days of the Company's giving notice of the amount due.

B.   **AGENCY BILL** - For policies designated as "agency bill", the Agent is required to collect premium on the Company's behalf, pursuant to the Agency/Company Agreement and the following rules:

    *1.*    *Definitions*

        **Accounting Month** means the month for which the premium accounting is to be made.

        **Documents** means premium bearing documents, including but not limited to policies, bonds, endorsements, renewal certificates, audits, interim reports, cancellations, and binders.

    *2.*    *Reporting of Premium*

        The Company designates the Agent as:
        ☐ An Account Current Agent
        ☐ A Statement Agent

        a.    Account Current Agent

            An Account Current Agent must report all amounts due from Documents which were effective or issued (whichever is later) during the Accounting Month. The Company must receive the Agent's account current report by the tenth (10th) day of the month following the Accounting Month.

            The Agent must provide the reason for omitting items and provide supporting documentation. The omission of an item from an account current does not relieve the Agent from responsibility for accounting and paying premium to the Company, affect the Company's right to collect sums which are due or extend the time within which the Agent must make payment.

        b.    Statement Agent

            The Company will send Statement Agents a statement of premiums charged by the Company to the Agent's account which are unpaid as of the end of the Accounting Month, including the name of each insured, policy number, gross premium, net premium due, and total balance due the Company. Within thirty (30) days of the statement date, the Agent shall provide written notice to the Company of the items on the statement with which the Agent disagrees, the reason for the disagreement, and supporting documentation.

            The Company's omission of an item or items from a monthly statement shall not affect the Agent's responsibility to account for and pay all amounts due the Company.

    *3.*    *Payment of Premium*

        The Company must receive payment in full by the fifteenth (15th) day of the second (2nd) month after the Accounting Month. For Account Current Agents, the amount due is the amount reported in the applicable account current. For Statement Agents, the amount due is the amount reported in the applicable Company statement.

EXHIBIT 6

The Company shall relieve the Agent from the duty to pay premiums in the following circumstances:

a.   **Flat Cancellation of Coverage**

The Company shall relieve the Agent from responsibility to pay premium for flat canceled insurance coverage only if the coverage is canceled as set forth below and no losses have been incurred.

    i)    For flat cancellation of short term coverage of ninety (90) days or less (including short term policies, renewal certificates, and endorsements), the Company must receive the original of the applicable Document prior to the effective date of coverage.

    ii)    For flat cancellation of any other coverage, the Company must receive the original of the applicable Document or lost policy release within thirty (30) days after the effective date of coverage or the Document's issue date (whichever is later).

        *NOTE: In no case shall a short rate or pro-rata cancellation relieve the Agent from responsibility for earned premiums.*

b.   **Collection Difficulties on Audits**

The Company shall relieve the Agent from responsibility for paying premium resulting from audits and interim reports so long as the Company receives from the Agent timely written notice (including a copy of the audit invoice) that the Agent has made reasonable efforts to collect but has been unable to collect the premium due.

The Company must receive the Agent's notice within forty-five (45) days after the billing date of the premium charges resulting from the audit or interim reports. By sending such written notice, the Agent relieves the Company of any obligation to pay commission on the premium in question.

c.   **Financed Premium**

The Agent is not responsible for paying the premium of policies which are financed through any premium financing arrangement, where the premium finance company sends the premium directly to the Company.

However, the Agent is responsible for premiums on all other transactions on policies which are financed, including, but not limited to:

    i)    original premium which is forwarded by the premium finance company to the Agent; and

    ii)    all additional premium which may become due (after the original financed premium is paid) as a result of policy activity, including, but not limited to, endorsement premiums or audit premiums which occur.

d.   **Premium Disputes**

If the Company and the Agent disagree on the amount of a policy premium, the Agent may delay payment of only that portion of the premium which the Agent specifically contests in writing to the Company. The Company's decision about the disputed premium shall be deemed final. The Agent shall deliver any payment which the Company decides is due within fifteen (15) days of being given written notice of the Company's decision.

4.   *Agency Bill Commissions*

The Company authorizes the Agent to retain commissions from premium collected by the Agent in accordance with the prevailing Commission Schedule. The Agent's privilege of retaining commission does not change the Agent's fiduciary obligation to the Company to hold premiums in trust for the Company.

5.   *Refunds and Return Premiums*

Whenever the Company refunds or returns premiums, the Agent will return such premiums to the policyholder or the premium finance company, as appropriate, plus that portion of premium retained by the Agent as commission which is unearned.

EXHIBIT 6

REVISED AMENDMENT

Woods Insurance Services, Inc.
CIMI #1053

## AMENDMENT TO PRODUCER AGREEMENT
## WITH CHANDLER INSURANCE MANAGERS, INC.

WHEREAS, the undersigned insurance producer hereinafter referred to as "Producer" has a currently effective Producer Agreement with Chandler Insurance Managers, Inc. ("CIMI"); and

WHEREAS, CIMI has proposed an amendment to the Producer Agreement and Producer has agreed to such amendment;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree that Paragraph 3 entitled "Guarantee of Payment" is hereby amended so that it reads in full as follows:

**Guarantee of Payment:**   The Producer guarantees payment of all premiums, excess and surplus lines taxes, policy fees, or any other charges or fees directly related to the policies of insurance placed through CIMI. All such premiums, taxes and other amounts, charges, or fees shall be paid upon the following terms and conditions:

a.   Premiums, fees, charges or taxes owing from Producer to CIMI shall be paid to CIMI based upon the terms and conditions ("quoted payment terms") included in each quote delivered by CIMI to Producer.

b.   If the quote does not include "quoted payment terms", all premiums, taxes, charges, or fees are due and payable to CIMI as follows:

   i.   For monthly reporting policies and direct bill policies, deposit premiums are due at binding and reports and premiums are due fifteen (15) days following the end of each month.

   ii.   For all other policies, premiums, taxes, charges or fees must be paid not later than ten (10) days following the end of each month based upon CIMI's statement of account.

c.   If the Producer cannot, with its best efforts, collect premiums determined to be due by an audit conducted by CIMI or the insurer ("audit premiums"), Producer is not liable to CIMI for "audit premiums" if:

   i.   The Producer has notified CIMI in writing that the Producer cannot collect the additional premium within thirty (30) days of receipt of a notice that additional premiums are due as a result of a final audit; and

   ii.   The Producer demonstrates proof of a good-faith effort to collect the "audit premiums"; and

1

EXHIBIT 6

iii.    CIMI is not required to pay the insurer for such "audit premiums."

CIMI will owe no commissions to Producer on "audit premiums" returned for collection.

This Amendment to Producer Agreement is signed by the parties on the respective dates indicated below and shall be effective as of the ___2___ day of _September_, 2009, but shall not be binding on either party until it is accepted by CIMI at its office in Chandler, Oklahoma.

PRODUCER: Woods Insurance Services, Inc.

By: _____

_Roy L. "Bunky" Owen_
Print or type name

_President_
Title

WITNESS

By: _____

_Deanne Levesque_
Print or type name

Accepted at Chandler, Oklahoma this ___8th___ day of _Sept_, 2009.

CHANDLER INSURANCE MANAGERS, INC.

By: _____

_Kyle Baker_
Print or type name

_Marketing Manager_
Title

2

EXHIBIT 6



5/19/2008

Re: Commissions and Profit Sharing Schedule for Woods Insurance Services in reference to Aztec Well Service account written through NAICO (National American Insurance Co.) & CIMI (Chandlers Insurance Managers Inc.)

National American Insurance Co. agrees to give 15% on GL and Auto even though it is written through State National. This will be included in Profit Sharing.

National American Insurance Co. agrees to give 10% on Work Comp policies and this will be included in Profit Sharing.

Cargo and rigging coverage is written through Praetorian. Commission is a standard pay by CIMI (Chandlers Insurance Managers Inc.). This is not included in Profit Sharing.

Umbrella is written with AIG through CIMI (Chandlers Insurance Managers Inc.). Commission is 10% and is not included in Profit Sharing.

*Brent LaGere*

Brent LaGere
CEO

1010 Manvel Avenue ❑ P.O. Box 9 ❑ Chandler, Oklahoma 74834
(405) 258-0804 ❑ WATS 1-800-822-7802

EXHIBIT 6

# PRODUCER AGREEMENT

This Agreement executed in duplicate by and between Chandler Insurance Managers Inc., having its principal office at 1010 Manvel Avenue, Chandler, Oklahoma, 74834 (hereinafter referred to as "CIMI" and ___Woods Insurance Service, Inc.___, a ___Corporation___
(corporation/partnership/sole proprietorship)
having its principal office at ___4801 N. Butler Ave, Ste. 12101 Farmington, NM 87740___ (hereinafter referred to as "the Producer").

WHEREAS, the Producer desires to utilize the services and facilities of CIMI in obtaining insurance coverages for the Producer's clients; and

WHEREAS, CIMI agrees to extend such services and facilities to the Producer subject to the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.  **Proper License:**  The Producer warrants that it is properly licensed to transact business as an agent or broker in accordance with the insurance laws of the state or states in which the Producer transacts such business.

2.  **Commission:** CIMI agrees to allow the Producer commission on insurance coverages placed by the Producer through CIMI in accordance with the rate of commissions stipulated by CIMI. In the event that such coverages are canceled or modified (regardless of whether such cancellation or modification is instituted by the insurance company, the insured, legally-empowered regulatory offices, a premium finance entity, or by any other person), the Producer agrees to immediately remit to CIMI commissions on any return premiums at the same rate at which such return premiums are calculated within thirty (30) days following CIMI's demand for return commission. No insurance contract may be returned to CIMI by the Producer for flat cancellation unless no regulatory filings have been made and unless the policy is returned prior to its effective date. Earned premium shall be computed and charged on every contract canceled after effective date in accordance with the cancellation provisions of such contract unless otherwise prescribed by law.

3.  **Guarantee of Payment:**  The Producer guarantees payment of all premiums, excess and surplus lines taxes, policy fees, or any other charges or fees directly related to the policies of insurance placed through CIMI. All such premiums, taxes and other amounts, charges, or fees shall be paid upon the following terms and conditions:

    a.  Premiums, fees, charges or taxes owing from Producer to CIMI shall be paid to CIMI based upon the terms and conditions ("quoted payment terms") included in each quote delivered by CIMI to Producer. No policy will be bound unless and until CIMI has received payment of deposit premium for such policy.

EXHIBIT 6

b.  If the quote does not include "quoted payment terms", all premiums, taxes, charges, or fees are due and payable to CIMI not later than fifteen (15) days following the effective date of the applicable policy or if such premiums, taxes, charges, or fees have not been calculated on or before the effective date of the applicable policy, then, such payment is due within ten (10) days of written notice or demand for payment sent by CIMI to Producer's address as stated in this Agreement.

c.  If the Producer cannot, with its best efforts, collect premiums determined to be due by an audit conducted by CIMI or the insurer ("audit premiums"), Producer is not liable to CIMI for "audit premiums" if:

    i.  The Producer has notified CIMI in writing that the Producer cannot collect the additional premium within thirty (30) days of receipt of a notice that additional premiums are due as a result of a final audit; and

    ii.  The Producer demonstrates proof of a good-faith effort to collect the "audit premiums"; and

    iii.  CIMI is not required to pay the insurer for such "audit premiums."

d.  CIMI will owe no commissions to Producer on "audit premiums" returned for collection.

4.  **Reporting and Payment of Excess and Surplus Lines Tax:** Producer shall be solely responsible for collecting, reporting and paying excess and surplus lines taxes, if any, with respect to any policy or polices placed by CIMI at the request of Producer.

5.  **Direct Collection on Producer Default:** If premiums on any policy are not paid when due, CIMI may, at its option, and without waiving any of its rights as to Producer, collect the premium due from the insured. In the event CIMI collects the premium or any part thereof from the insured, the Producer shall not be entitled to any commission on the premium so collected. Attempts by CIMI to collect from the insured shall not relieve the Producer of liability to CIMI except to the extent of amounts actually collected by CIMI from the insured. CIMI reserves the right to cancel or request that the insurer cancel any policies for which premium payments are delinquent.

6.  **Cost of Collection and Litigation:** CIMI shall be entitled to recover the cost of collection from the Producer, including reasonable attorney's fees incurred in an effort to collect unpaid premium. The prevailing party in any litigation arising from or relating to this Agreement shall be entitled to recover reasonable attorney's fees and litigation expenses.

EXHIBIT 6

7. **Issuance of Certificates Is Producer's Sole Responsibility:** Certificates of insurance are issued by Producer at its sole risk and expense. CIMI neither authorizes, encourages, or discourages the issuance of certificates. Certificates are merely an expression of Producer's opinion regarding coverage. CIMI shall confirm or deny the existence of a policy or policies if requested by Producer, but shall not issue certificates of insurance.

8. **Indemnification:** Each party agrees that it will indemnify and hold the other harmless from and against all claims, losses, damages, liabilities, judgments or settlements including reasonable attorney's fees, arising out of or related to any negligence, wrongful act, violation of law or regulation or any error or omission of such indemnifying party, except to the extent that such act, error or omission was caused by, contributed to or compounded by the indemnified party.

9. **E&O Insurance Coverage:** Errors & Omissions Insurance Coverage shall be maintained by the Producer. The undersigned Producer hereby represents and warrants that such coverage exists and is in good standing and is maintained to a limit of liability of One Million Dollars ($1,000,00.00). It is further agreed that the Producer shall provide evidence of such coverage when requested by CIMI.

10. **No Implied Authority:** The Producer shall not bind CIMI as respects any insurance without the prior written authorization of CIMI in each case; nor shall the Producer place any advertisement respecting CIMI in any publication, or issue or distribute any circular or paper referring to CIMI without the prior consent of CIMI in writing. The Producer agrees to defend CIMI and pay all costs and damages incurred by CIMI resulting directly or indirectly from any such unauthorized binder, advertisement, publication, issuance or distribution.

11. **Entire Agreement:** This instrument constitutes the entire Agreement between the parties and supersedes all previous agreements entered into between the parties hereto; and all such previous agreements, whether oral or written, are hereby merged into this instrument.

12. **Termination:** This Agreement may be canceled at any time, upon thirty (30) days written notice of either party to the other, but said cancellation shall not alter, in any way, the continued application of this Agreement to insurance policies effective prior to the date of such cancellation.

13. **Choice of Law, Jurisdiction, and Venue:** This Agreement shall be construed under the laws of the State of Oklahoma, and Producer consents to jurisdiction of the State Court of general jurisdiction in Lincoln County, Oklahoma, for any action arising from or relating to this Agreement and such court shall be the exclusive venue for any such action.

EXHIBIT 6

This Agreement is signed by the parties on the respective dates indicated below and shall be effective as of the ____6th____ day of ____March____, 20_06_, but shall not be binding on either party until it is accepted by CIMI at its office in Chandler, Oklahoma.

PRODUCER

BY: _Beverly Owen_
     Name

_Vice-President_
     Title

WITNESS

BY: _Dianne Kwinque_
     Name

Accepted at Chandler, Oklahoma this ___4___ day of _May_____, 20_06_

CHANDLER INSURANCE MANAGERS, INC.

BY: _Tina Christy_
     Name

_Vice-President_
     Title

Edition 12-04

4

EXHIBIT 6



# PROFIT SHARING AGREEMENT

EXHIBIT 6

Woods Insurance Service, Inc.
(Agent)

In addition to the commissions otherwise payable, National American Insurance Company agrees to allow Agent a profit sharing commission to be computed as herein described.

**Premiums earned** represent the actual premiums earned during the Plan Period as shown by the records of National American Insurance Company.

**Losses incurred** represent losses, reserves for losses and loss adjustment expenses paid and reserved. These losses are valued as of June 30th following the Plan Period.

**Loss Ratio** is the percentage obtained by dividing **losses incurred** by **premiums earned.**

The **Plan period** is January 1st to December 31st.

## CONDITIONS

Company reserves the right to amend this Agreement by giving sixty (60) days written notice to Agent of the terms and conditions of the amendment. Company and Agent may amend this Agreement at any time with an amendment executed by both parties.

In case of misunderstanding as to the interpretation or application of any provision of this Agreement, it is agreed that such differences will be submitted to two arbitrators, one to be appointed by Company and one to be appointed by Agent. The arbitrators will select an experienced umpire who will have no conflict of interest in the matter. A decision rendered in writing and signed by any two of the persons acting hereunder shall be final and binding upon both Company and Agent. In the event of arbitration, Agent agrees to bear all of the expenses of its selected arbitrator and one half of the expenses of the umpire and Company agrees to bear all of the expenses of its selected arbitrator and one half of the expenses of the umpire.

If Company charges off as uncollectible, premiums on business not otherwise excluded under this Agreement, which by agreement, Agent has been relieved from paying Company, such premiums will be deducted from premiums earned for the profit sharing period during which such charge off occurred.

If Agent is delinquent in the payment of any monies due Company or in rendering an account current statement, any amount due Agent under this Agreement will not be paid to Agent. When the delinquency has been eliminated, payment of monies due Agent under this Agreement will be adjusted to reflect any unreimbursed costs incurred by Company may apply any monies due under this Agreement against any other amounts due Company Agent, including but not limited to, any costs of collection incurred by Company.

EXHIBIT 6

This Agreement may be terminated by either party at any time upon written notice to the other stating when, not less than ninety (90) days after the mailing of such notice, such cancellation will become effective, or immediately upon termination of the Agency Agreement, whichever occurs first. The final profit sharing calculation will be made as of June 30th following the plan period.

Profit sharing commission is payable only by Company check or draft.

This agreement is not assignable.

The following line descriptions only are included in the calculation of the profit sharing: **Workers' Compensation, Automobile Liability, Physical Damage and General Liability** unless rated under a retrospective rating plan or under the Municipality or School program.

No profit sharing payments will be made for any calendar year period during which the net premiums written are less than $ 250,000.

The profit sharing amount due Agent will be paid within 60 days following June 30th after each Plan Period.

### PROFIT SHARING CALCULATION TABLE

| Loss Ratio | Profit Commission Factor |
|---|---|
| 60% and over | 0% |
| 55% - 59.9% | .5% |
| 50% - 54.9% | 1.0% |
| 45% - 49.9% | 1.5% |
| 40% - 44.9% | 2.0% |
| 35% - 39.9% | 2.5% |
| 30% - 34.9% | 3.0% |
| 29.9% and below | 3.5% |

The **Profit Sharing Commission** is determined by multiplying the **Earned Premium,** for the Plan Period, by the **Profit Commission Factor.**

IN WITNESS WHEREOF, this agreement has been signed by the parties hereto this _31_ day of _January_ , 19 _96_ .

Woods Insurance Service, Inc.

                                                        (Agent)

BY: _____

Roy Owen
NATIONAL AMERICAN INSURANCE COMPANY
                                                        (Company)

BY: _____ Chairman & CEO

EXHIBIT 6

# NATIONAL AMERICAN INSURANCE COMPANY

## PROFIT SHARING AGREEMENT

### Amendment A

Beginning with the calculation of the 1998 Plan period your Profit Sharing Agreement is changed as follows:

1. The line description **Property** will be **included** in the calculation of the profit sharing.

2. The line description **Umbrella** is **not included** in the calculation of the profit sharing.

In witness whereof, this amendment has been signed by the parties hereto this ___15___ day of ___MARCH___ 19 _99_.

WOODS INSURANCE
(Agent)

By: _____

NATIONAL AMERICAN INSURANCE COMPANY

By: _____

EXHIBIT 6



**NATIONAL AMERICAN INSURANCE COMPANY**

*"Setting the standard that others strive for..."*™

### ADDENDUM TO NATIONAL AMERICAN INSURANCE COMPANY PROFIT SHARING AGREEMENT
#### Growth Bonus

Effective January 1, 2010 (1/1/10), this addendum amends the NAICO Profit Sharing Agreement between Company and the Agent.

If a Profit Sharing bonus is payable under the NAICO Profit Sharing Agreement, and if the total eligible Written Premium for the calendar year equals or exceeds one hundred twenty five percent (125%) of the total eligible Written Premium for the prior calendar year, a growth bonus shall be payable. The amount of the growth bonus shall be 25% of the Profit Sharing Bonus amount otherwise payable as calculated under the Profit Sharing agreement between the Company and the Agent.

IN WITNESS WHEROF, the Company and the Agent have signed this Addendum this _25th_ day of _May_ _2010_.

FOR THE AGENT

By: _____

Name: _Bunky Owens_

Title: _President_

FOR THE COMPANY

By: _____

Name: _Lance LaGere_

Title: _EVP & COO_

Agency Name: _Woods Insurance Service, Inc._

1010 Manvel Avenue θ P.O. Box 9 θ Chandler, Oklahoma 74834
(405)258-0804 θ WATS 1-800-822-7802

EXHIBIT 6

# NATIONAL AMERICAN INSURANCE COMPANY

## COMMISSION SCHEDULE

| Workers' Compensation Premium Level | | Commission |
|---|---|---|
| $ 2,500. - | $ 5,000. | 10% |
| 5,001. - | 10,000. | 9% |
| 10,001. - | 20,000. | 8% |
| 20,001. - | 50,000. | 7% |
| 50,001. - | 100,000. | 6% |
| 100,001. - | 250,000. | 5% |
| 250,001. - | | 4% |

| | |
|---|---|
| Commercial Auto | 15% |
| Comprehensive General Liability | 15% |
| Umbrella/Excess Liability | 10% |
| Commercial Package | 15% |
| Commercial Property | 15% |
| Inland Marine | 15% |
| OIPA Program | 20% |
| Municipality | 15% |
| Personal Auto | 15% |
| Schools - Package | 10% |
| Schools - Workers' Compensation | 5% (Level) |

Commissions can be negotiated at any level.

EXHIBIT 6

# NATIONAL AMERICAN INSURANCE COMPANY

## COMMISSION SCHEDULE

**Workers' Compensation**
**Premium Level**

| | Commission |
|---|---|
| $0 - $25,000 | 10% |
| $25,001 - 100,000 | 7.5% |
| $100,001 & above | 5% |

| | |
|---|---|
| Commercial Auto | 15% |
| Comprehensive General Liability | 15% |
| Umbrella/Excess Liability | 10% |
| Commercial Package | 15% |
| Commercial Property | 15% |
| Inland Marine | 15% |
| OIPA Program | 20% |
| Municipality | 15% |
| Schools - Package | 10% |
| Schools - Workers' Compensation | 5% (Level) |

Commissions can be negotiated at any level.

12/29/99&mb

Standard Commission Schedule

EXHIBIT 6

# NATIONAL AMERICAN INSURANCE COMPANY

## COMMISSION SCHEDULE

Workers' Compensation
   Premium Level

| | Commission |
|---|---|
| $     0  - $  25,000 | 10% |
| $25,001 -   100,000 | 7.5% |
| $100,001 & above | 5% |

| | |
|---|---|
| Commercial Auto | 15% |
| Comprehensive General Liability | 15% |
| Umbrella/Excess Liability | 10% |
| Commercial Package | 15% |
| Commercial Property | 15% |
| Inland Marine | 15% |
| OIPA Program | 20% |
| Municipality | 15% |
| Personal Auto | 15% |
| Schools - Package | 10% |
| Schools - Workers' Compensation | 5% (Level) |

Commissions can be negotiated at any level.

6-19-96 Rev.

STDCOMM.WPD

EXHIBIT 6



5/19/2008

Re: Commissions and Profit Sharing Schedule for Woods Insurance Services in reference to Aztec Well Service account written through NAICO (National American Insurance Co.) & CIMI (Chandlers Insurance Managers Inc.)

National American Insurance Co. agrees to give 15% on GL and Auto even though it is written through State National. This will be included in Profit Sharing.

National American Insurance Co. agrees to give 10% on Work Comp policies and this will be included in Profit Sharing.

Cargo and rigging coverage is written through Praetorian. Commission is a standard pay by CIMI (Chandlers Insurance Managers Inc.). This is <u>not</u> included in Profit Sharing.

Umbrella is written with AIG through CIMI (Chandlers Insurance Managers Inc.). Commission is 10% and is not included in Profit Sharing.

Brent LaGere
CEO

1010 Manvel Avenue ❏ P.O. Box 9 ❏ Chandler, Oklahoma 74834
(405) 258-0804 ❏ WATS 1-800-822-7802

<span style="color:red">EXHIBIT 6</span>

```
DATE:  2/27/2017          NATIONAL AMERICAN INSURANCE CO        PMR0015
                          NOTE PAD LISTING AS OF 10:54:04        PAGE:    1


POLICY :   MP10570130 -
CLAIM :    BA140707

-----------------------------------------------------------------------
 ********************************* Report & Diary Control Date: 4/20/2015
* BA140707 - ABC Concrete:  Nelson v ABC Concrete & Montano
* BA140707 - ABC Concrete:  NAICO v ABC Concrete, et al
 **********************************************************************
   04-20-15 DHARRISON - Reviewed F9 on claim notepad.  I need to handle coveage.
Opened coverage assist & set diary for initial review.
*** REVIEW DIARY DATE SET FOR 04/22/2015 FOR DHARRISON. ***
   04-22-15 DHARRISON - Reviewed F9 from James Malone in claim notepad.  IV was
added to schedule on policy 3 months after accident.
04-22-15 *DOC DHARRISON-MP10570130 - 2/09/14-15
04-22-15 *DOC DHARRISON-MB47270130 - 2/09/14-15
04-22-15 *DOC DHARRISON-4/18/15 FIRST REPT W/ ENCL: TENDER LETTER & COMPLAINT
04-22-15 *DOC DHARRISON-1/09/2012 TRUCK LEASE & SERVICE AGREEMENT
   04-22-15 DHARRISON - Reviewed file.  Pltf's file suit against ABC Concrete &
driver Nicholas Montano alleging that Montano is an employee of ABC Concrete.
   04-22-15 DHARRISON - Sent EM to Ryan Gilmore for coverage review.
04-22-15 *DOC DHARRISON-4/22/15 EM TO RYAN GILMORE FOR COVERAGE REVIEW
   04-22-15 DHARRISON - Sent policy links to Ryan Gilmore.
4-22-15 *DOC DHARRISON-DOCUMENT ACCESS BATCH 11652 SENT TO RGILMORE@NAICO.COM
Subject: BA140707 - ABC Concrete
04-22-15 *DOC DHARRISON-4/22/15 EM TO RYAN GILMORE - POLICY LINKS
   04-22-15 DHARRISON - Reviewed & noted above.  File has been submitted to
Legal for review.
*** REVIEW DIARY DATE SET FOR 04/27/2015 FOR DHARRISON. ***
   04-23-15 DHARRISON - Discussed with James Malone.  Apparently, Concrete pays
Septic's wages & insurance in exchange for Septic hauling Concrete's products.
All payroll is on Concrete's checks.
   04-24-15 DHARRISON - Discussed with James M yesterday.  Sent supplemental EM
to Ryan Gilmore with additional information.
04-24-15 *DOC DHARRISON-4/24/15 EM TO RYAN GILMORE - COVERAGE (SUPPLEMENTAL)
   04-24-15 DHARRISON - Reviewed & noted above.  Waiting for response from
Legal.
*** REVIEW DIARY DATE SET FOR 05/04/2015 FOR DHARRISON. ***
   04-27-15 DHARRISON - Reviewed F9 from James B on claim notepad.  We have now
received a copy of Scottsdale's policy.  Reviewed, bookmarked & highlighted the
Scottsdale policy.
04-27-15 *DOC DHARRISON-LTO0015269 - 11/05/13-14 (SCOTTSDALE) BKMK'D & HILITED
   04-27-15 DHARRISON - Sent supplemental em to Ryan Gilmore regarding coverage.
04-27-15 *DOC DHARRISON-4/27/15 EM TO RYAN GILMORE - COVERAGE(2ND SUPPLEMENTAL)
   05-01-15 DHARRISON - Reviewed file.  I have submitted this file to Legal for
coverage review in 3 separate EMs dated 4/22, 4/24 & 4/27.  I am currently
waiting for a response from Legal regarding the coverage & primary/excess
issues.
*** REVIEW DIARY DATE SET FOR 05/06/2015 FOR DHARRISON. ***
05-04-15 *DOC DHARRISON-5/04/15 RYAN GILMORE EM - COVERAGE
   05-04-15 DHARRISON - Reviewed & noted above.  Sent EM to Ryan & Pat asking if
they are available to meet on Wednesday.
   05-04-15 DHARRISON - Meeting to discuss this file has been set Wednesday @
9:30 AM in Rick's conference room.
```



EXHIBIT 7

```
DATE:  2/27/2017           NATIONAL AMERICAN INSURANCE CO       PMR0015
                           NOTE PAD LISTING AS OF 10:54:04       PAGE:    2


POLICY :  MP10570130 -
CLAIM  :  BA140707
```
---------------------------------------------------------------------------
*** REVIEW DIARY DATE SET FOR 05/11/2015 FOR DHARRISON. ***
05-06-15 *DOC DHARRISON-4/30-5/05/15 E-MAILS (11) SETTING MEETING
  05-06-15 DHARRISON - Discussed file in meeting with Rick, Tony, Pat, Ryan,
James B & James M.  Pat will draft letter for my signature in response to the
tender.
*** REVIEW DIARY DATE SET FOR 05/13/2015 FOR DHARRISON. ***
  05-07-15 DHARRISON - Discussed with Pat at the Senior meeting.  He is working
on letter.
*** REVIEW DIARY DATE SET FOR 05/15/2015 FOR DHARRISON. ***
  05-08-15 DHARRISON - Reviewed initial draft prepared by Pat Gilmore.  Made 1
addition and sent to Pat in red-lined version.
  05-08-15 DHARRISON - Pat called to discuss my change.  He may incorporate
into his draft with some minor changes.  He is continuing work on the letter.
05-08-15 *DOC DHARRISON-5/07/15 PAT GILMORE MEMO RE PRIOR CLAIM NOT REPORTED
05-08-15 *DOC DHARRISON-5/08/15 EM TO PAT GILMORE RE CLAIMS HISTORY
  05-08-15 DHARRISON - Received final draft of RORL.  Updated with CC info and
sent to Cheryll Griggs for priting.
*** REVIEW DIARY DATE SET FOR 05/18/2015 FOR DHARRISON. ***
  05-11-15 DHARRISON - Received printed letter.  I forgot to update the RE:
information on the first page.  Updated letter & sent to Cheryll to print.
  05-11-15 DHARRISON - Signed & scanned letter.  Gave original to Tracy Beall
to mail.  Sent copies by EM to: J Stephanie Krmpotic, Woods Insurance Service,
ABC Concrete Mfg Co. and James Malone.
05-11-15 *DOC DHARRISON-5/11/15 ABC RORL TO KRMPOTIC
05-11-15 *DOC DHARRISON-5/11/15 EM DISTRIBUTING COPIES OF ABC RORL TO KRMPOTIC
  05-11-15 DHARRISON - Reviewed & noted above.  RORL has been mailed.
*** REVIEW DIARY DATE SET FOR 06/17/2015 FOR DHARRISON. ***
05-13-15 *DOC DHARRISON-5/11/15 CERT MAIL RECIEPT FOR MAILING RORL TO KRMPOTIC
05-20-15 *DOC DHARRISON-5/14/15 SIGNED RECEIPT FOR ABC RORL TO KRYMPOTIC
  05-21-15 DHARRISON - Michael Heifort w/ National Casualty called.  Wanted to
know why we felt our policy did not apply.  NAICO's coverage symbol for liabili
liability is 1 and our insured owns the vehicle.  It appears to him that the
NAICO policy applies and that NAICO is primary.  Advised him I would discuss w/
Legal and get back to him in a few days.  His number is 651-252-3151.
05-22-15 *DOC DHARRISON-5/22/15 EM TO PAT & RYAN REQUESTING MEETING
  05-22-15 DHARRISON - Exchanged EMs and discussed with Rick & Tony.  Meeting
is set Tuesday, 5/26/15 @ 9:30 AM in Rick's conference room.  Added to my Lotus
calendar.
*** REVIEW DIARY DATE SET FOR 05/26/2015 FOR DHARRISON. ***
  05-26-15 DHARRISON - Cheryll called.  Rick delayed due to travel problems.
He will not be in the office until noon.  I need to reschedule the meeting.
Rescheduled for 2:00 PM today and sent confirming EMs to all.  Pat, Ryan & Tony
have acknowledged that they are available for the new time.  Updated my Lotus
calendar.
  05-26-15 DHARRISON - Discussed file in meeting with Pat, Ryan, Rick, Tony,
Tracie & James M.  Policy does not apply because it was issued w/ sym 1 in
error.  Should have been 7,8&9.  UW has reformed the current policy.  We are
not issuing change on this policy because it has expired.  However, if we are
pushed &/or sued for coverage, we will counter with a dec action to reform.  I

EXHIBIT 7

```
DATE:  2/27/2017          NATIONAL AMERICAN INSURANCE CO      PMR0015
                          NOTE PAD LISTING AS OF 10:54:04     PAGE:    3


POLICY :   MP10570130 -
CLAIM :    BA140707
------------------------------------------------------------------------
will advise Heifort of our position.  We will not participate in defense and
will not take any further action unless pushed by National Casualty or Insured.
   05-28-15 DHARRISON - Discussed with Tony.  In the meeting, we discussed that
someone should call Bunky (agent) to see if they are the agent on the Nat Cas
policy and if so, request a copy of the application submitted.  It was my
understanding that James M or Tony would call agent.  However, Rick wanted me
to make the call.  I will call Bunky today.
   05-28-15 DHARRISON - Called Bunky Owen @ Woods Insurance Service, Inc.:
505-326-1111.  L/M.
   05-29-15 DHARRISON - Called Bunky Owen.  L/M.
*** REVIEW DIARY DATE SET FOR 06/02/2015 FOR DHARRISON. ***
   05-29-15 DHARRISON - Bunky Owen called.  He wasn't aware of claim.  I went
over the issues that are going on and explained whey we wanted National
Casualty's application.  He doesn't recall, but doesn't think they were the
broker of Septic's coverage.  He will check their files and call me back.
   05-29-15 DHARRISON - Bunky Owen called.  They were not the agent for Septic's
policy with National Casualty.  Bunky asked for copies of correspondence for
his file.
05-29-15 *DOC DHARRISON-5/29/15 EM TO BUNKY OWEN - COPIES OF LETTERS
   06-02-15 DHARRISON - Discussed with Jackie w/ Woods Insurance.  She had some
questions regarding this claim.  NAICO has cancelled the current policy
effective 6/06/15.
   06-02-15 DHARRISON - Discussed above with Pat Gilmore.  He will call Bunky.
Pat asked for copies of cancellation docs for his file.
06-02-15 *DOC DHARRISON-6/02/15 EM TO PAT GILMORE - CANCELLATION DOCS
   06-03-15 DHARRISON - Discussed with Pat Gilmore.  He will be discussing this
file in Senior today.  He asked for a copy of the letter mailed to Low Ball.
Sent copy to Pat by EM.
*** REVIEW DIARY DATE SET FOR 06/08/2015 FOR DHARRISON. ***
   06-03-15 DHARRISON - Discussed file in Senior meeting.  Due to info provided
by agent in EMs exchanged with UW during the application process and some
incorrectly answered questions on the application, it is our position that the
policy should have been issued with symbols 7,8&9 instead of 1 for liability.
If the policy had been issued correctly, NAICO would have not coverage.  Our
position will be our policy does not apply.  If Scottsdale pursues further, we
will file a Dec Action to reform the policy.
   06-04-15 DHARRISON - Called Michael Heifort.  Explained our position.  He
will pass it on up the chain of command and go from there.
*** REVIEW DIARY DATE SET FOR 06/17/2015 FOR DHARRISON. ***
06-08-15 *DOC DHARRISON-6/05/15 PAT GILMORE EM - INSD HAS NEW AGENT
   06-10-15 DHARRISON - Reviewed file.
*** REVIEW DIARY DATE SET FOR 07/22/2015 FOR DHARRISON. ***
   06-17-15 REVANS Note - ins'd changed agents.. Not sure we have much leverage
as to affadavit from Ins'd on coverage application ....
   07-01-15 REVANS  Dick -- Thought we were going to contact the insured
about an affidavit that other policy was to be applicable?
Did I misunderstand?
*** NOTEPAD REVIEW REQ. CREATED ON 07/01/2015 BY REVANS. SENT TO DHARRISON. ***
   07-03-15 DHARRISON - Reviewed & noted above.
```

EXHIBIT 7

```
DATE:  2/27/2017          NATIONAL AMERICAN INSURANCE CO      PMR0015
                          NOTE PAD LISTING AS OF 10:54:04     PAGE:    4


POLICY :   MP10570130 -
CLAIM  :   BA140707
```
--------------------------------------------------------------------------

   Rick:  No.  You did not misunderstand.  The agent is going to try to get the
insured to sign the form that Pat Gilmore provided to the agent.  Pat was the
one who talked to the agent about this.  I will follow-up with Pat next week.
Dick
*** NOTEPAD REVIEW REQ. CREATED ON 07/03/2015 BY DHARRISON. SENT TO REVANS. ***
*** REVIEW DIARY DATE SET FOR 07/08/2015 FOR DHARRISON. ***
   07-06-15 DHARRISON - Discussed with Pat Gilmore during a meeting on another
file.  He has not heard from the agent since their 6/05/15 EM.  He will call
the agent to follow-up.
07-09-15 *DOC DHARRISON-7/08/15 RPG EM FWD'G AGENT'S EM - AFFIDAVIT NOT SIGNED
   07-09-15 DHARRISON - Reviewed & noted above.  Insured is out of town for
three months.  Insured has new agent, our agent suggests the adjuster try to
get the affidavit signed during the investigation.  I will discuss with James
Malone.  Sent IM to James to drop by my office.
   07-09-15 DHARRISON - Discussed with James Malone.  He will see if the
insured pricipal will sign the affidavit.
   07-09-15 DHARRISON - Affidavit not in file.  I will need to get from Legal.
07-13-15 *DOC DHARRISON-7/13/15 JANET TAYLOR EM - 6/3/15 LETTER & AFFIDAVIT
   07-13-15 DHARRISON - Sent IM to James Malone that Affidavit is now in file.
   07-15-15 DHARRISON - Reviewed F9 from James Malone on claim notepad.  The
insured has declined to sign the affidavit.
   07-15-15 DHARRISON - Sent EM to Pat Gilmore w/ copies of Doug Murray's EMs &
asking Pat opinion regarding how to proceed.  CCed Ryan & CMG.
07-15-15 *DOC DHARRISON-7/15/15 EM TO PAT GILMORE W/ DOUG MURRAY'S EMAILS
07-15-15 *DOC DHARRISON-7/15/15 RPG EM - WE SHOULD WAIT TO SEE WHAT HAPPENS
   07-15-15 DHARRISON - Reviewed & noted above.
*** REVIEW DIARY DATE SET FOR 08/19/2015 FOR DHARRISON. ***
   08-11-15 DHARRISON - Reviewed file.  Still no response from Scottsdale.
*** REVIEW DIARY DATE SET FOR 10/21/2015 FOR DHARRISON. ***
   10-15-15 DHARRISON - Reviewed file.
*** REVIEW DIARY DATE SET FOR 12/23/2015 FOR DHARRISON. ***
11-05-15 *DOC DHARRISON-11/05/15 NCC LETTER: 1/05/16 MEDIATION & SETTLEMENT
   11-05-15 DHARRISON - Reviewed & noted above.  NCC is looking to NAICO to
participate in settlement at mediation as a co-primary insurer.  They are going
after NAICO for reimbursement if we do not participate.  Sent email to Ryan
Gilmore with a copy of the letter.  CCed Pat Gilmore & CMG.
11-05-15 *DOC DHARRISON-11/05/15 EM TO RYAN GILMORE W/ NCC LETTER
   11-05-15 DHARRISON - Reviewed & noted above.  Response from Legal pending.
*** REVIEW DIARY DATE SET FOR 11/18/2015 FOR DHARRISON. ***
11-06-15 *DOC DHARRISON-11/05/15 RYAN GILMORE EM - NEED TO MEET TO DISCUSS
   11-06-15 DHARRISON - Discussed with Pat Gilmore after the Senior meeting
yesterday PM.  He told Ryan to review and then get Pat up to speed on this.  We
can set meeting after that.
   11-06-15 DHARRISON - Sent email to Ryan asking him to let me know when he &
Pat are ready so that I can set up a meeting.
11-06-15 *DOC DHARRISON-11/06/15 EM TO RYAN GILMORE RE MEETING
   11-20-15 DHARRISON - Reviewed file on diary.  Still waiting for Legal to
advise when they are ready to discuss this file in a meeting.
*** REVIEW DIARY DATE SET FOR 11/30/2015 FOR DHARRISON. ***

EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NATIONAL AMERICAN INSURANCE COMPANY,

      Plaintiff,

vs.                             No. 1:15-cv-01169 KG-KBM

ABC CONCRETE MFG. CO., INC.;
ABC CONCRETE MFG. CO., INC.,
d/b/a ABC SEPTIC SYSTEMS, INC.;
NICHOLAS MONTANO;
SCOTTSDALE INSURANCE COMPANY;
and NATIONAL CASUALTY COMPANY,

      Defendants.

## PLAINTIFF NATIONAL AMERICAN INSURANCE COMPANY'S RESPONSES TO DEFENDANT NATIONAL CASUALTY COMPANY'S FIRST REQUESTS FOR ADMISSION

COMES NOW, Plaintiff National American Insurance Company, by and through its attorneys of record, Butt Thornton & Baehr PC (James H. Johansen), and for its Responses to Defendant National Casualty Company's First Requests for Admission, states as follows:

**REQUEST NO. 1.** Admit that Woods Insurance Service, Inc. was an agent of both NAICO and ABC Concrete with regard to the procurement of the subject policy.

**RESPONSE:** Admit.

EXHIBIT 8

**REQUEST NO. 31.**   Admit that NAICO did not rely upon any information from the FMCSA website found at www.safersys.org in the underwriting of the NAICO policy at issue.

**RESPONSE:**  Admit.


**REQUEST NO. 32.**   Admit that Nicholas Montano was issued a federal W-2 form or a federal 1099 form from ABC Concrete for his work for ABC Concrete in 2014.

**RESPONSE:**  Admit.


**REQUEST NO. 33.**   Admit that, with respect to the allegations in paragraph 40 of NAICO's amended complaint, NAICO is not suggesting that Woods Insurance Service, Inc. or ABC Concrete asked that the inclusion of the Freight liner on the NAICO policy be backdated to the date of the accident or before the date of the accident.

**RESPONSE:**  Admit.

BUTT THORNTON & BAEHR PC


_____
James H. Johansen
*Attorneys for Plaintiff*
*National American Insurance Company*
P.O. Box 3170
Albuquerque, NM  87190
Telephone:  (505) 884-0777
jhjohansen@btblaw.com

DATE:  January 13, 2017

EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NATIONAL AMERICAN INSURANCE COMPANY,

      Plaintiff,

vs.                                   No. 1:15-cv-01169 KG-KBM

ABC CONCRETE MFG. CO., INC.;
ABC CONCRETE MFG. CO., INC.,
d/b/a ABC SEPTIC SYSTEMS, INC.;
NICHOLAS MONTANO;
SCOTTSDALE INSURANCE COMPANY;
and NATIONAL CASUALTY COMPANY,

      Defendants.

**PLAINTIFF NATIONAL AMERICAN INSURANCE COMPANY'S ANSWERS TO
DEFENDANT NATIONAL CASUALTY COMPANY'S FIRST INTERROGATORIES**

COMES NOW, Plaintiff National American Insurance Company, by and through its attorneys of record, Butt Thornton & Baehr PC (James H. Johansen), and for its Answers to Defendant National Casualty Company's First Interrogatories, states as follows:

**INTERROGATORY NO. 1.** To the extent NAICO denied any request for admission contained in NCC's First Requests for Admission to NAICO, please identify the bases for such denial and any fact or item of real or documentary evidence that supports such contention.

**ANSWER:**

Request No. 5: NAICO was not aware that at the time it had agreed to provide coverage for ABC Concrete under the policy in effect at the time of the 8/7/14 accident, that ABC Concrete had interstate authority from the FMCSA to operate as a private motor carrier.

EXHIBIT 9

Request No. 6: NAICO would have only reviewed information from the FMCSA website had NAICO known that ABC Concrete was a motor carrier.

Request No. 7: NAICO would have only reviewed information from the FMCSA website had NAICO known that ABC Concrete was a motor carrier.

Request No. 8: NAICO never intended for its policy to cover autos that were being used by ABC Concrete to operate as a private motor carrier in interstate commerce.

Request No. 9: NAICO was not aware that ABC Concrete had authority to operate as a private motor carrier. NAICO intended their policy to cover "all autos" but not those operating "for hire."

Request No. 11: NAICO was unaware of "the numerous trips to/from Ft. Bliss, Texas and Naco, Arizona, performed in 2014," but acknowledges that there would be coverage absent reformation based upon the mutual mistake of the parties.

Request No. 12: NAICO is seeking, among other things, a Judgment to reform the NAICO policy to limit liability coverage to "Specifically Described 'Autos'" that were not intended to be used as for-hire, long-haul, interstate trucking.

Request No. 13: NAICO is seeking, among other things, a Judgment to reform the NAICO policy to limit liability coverage to "Specifically Described 'Autos'" that were not intended to be used as for-hire, long-haul, interstate trucking.

Request No. 14: NAICO is unaware if any of the scheduled autos that were not intended to be used as for-hire, long-haul, interstate trucking were mechanically or administratively capable of transporting goods in interstate commerce.

EXHIBIT 9

Request No. 15: NAICO is unaware if any of the scheduled autos that were not intended to be used as for-hire, long-haul, interstate trucking were mechanically or administratively capable of transporting goods in interstate commerce.

Request No. 20: NAICO did not intend to insure "trucks operated under ABC Concrete's authority as a private, interstate motor carrier."

Request No. 25: NAICO was under the belief, as was Doug Murray, that ABC Septic was not "doing business as" ABC Concrete but rather the entities were distinct legal entities.

Request No. 28: NAICO has no way of knowing if Doug Murray had changed the substantive content of his website during any relevant time period.

Request No. 29: NAICO's underwriting protocols did not require NAICO to review a proposed insured's website as part of the process of determining whether NAICO will issue a policy to the potential insured.

Request No. 30: NAICO did not know that ABC Concrete was a "for-hire" motor carrier. NAICO directs counsel to its Response to Request No. 6 and 29.

**INTERROGATORY NO. 2.**   Please specify whether NAICO's underwriting department made any attempt to verify whether ABC Concrete and ABC Septic Systems were or were not separate legal entities before issuing the subject policy.  If there was any attempt, please specify each act taken by NAICO identifying the act by person performing the act, when the act was performed and identify any item of real or documentary evidence that was produced or reviewed as a result of such act.

**ANSWER:**   NAICO's underwriting department did not attempt to verify whether ABC Concrete and ABC Septic Systems were or were not separate legal entities. NAICO relied on the representations made to it by Doug Murray.

**INTERROGATORY NO. 3.**  Please specify all efforts by NAICO to determine the identity of the "separate operation" and/or to review the "separate insurance policy" referred to in Paragraph 25 of NAICO's Amended Complaint.  If there was any act by NAICO responsive hereto, please specify each act taken by NAICO identifying the act by person performing the act, when the act was performed and identify any item of real or documentary evidence that was produced or reviewed as a result of such act.

**ANSWER:**  No efforts were taken.

**INTERROGATORY NO. 4.**  Please identify any exclusion issued by or relied upon by NAICO that precludes or in any way limits coverage for "for -hire" operations of a motor carrier in the last 20 years.

**ANSWER:** Please see NAICO 004649–4683. Additionally, NAICO may have created manuscript exclusions for insureds over the span of the last twenty years, but NAICO has no practical or efficient way to search for those manuscript exclusions.

**INTERROGATORY NO. 7.**  Please specify each action or inaction of Woods Insurance Service, Inc. that was inappropriate.

**ANSWER:**   NAICO objects to Interrogatory No. 7 on the grounds that the term "inappropriate" is overly broad and vague. *See* Rule 26(b)(1). NAICO does not contend that actions undertaken by Woods Insurance Service, Inc. were "inappropriate," but NAICO does contend that information provided to NAICO did not properly represent the risks associated with ABC Concrete's operation.

BUTT THORNTON & BAEHR PC

_____

James H. Johansen
*Attorneys for Plaintiff*
*National American Insurance Company*
P.O. Box 3170
Albuquerque, NM  87190
Telephone:  (505) 884-0777
jhjohansen@btblaw.com

DATE:  January 13, 2017

6

EXHIBIT 9

## VERIFICATION

R. Patrick Gilmore affirms, under penalty of perjury under the laws of the State of New Mexico, the following to be true and correct:

That he is General Counsel with National American Insurance Company, that he has read over, knows and understands the contents of the foregoing Answers to Defendant National Casualty Company's First Interrogatories, and that the statements therein made are true and correct to the best of his knowledge, except those statements that are made upon information and belief, and as to those he believes them to be true.

R. PATRICK GILMORE
General Counsel
National American Insurance Company

EXHIBIT 9

PR#119220          MARSHALL, ANITA          2/28/2017

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


NATIONAL AMERICAN INSURANCE
COMPANY,

          Plaintiff,

vs.                              No. 1:15-CV-01169-KG-KBM


ABC CONCRETE MFG., CO., INC.;
ABC CONCRETE MFG. CO., INC.
d/b/a ABC SEPTIC SYSTEMS,
INC.; NICHOLAS MONTANO;
SCOTTSDALE INSURANCE COMPANY
and NATIONAL CASUALTY COMPANY,
          Defendants.


DEPOSITION OF ANITA MARSHALL
TAKEN ON BEHALF OF THE DEFNDANTS
ON FEBRUARY 28, 2017 AT 1:15 PM
IN OKLAHOMA CITY, OKLAHOMA


APPEARANCES
On behalf of the PLAINTIFF:
James H. Johansen
BUTT, THORNTON & BAEHR, P.C.
4101 Indian School Road, NE, Suite 300
Albuquerque, New Mexico  87110
505.884.0777
jhjohansen@btblaw.com
On behalf of the PLAINTIFF:
R. Patrick Gilmore
NATIONAL AMERICAN INSURANCE COMPANY
1010 Manvel Avenue
Chandler, Oklahoma  74834
405.258.4262
pgilmore@naico.com
(Appearances continued on Page 2.)
REPORTED BY:   Jody Graham, CSR, RPR, RMR, CRR

1

EXHIBIT 10

PR#119220          MARSHALL, ANITA          2/28/2017

---

1    Q   And when you were underwriting the policy
2  that we're here about today, you knew that Concrete
3  operated heavy tractor-trailers; right?
4    A   They had it listed on the schedule.
5    Q   Okay.  So you knew that.  And did you also
6  know that they operated in interstate commerce?
7    A   That they traveled, yes.
8    Q   Across state lines?
9    A   Yes.
10   Q   Okay.  And what was your understanding about
11 the radius of their operations?
12   A   I believe the application said 50-mile
13 radius.
14   Q   Okay.  And did you rely upon that in
15 underwriting this policy?
16   A   Yes.
17   Q   If they had said that they had a 500-mile
18 radius, would you have written this policy?
19       MR. JOHANSEN:  Object to the form.
20 Foundation, answer if you can.
21       THE WITNESS:  I don't know if it would have
22 changed anything.  It might have.
23   Q   (BY MR.McMICKLE) Do you have any reason
24 to believe it would have changed anything, or would
25 it have been the same?

10

---

1    A   I would -- I would decline it as an
2  underwriter.
3    Q   If what?
4    A   If it was for-hire.
5    Q   Why?
6    A   Because we don't do for-hire trucking.
7    Q   Well, do you do private trucking?
8    A   If they're hauling their own goods.  A lot
9  of companies do haul their own goods.
10   Q   Okay.  So have you -- what's the difference
11 between for-hire motor carriage and private motor
12 carriage other than who owns the goods that are on the
13 truck?
14   A   I don't know what you're asking me.
15   Q   In your mind -- or, well, are you aware of
16 any material distinction between for-hire motor
17 carriage and private motor carriage from an insurance
18 risk perspective?
19       MR. JOHANSEN:  Object to the form.
20 Foundation.  You can answer if you can.
21       THE WITNESS:  I would say it would be a
22 bigger -- greater exposure for-hire.
23   Q   (BY MR.McMICKLE) Okay.  Why?
24   A   More on-the-road exposure.
25   Q   So is that out of a -- is it your belief

12

---

1    A   I believe it would have been the same.
2    Q   Okay.  Do you know the difference between
3  for-hire motor carriage and private motor carriage?
4    A   Yes.
5    Q   What's the difference?
6    A   The for-hire is goods of other people.
7    Q   Okay.
8    A   And private is your own goods.
9    Q   Does NAICO, when it does underwrite someone
10 that operates as a motor carrier, does it distinguish
11 between for-hire motor carriers and private motor
12 carriers?
13       MR. JOHANSEN:  Object to the form.
14 Foundation.  Answer if you know.
15       THE WITNESS:  I don't understand what you're
16 asking me.
17   Q   (BY MR.McMICKLE) Have you ever seen NAICO
18 distinguish between insureds in terms of whether or
19 not they're a for-hire motor carrier versus a
20 private motor carrier?
21   A   I don't write trucking.
22   Q   Okay.
23   A   Or for-hire.
24   Q   Okay.  So is the answer you've never seen
25 any distinction?

11

---

1  that for-hire motor carriers are on the road more than
2  private motor carriers?
3    A   I would say in some instances.
4    Q   Okay.  Can you give me any specific instance
5  where you've had that experience?
6    A   No.
7    Q   Okay.  Are you aware that the for-hire motor
8  carrier drivers are subject to the same
9  hours-of-service regulations as the private motor
10 carrier drivers?
11   A   No.
12   Q   Okay.  If that is, in fact, true, would your
13 statement about more hours, would that -- what I'm
14 looking for is what is it that supports this argument
15 or suggestion that for-hire is different because it
16 involves more hours?
17       MR. JOHANSEN:  Object to the form.
18 Foundation.
19       THE WITNESS:  I don't know.
20   Q   (BY MR.McMICKLE) Okay.  Have you ever
21 seen anything in any underwriting guideline,
22 bulletin, rule, et cetera within NAICO that says,
23 "We don't insure for-hire motor carriers"?
24   A   I don't know.
25   Q   Have you ever had any discussion with

13

---

4 (Pages 10 to 13)

EXHIBIT 10

**Page 18**

1    A  For-hire?
2    Q  -- for-hire at least being rated.
3    A  No.  Then I misunderstood the question.
4    Q  Okay.  How do you know that the rating for
5  for-hire motor carriers is different or higher than
6  for private motor carriers?
7    A  I don't.
8    Q  Okay.  When NAICO -- and you want to talk
9  about somebody that's operating as a long-haul
10  trucker, okay, with "long-haul" being the word I'm
11  trying to define.  How do you define long-haul?
12    MR. JOHANSEN:  Object to the form.
13  Foundation.  Answer if you can.
14    THE WITNESS:  Over 200 miles.
15    Q  (BY MR.McMICKLE)  So if somebody told you
16  that they're regularly going 150 miles, that
17  wouldn't be long-haul for you?
18    A  No.
19    Q  Okay.  If somebody were to tell you that,
20  "Our normal radius of operations is, say, 150 miles,"
21  would that suggest to you that there were occasions
22  that they went beyond the 150 miles?
23    A  I don't know how I'd know that.
24    Q  Did you know at the time that you
25  underwrote the policy that's at issue that Concrete

**Page 19**

1  operated in multiple states and had a radius -- a
2  normal radius of operations of 150 miles?
3    A  Not at the initial underwriting.
4    Q  If you had known that at the initial
5  underwriting, would you have issued this policy?
6    MR. JOHANSEN:  Object to the form.
7  Foundation.  You can answer if you can.
8    THE WITNESS:  For ABC Concrete?
9    Q  (BY MR.McMICKLE)  Correct.
10    A  Hauling Concrete products?  Their own goods?
11    Q  (Nodding head.)
12    A  I don't think that it would have made any
13  difference if they occasionally went over the 50-mile
14  radius.
15    Q  Well, you were told in the loss control
16  survey that the normal radius of operations was
17  150 miles; right?
18    MR. JOHANSEN:  Object to the form.
19  Foundation.  You can answer if you can.
20    THE WITNESS:  After --
21    Q  (BY MR.McMICKLE)  I wasn't through with my
22  question.  If you had known that when you were
23  underwriting this policy, would you have issued the
24  policy?
25    MR. JOHANSEN:  Object to the form.

**Page 20**

1  Foundation.  You can answer if you can.
2    THE WITNESS:  I don't know.
3    Q  (BY MR.McMICKLE)  I'm going to show you
4  Exhibit KK.  Is that a document you're familiar
5  with?
6    A  Yes.  These are in the file.
7    Q  Okay.  And are these -- on page 2, is that
8  the checklist that you and/or Misty Molloy were to
9  follow with regard to the renewal of this policy?
10    MR. JOHANSEN:  Object to the form.
11    THE WITNESS:  This was a renewal process
12  checklist.
13    Q  (BY MR.McMICKLE)  Okay.
14    A  Not every item has to be done on every file.
15    Q  Well, how do you know which items have to be
16  done and which items don't have to be done?
17    A  During the renewal process you should be
18  able to tell when you have the file in front of you.
19    Q  Okay.  Would there be some communication
20  from you to Misty Molloy about, "Hey, I know the list
21  says all these things, but only do a certain subset of
22  those things"?
23    A  No.
24    Q  Okay.  How is it that you communicate to
25  Misty Molloy that some of the things that she's tasked

**Page 21**

1  with here she doesn't have to do?
2    A  It's part of their training as an assistant.
3    Q  Okay.  And is that training anything that
4  might be in writing?
5    A  No.  That's what this checklist process is,
6  is for an assistant to be able to look at the document
7  and determine what needs to be done to renew the file.
8    Q  Okay.  So some of these things need to be
9  done and some of these don't?
10    A  That's correct.
11    Q  All right.  And Misty Molloy is to do some
12  of these things and not do some of these things based
13  upon her experience and training?
14    A  That's correct.
15    Q  All right.  So, for example, was she
16  supposed to get a Safer report for this insured?
17    A  This file didn't have a Safer report in it
18  initially or a filing, therefore she wouldn't have
19  ordered one at renewal.
20    Q  Okay.  So you're saying by her experience
21  and training she knew that a Safer report was not
22  needed?
23    A  She would not have pulled one.
24    Q  Okay.  I mean, is that, like, a direction
25  from you; or is that just something she would have

EXHIBIT 10

PR#119220          MARSHALL, ANITA          2/28/2017

1    Did you ask any questions about what
2 "separate operation" meant?
3    A  I didn't ask any questions about it.
4    Q  Okay.  Did you assume that that meant a
5 separate company, separate legal entity?
6    A  I understood it that way, yes.
7    Q  Okay.  I want you to flip over to
8 Exhibit GG.  I tell you what, before we -- well, we'll
9 go there.  Put this pencil there.
10    MR. JOHANSEN:  Did you say you were on GG?
11    MR.McMICKLE:  Correct.
12    Q  (BY MR.McMICKLE) Do you consider Woods
13 Insurance Agency to be a representative of both
14 NAICO and the insured?
15    A  Yes.
16    Q  Okay.  And would you expect Woods to
17 communicate to you information that it had regarding
18 Concrete operations that was material to the risk?
19    A  Yes.
20    Q  Okay.  Read through Exhibit GG, just this
21 top part, if you will.  And I'll submit to you just to
22 kind of get you going, is that Amanda Gill is
23 responding to Nichole Cottington.  Do you know who
24 that is?
25    A  Yeah.  She's a CSR at Woods.

26

1    Q  Okay.  And what's happened is Nichole
2 Cottington has pushed out a email looking for somebody
3 to provide coverage to Concrete.  And this lady,
4 Amanda Gill, at EMC is responding; okay?  Read that
5 first paragraph there or the first two paragraphs.
6    A  (Witness complies.)
7    Q  Look at the date on that, if you would.
8    A  (Witness complies.)
9    Q  That's November 10th; right?
10    A  Correct.
11    Q  And then on November 26th, so couple weeks
12 later, she sends somebody at NAICO this email that's
13 Exhibit Q.  Does that appear to be the case?
14    A  Yes.
15    Q  Okay.  So in Exhibit GG she is specifically
16 told by EMC that the trucking operation -- the
17 long-haul trucking operation is conducted under the
18 same name.  Do you see that?
19    A  I do see it.
20    Q  But here she says it's a separate operation.
21 Is that misleading to you?
22    MR. JOHANSEN:  Object to the form.
23 Foundation.
24    THE WITNESS:  I wasn't aware of it.
25    Q  (BY MR.McMICKLE) If you had been aware

27

1 that the long-haul trucking operation is conducted
2 under the same name, would you have issued this
3 policy?
4    A  We wouldn't.
5    Q  So the answer's no?
6    A  No.  We would have declined.
7    Q  Do you feel like -- well, let's leave it
8 there.  And is it -- let's see.  Exhibit XX.  Is
9 Exhibit XX an email chain or exchange you had with
10 Nichole Cottington?
11    A  Yes.
12    Q  And were you, in fact, looking at ABC
13 Concrete's website around December 19 of 2012?
14    A  The email says I did.  I don't remember it
15 specifically.
16    Q  Okay.  Does that refresh your recollection?
17 We're looking at Exhibit X.
18    MR. JOHANSEN:  Object to the form.  Lack of
19 foundation, misleading.
20    MR.McMICKLE:  Just asking if she's seen it.
21    Q  (BY MR.McMICKLE) Have you seen Exhibit X?
22    A  I saw it yesterday.
23    Q  Okay.  Well, we asked -- was this in your
24 underwriting file?
25    A  At what time was it in our underwriting

28

1 file?
2    Q  Okay.  You told me earlier today that the
3 only documents you reviewed are documents in your
4 underwriting file; right?
5    A  That's correct.  I -- you know, you have to
6 click on a document and open it up.  I did not click
7 on every single document and open it up so I couldn't
8 tell you if that is in our file or not.
9    Q  Okay.  I'm sorry.  I thought --
10    A  That I reviewed.
11    Q  I thought I understood you to just say that
12 you saw this document that's Exhibit X yesterday.
13    A  Yesterday.
14    Q  Is that true?
15    A  Yes, it is.
16    Q  Okay.  And did you that see while you were
17 looking in the underwriting file as you described
18 earlier?
19    THE WITNESS:  When I was reviewing --
20    MR. JOHANSEN:  What time are you talking
21 about because you're trying to mislead the witness
22 here.
23    MR.McMICKLE:  You need to be careful about
24 what you claim.
25    MR. JOHANSEN:  Yeah.  Well, no, I'm claiming

29

8  (Pages 26 to 29)

EXHIBIT 10

**Page 34**

1    A  I did not.

2    Q  Did you follow up with anybody at Woods to
3  your recollection about five semi trucks that deliver
4  products all over the United States?

5    A  I did not.

6    Q  Okay.  Did you ever run any MVRs for the
7  Concrete drivers?

8    A  I don't run MVRs, and I don't remember
9  seeing any in file.

10    Q  Okay.  Why don't you flip over.  If we go to
11  Exhibit R.  Does Exhibit R appear to be an
12  application?

13    A  It's a contractor supplemental.

14    Q  Is this something that you would have relied
15  upon in the underwriting process?

16      MR. JOHANSEN:  Object to the form.
17  Foundation.

18      THE WITNESS:  Sometimes we get this prior to
19  underwriting a file.  Sometimes it's given at binding,
20  information.

21    Q  (BY MR.McMICKLE) Okay.  Have you ever
22  seen NAICO use a radius exclusion?

23    A  Never seen it.

24    Q  Okay.  Have you ever heard of NAICO using a
25  radius exclusion?

**Page 35**

1    A  I've never heard of it.

2    Q  Do you know what I'm talking about when I
3  say a "radius exclusion"?

4    A  No, I don't.

5    Q  Okay.  Have you ever seen an exclusion for
6  for-hire trucking that says, "We don't cover a loss if
7  it involves for-hire trucking"?

8    A  Have I ever seen it?  No.

9    Q  Okay.  Have you ever heard of any kind of
10  exclusion or endorsement like that?

11    A  No.

12    Q  I'm going to show you what's been marked as
13  Exhibit T.  And I'll submit to you that this is some
14  Safer data on ABC Concrete.  If you had known that ABC
15  Concrete had private authority to operate in
16  interstate commerce from the Federal Motor Carrier
17  Safety Administration, would you have issued this
18  policy?

19      MR. JOHANSEN:  Object to the form.
20  Foundation.  You can answer if you can.

21      THE WITNESS:  I don't understand what you're
22  asking.

23    Q  (BY MR.McMICKLE) If, when you underwrote
24  this policy and issued this policy, you had known
25  that Concrete had private interstate authority from

**Page 36**

1  the Federal Motor Carrier Safety Administration,
2  would you have written this policy?

3    A  Yes.

4    Q  Okay.  If you had known that ABC Concrete
5  represented to the FMCSA that its trucks operated
6  approximately 210,000 miles -- let's say this was 2013
7  or '14.  It says '15, but just assume that there was a
8  Safer report that says 210,000 miles in 2013 or '14;
9  okay?  If you had seen that, would you have issued
10  that policy?

11    A  I didn't see it prior to.

12    Q  Okay.  And I understand that.  What I'm
13  saying is if you had seen it.

14      MR. JOHANSEN:  Object to the form.
15  Foundation.

16    Q  (BY MR.McMICKLE) You can answer.

17    A  I don't know that it would have made a
18  difference.

19      MR. JOHANSEN:  While you're doing that,
20  let's take a break for a few minutes.

21      (A recess was taken from 2:00 PM to
22  2:09 PM.)

23    Q  (BY MR.McMICKLE) Was it important to you
24  in the underwriting of this policy that Concrete
25  identify all trucks that it owned in the

**Page 37**

1  application?

2    A  Yes.

3    Q  Okay.  Why was that important?

4    A  I believe it's on the application.

5    Q  Okay.  I understand it's in the application.
6  We can find it if we want to, but I figured you'd
7  know.  But my question is is why is it important?

8    A  I guess I don't understand the question.

9    Q  Okay.  Why is it important to NAICO that the
10  insured tell NAICO -- or that an insured identify all
11  vehicles that it owns in the application that it
12  submits to NAICO?

13    A  To get the correct premium to know what your
14  exposure is.

15    Q  Okay.  Will you pull out Exhibit OO.  It's
16  somewhere over there.

17      MR. JOHANSEN:  There aren't very many
18  exhibits there.  I've got my OO, but where are the
19  rest of the exhibits?

20      THE REPORTER:  It's in there.

21      MR. JOHANSEN:  I have it.  Sorry.

22    Q  (BY MR.McMICKLE) So there's Exhibit OO.
23  Is that an email with an application that you relied
24  upon in issuing this policy?

25    A  It looks like it.

EXHIBIT 10

PR#119220          MARSHALL, ANITA          2/28/2017

**Page 38**

1    Q   Bear with me one second while I get to a
2    page.  Okay.  Do you see the bottom right-hand corner
3    there's some numbers.  Will you go to 3638, please.
4    A   (Witness complies.)
5    Q   Okay.  Do you see that?  There at the bottom
6    talks about some general information?
7    A   Yes.
8    Q   And is that general information material to
9    your underwriting process?
10   A   Yes.
11   Q   Okay.  So, for example, it says, "Are any
12   vehicles leased to others?"  And it says, "No."  Do
13   you see that, number 4?
14   A   Yes.
15   Q   If, in fact, Concrete had leased trucks to
16   others, would that have been material to the
17   underwriting process?
18   A   They're supposed to explain all "yes"
19   responses.
20   Q   Okay.  If they had told you that they were
21   leasing trucks to others, would you have still issued
22   this policy?
23   MR. JOHANSEN:  Object to the form.
24   Foundation.
25   THE WITNESS:  I have no way of knowing.

**Page 39**

1    Q   (BY MR.McMICKLE) Okay.  Number 6 says,
2    "Are ICC, PUC or other filings required?"  It says,
3    "Yes."  Do you see that?
4    A   Yes, I do.
5    Q   Do you recall there being any kind of
6    discussion between you and the agent about filings?
7    A   No.
8    Q   Would you have followed up on that since it
9    said, "Yes"?
10   A   No.
11   Q   Okay.  Now, over there at number 13 it says,
12   "Are any vehicles owned but not scheduled in this
13   application?"  It says, "No."  If they had said,
14   "Yes," what would have happened next?
15   MR. JOHANSEN:  Object to the form.
16   Foundation.  You can answer if you can.
17   THE WITNESS:  We would have changed the auto
18   liability symbol --
19   Q   (BY MR.McMICKLE) What would the auto
20   liability sym --
21   A   -- to a specific -- a 7.
22   Q   A symbol 7?
23   A   Yeah.
24   Q   Would you have included a symbol 8?
25   MR. JOHANSEN:  Object to the form.

**Page 40**

1    Foundation.
2    THE WITNESS:  Seven.
3    MR. JOHANSEN:  Go ahead and answer if you
4    can.
5    THE WITNESS:  Seven, 8 and 9.
6    Q   (BY MR.McMICKLE) That's what you would
7    have issued?
8    A   On auto liability, symbol 7.
9    Q   Okay.  And 8 and 9?
10   A   Yes.
11   Q   Okay.  Would you -- or is it fair for
12   Concrete to expect that Woods would communicate to
13   NAICO what Doug Murray at Concrete had communicated to
14   Woods about Concrete's operations?
15   MR. JOHANSEN:  Objection.  Form, foundation.
16   THE WITNESS:  I rely on the information the
17   agent provides.
18   Q   (BY MR.McMICKLE) Okay.  And do you feel
19   like Woods was either not completely forthright or
20   in some way misled NAICO in the underwriting of this
21   policy?
22   MR. JOHANSEN:  Objection.  Form, foundation.
23   THE WITNESS:  I don't know.
24   Q   (BY MR.McMICKLE) Okay.  Based upon what
25   we saw in Exhibit GG and what they told you in

**Page 41**

1    Exhibit R -- excuse me, Exhibit Q -- do you remember
2    that where we talked about separate operations and
3    Exhibit G where they said it was under the same
4    operation?
5    MR. JOHANSEN:  Objection.
6    Q   (BY MR.McMICKLE) Do you feel like that
7    was misleading?
8    MR. JOHANSEN:  Object to the form,
9    foundation.
10   THE WITNESS:  I don't know what their intent
11   was.
12   Q   (BY MR.McMICKLE) Okay.  If you -- do you
13   feel like they should have told you that information
14   that was in Exhibit GG?
15   MR. JOHANSEN:  Object to the form.
16   Foundation.  You can answer if you can.
17   THE WITNESS:  I don't know what their intent
18   was.
19   Q   (BY MR.McMICKLE) I'm not asking about
20   their intent.  Is that something you would have
21   liked to have known?
22   A   Well, I was relying on this email
23   information sheet to provide them.
24   Q   Okay.  But would you have liked to have
25   known that, in fact, the long-haul trucking

EXHIBIT 10

National American Insurance Company v. ABC Concrete Mfg. Co., Inc., et al.                November 29, 2017
Patrick Gilmore                                                                            NO: 1:15:CV-01169-KBM

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NATIONAL AMERICAN INSURANCE COMPANY,

        Plaintiff,

-vs-         NO:  1:15:CV-01169-KBM

ABC CONCRETE MFG. CO., INC,; ABC CONCRETE MFG. CO., INC.
d/b/a ABC SEPTIC SYSTEMS, INC.; NICHOLAS MONTANO; and
NATIONAL CASUALTY COMPANY,

        Defendants.

DEPOSITION OF PATRICK GILMORE

    November 29, 2017
    4:05 p.m.
    4101 Indian School Road, Northeast
    300 S
    Albuquerque, New Mexico 87110

PURSUANT TO THE FEDERAL RULES OF CIVIL

PROCEDURE, this deposition was:

TAKEN BY:  SCOTT W. MCMICKLE
    ATTORNEY FOR NATIONAL CASUALTY COMPANY

REPORTED BY:  Ruth A. Elwell
    CCR-RPR
    Trattel Court Reporting & Videography
    609 12th Street, Northwest
    Albuquerque, New Mexico  87102

EXHIBIT 11

National American Insurance Company v. ABC Concrete Mfg. Co., Inc., et al.
Patrick Gilmore

November 29, 2017
NO: 1:15:CV-01169-KBM

Page 34

1   681?
2   A.   Yes.
3   Q.   I mean, basically says he believes that "the Court
4   will conclude the Scottsdale policy is excess to the NAICO
5   policy"; correct?
6   A.   That's what that says.  If you're asking me if that's
7   correct that's what it says.  That's what it says, yes.
8   Q.   Yes.  I'm not -- yes.  Okay.  And then he goes on to
9   say that he reached this conclusion because he believes
10  Concrete is not a motor carrier for-hire; correct?
11  A.   I think, right.  Yeah, he says Concrete is not a motor
12  carrier for-hire.
13  Q.   Okay.  What's Ryan's position in the company?
14  A.   He's associate general counsel.
15  Q.   Okay.  And you would agree with me that then, as now,
16  you believed that the NAICO policy would provide coverage
17  for the tractor involved in the accident unless the policy
18  was reformed; correct?
19  A.   Yes.  The way you phrased the question, "the tractor
20  involved in the accident," there was also a trailer, and you
21  have other issues that arise out of that.  But I agree with
22  what you're wanting me to agree with.
23  Q.   I purposely didn't include the trailer because --
24  A.   That's a whole different thing.
25  Q.   I know that it's probably something that's just a

Page 35

1   whole other tangent for us.  Okay.  Because the tractor is
2   what's important for this discussion.  Would you agree?
3   A.   Right.
4   Q.   Okay.  So --
5   A.   Provides coverage for liability.
6   Q.   Of the named insured and whoever?  Any permissive
7   user; right?
8   A.   Right.  But not the physical damage.
9   Q.   None of my questions relate to physical damage.  Okay.
10  Yeah.  So May 4 of '15, your son, the associate general
11  counsel, has sent this e-mail indicating his beliefs as to
12  whether or not there's coverage and who's primary.
13  A.   It's his initial thoughts.  I have to keep going back
14  to that, because there was also a meeting that was scheduled
15  to talk about the initial thoughts.
16  Q.   All right.
17  A.   And that's much different than him giving an opinion.
18  Because this is not an opinion that he -- where he responds.
19  This is where he's saying -- and that's what got my
20  attention.  He's saying here are my initial thoughts; here's
21  what I think.  So it's different than an opinion.  But I
22  will agree with you that these are his initial thoughts.
23  Q.   Okay.  And I'm not going to quibble with you about --
24  I mean, he says what he believes, and somebody out there
25  could say, Well, in some context that's an opinion.  But I

Page 36

1   guess if what you're telling me is you're saying that he put
2   it on formal letterhead and called it a conclusive legal
3   opinion I don't see those words and I don't see that.
4   A.   No.  That's not my point.
5   Q.   Fair enough.
6   A.   That's not my point.  My point is he says it's his
7   initial thoughts.  And that's what it was.  When he says
8   that, he's asking for more discussion on it.
9   Q.   So -- do you have Exhibit WW in front of you?
10  A.   Yes.
11  Q.   Will you look at Page 359 Bates number.  It's the
12  fourth page.
13  A.   Yes.
14  Q.   So you say there -- or Dick Harrison says there at the
15  top, "Our preliminary examination indicates that the
16  freightliner is not listed among the autos to be covered by
17  the NAICO policy."  Okay.
18  A.   It doesn't say exactly that.  But...
19  Q.   Well, it says what it says.  I'm just trying --
20  A.   I'm reading it.
21  Q.   I'm not going to suggest -- try to get a witness to
22  say it says something different.  I'm trying to get through
23  it.
24  A.   Right.
25  Q.   Again, your policy is Symbol 1 policy.  So the tractor

Page 37

1   was a covered auto under your policy; correct?
2   A.   Unless the policy is reformed.
3   Q.   Right.  So the fact that it might not have been listed
4   among the autos to be covered by the NAICO policy until some
5   period of time after the accident is irrelevant to the
6   coverage discussion.
7   A.   Not irrelevant, no.
8   Q.   How is it relevant?
9   A.   Because after the accident they asked that it be
10  listed on the policy for purposes of calculating the premium
11  and, also, for physical damage purposes.  It also indicates
12  that they perhaps had a changed use for the vehicle.  It
13  indicates any number of things, but it's not irrelevant.
14  Q.   I mean, it has no impact, however slight, in terms of
15  whether or not the tractor was covered at the time of the
16  accident; correct?
17  A.   Correct.
18  Q.   All right.  So even though Ryan Gilmore had at least
19  initial thoughts concluding that NAICO not only provided
20  coverage but also was primary, and Dick Harrison had prior
21  to that concluded there was coverage under your policy,
22  NAICO rejected the tender that Ms. Krmpotic made to NAICO;
23  correct?
24  A.   Yes.
25  Q.   Okay.

10 (Pages 34 to 37)