IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NATIONAL AMERICAN INSURANCE
COMPANY,

       Plaintiff,

vs.                                                                                    Civ. No. 15-1169 KG/KBM

ABC CONCRETE MFG. CO., INC.; ABC
CONCRETE MFG. CO., INC. d/b/a ABC
SEPTIC SYSTEMS, INC.; NICHOLAS
MONTANO; and NATIONAL CASUALTY
COMPANY,

       Defendants,

-and-

NATIONAL CASUALTY COMPANY,

       Counter Claimant,

vs.

NATIONAL AMERICAN INSURANCE
COMPANY,

       Counter Defendant.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Plaintiff National American Insurance Company's

(NAICO) Motion for Summary Judgment, filed December 19, 2017, seeking summary judgment

on its claim for reformation of an insurance contract, and Defendant National Casualty

Company's (NCC) Motion for Summary Judgment, filed January 16, 2018, seeking dismissal of

NAICO's reformation claim and summary judgment on NCC's counterclaim for subrogation.

(Docs. 68 and 74).  NCC filed its response to NAICO's Motion on February 7, 2018, and its

reply in support of its own Motion on March 7, 2018. (Docs. 80 and 90). NAICO filed its response to NCC's Motion on February 21, 2018, and its reply in support of its own Motion on March 7, 2018. (Docs. 82 and 88). Although served, Defendant Nicholas Montano (Montano) never appeared in this case. Defendants ABC Concrete Mfg. Co., Inc. (Concrete), and ABC Concrete Mfg. Co., Inc. d/b/a ABC Septic Systems, Inc., take no position on the motions. (Docs. 68 and 74). The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.

After considering the submissions and arguments of the parties, the record, and the applicable law, the Court denies NAICO's Motion for Summary Judgment (Doc. 68) on its reformation claim and grants-in-part NCC's Motion for Summary Judgment (Doc. 74). NAICO's reformation claim fails and NCC is entitled to subrogation as explained below.

I.    Procedural History

This declaratory judgment action arises out of the August 7, 2014, accident between Montano, who was driving a 2007 Freightliner tractor-trailer (VIN #1FUJA6CKX7LW28215) owned by Concrete and leased to ABC Septic Systems, Inc. (Septic), and non-parties Alan and Nina Nelson (collectively, "the Nelsons"). (Doc. 5) at ¶¶ 14-15. The accident occurred in California. *Id.* Montano kept logs at the time of the accident under the Septic name because he was engaged in the for-hire transportation of property. The Nelsons filed suit against Septic and Montano in California on February 5, 2015 (Underlying Lawsuit). (Doc. 5) at ¶ 14.

Doug Murray (Murray), owner of Concrete and Septic, which he believed to be separate legal entities, contacted NCC, the insurance carrier for Septic, regarding the Underlying Lawsuit. NCC timely provided a defense to Septic and Montano.

On April 17, 2015, underlying defense counsel, retained by NCC, sent a tender of defense letter to NAICO demanding that NAICO defend and indemnify Septic in the Underlying Lawsuit. (Doc. 74) at ¶ 10; (Doc. 82) at 3. NAICO received that letter on April 20, 2015. (Doc. 74-1) at 18 (May 11, 2015 letter from NAICO to underlying defense counsel). NAICO rejected the tender of defense on May 11, 2015, on the basis that NAICO's policy was never intended to cover the Freightliner and NCC's policy was primary. *Id.* at 18-22.

Nevertheless, NAICO and NCC participated in a mediation of the Underlying Lawsuit on January 6, 2015, and resolved that case for $850,000.00. (Doc. 74) at ¶ 49; (Doc. 82) at 3. Each insurer contributed fifty percent (50%) of the settlement monies. Each insurer reserved all rights vis-à-vis the settlement and any declaratory judgment action. *Id.*

NAICO filed its Amended Complaint for Declaratory Judgment, Equitable Indemnification, Subrogation and Reimbursement for Recovery of Damages on March 10, 2016. (Doc. 5). Count I seeks reformation of the insurance contract between NAICO and Concrete based on mutual mistake. Counts II and III seek complete equitable indemnification and subrogation, respectively, as well as reimbursement from NCC of the $425,000.00 that NAICO contributed to settle the Underlying Lawsuit.

NCC filed its Answer and Counterclaim on April 13, 2016. (Doc. 12). NCC seeks equitable contribution from NAICO of the cost of defense and property damage settlement in the Underlying Lawsuit. NCC also seeks the cost of defense and settlement arising from a July 8, 2014, accident (July 2014 Accident) that involved a tractor-trailer owned by Concrete, leased to Septic, and operated under the Septic name. Murray notified NCC of the July 2014 Accident. NCC timely defended Septic and settled the case. (Doc. 74) at ¶ 45; (Doc. 82) at 3. NAICO

was not notified of the July 2014 Accident, however, until after the case settled.   On January 3, 2018, NCC stipulated that it did not seek reimbursement for the physical damage payment made following the July 2014 Accident.   (Doc. 70).

NAICO now moves for summary judgment on its reformation and reimbursement claims, while NCC moves for summary judgment on all of NAICO's claims and on NCC's equitable contribution counterclaim.

## II.   Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to a material fact and the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).   "When applying this standard, [the Court] view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party."   *Scull v. New Mexico*, 236 F.3d 588, 595 (10th Cir. 2000) (internal quotation marks omitted).   The movant bears the initial burden of showing the absence of a genuine issue of material fact, then the burden shifts to the non-movant to provide evidence of a genuine issue of material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).   A fact is "material" if, under the governing law, it could influence the outcome of the lawsuit, and "genuine" if a reasonable jury could return a verdict for the non-movant.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1079 (10th Cir. 1999); *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996) (citation omitted).   A party cannot avoid summary judgment simply by resting upon the mere allegations or denials of his pleadings.   *Bacchus Indus., Inc.*, 939 F.2d at 891.

## III.   Material Facts and Reasonable Inferences Viewed in the Light Most Favorable to the

<u>Nonmovants</u>[1]

A. *The Companies*

At all relevant times, Murray and his wife owned and operated Concrete in Farmington, New Mexico. (Doc. 68) at ¶ 12; (Doc. 80) at ¶ 12. Concrete has been in business for over thirty years fabricating concrete barriers and other materials. (Doc. 68) at 66 (Concrete Commercial Insurance Application). Concrete had and maintains "private" authority from the Federal Motor Carrier Safety Administration (FMCSA) to ship its own goods on semis (26,000+ gross pounds) across state lines. (Doc. 68) at 41-42 (Dep. D. Murray, 133:19-134:1); (Doc. 80-1) at 26 (Dep. D. Murray, 73:7-22); *see also* (Doc. 80-1) at 33 (FMCSA Information on Concrete as of October 23, 2016). Murray also owned Septic, which he considered a separate, distinct company from Concrete. (Doc. 68) at 42 (Dep. D. Murray, 134:2-17) (Murray stating his belief that Concrete and Septic were separate entities and only Septic could haul for-hire). Septic was authorized by FMCSA to conduct "for-hire" interstate trucking to haul products other than its own for a fee. *See* (Doc. 80-1) at 39 (SAFER Snapshot of Septic showing "Auth. For Hire" and "Interstate").

Concrete leased its vehicles to Septic. (Doc. 68) at 96-99 (Truck lease and service agreement); *see also* (Doc. 80-1) at 28 (Dep. D. Murray, 100:9-22) (Murray stating that Concrete leased all vehicles to Septic). All of the drivers for Septic received W-2s from Concrete. (Doc. 68) at 40 (Dep. D. Murray, 110:1-5) (Murray stating same). Concrete used the same vehicles to

---

[1] Unless otherwise noted, the summary of material facts is undisputed and reflects only the facts the Court viewed as material to the claims. The Court has not included or discussed facts that are not pertinent to the claims before the Court.

haul its own products under its private authority. (Doc. 80-1) at 29 (Dep. D. Murray, 117:10-19) (Murray stating that all vehicles hauled for both companies and used appropriate logs depending on for-hire status). During the relevant period, any time Concrete's product was delivered and Murray did not procure a back-haul load (a for-hire shipment back to the Farmington area), the trucking was conducted under Concrete's private authority and the drivers logged their time on Concrete log sheets. (Doc. 68) at 36 (Dep. D. Murray, 72:22-73:6) (Murray stating that Concrete only hauled its own product under its private authority). Any time a for-hire load was hauled during the outbound or return trip, the trucking was done under Septic's for-hire authority, using Septic log sheets. *Id.* (Murray stating that Septic hauled all loads involving for-hire trucking). Again, the trucks were the same.

Concrete and Septic had two separate federal tax numbers and two separate registration numbers with the United States Department of Transportation, Septic was a "dba" name of Concrete. *Id.* at 27 (Dep. D. Murray, 28:16-22) (Murray stating that he understood Concrete and Septic to be separate legal entities), 29 (Dep. D. Murray, 36:25-37:5) (Murray stating that Septic and Concrete had different tax ID numbers), 38 (Dep. D. Murray at 79:9-16) (Murray stating that he has come to know that Concrete and Septic are not legally separate entities). However, the ownership, management, and the physical location of Concrete and Septic were the same, and Murray filed only one tax return. *Id.* at 29 (Dep. D. Murray, 36:22-24) (Murray stating he filed one tax return for Concrete and Septic).

Murray testified that, based on his understanding of Concrete and Septic as separate legal entities, he procured two separate insurance policies. (Doc. 68) at 26 (Dep. D. Murray, 24:23-25:1). Murray stated he intended NAICO's policy to insure all of Concrete's activities, and

6

NCC's policy to insure all of Septic's activities.   *Id.* at 44 (Dep. D. Murray, 146:17-25).

B.  *The Policies*

In November 2012 Murray contacted Woods Insurance Services, Inc. (Woods) to procure a commercial auto policy and commercial general liability policy for Concrete.   *Id.* at ¶ 1; (Doc. 74) at ¶ 31.   Commercial lines agent Nichole Cottington, an employee of Woods, began making inquiries on Concrete's behalf.   Cottington emailed EMC Insurance on November 8, 2012, requesting a quote for Concrete and describing the business as follows:

> Please provide quote for ABC Concrete Mfg Co.  This is a 02/09/2013 effective date.  Iâ€™ll include a narrative below, after a summary of the attached Acord applications & brief description.
>
> Â·   Effective 02/09/2013
> Â·   Family owned business in Farmington, NM and 30+ years in business
> Â·   Annual revenues around $2,300,000
> Â·   Acords attached for the following lines
>   o  Property
>   o  General Liability
>   o  Auto
>   o  Equipment
>   o  Umbrella
> Â·   Loss runs & MVRs to follow
> Â·   Currently written with another agent through Colorado Casualty
>   o  Please note, their long haul trucking is a separate operation with a separate insurance policy
>
> ABC Concrete is located in northwestern New Mexico in the heart of the coal and gas industry. They are a family owned business that believes in quality products at a fair price. ABC Concrete has been in business for over 30 years under the current ownership of the Murray family. They are a manufacturing company that not only meets the needs of the local consumer but has expanded out to all 50 states. Their products have also been shipped overseas to US military installations.
>
> ABC Concrete started out with 3 main products but has evolved today into a business whose product base is ever changing with the needs of the customer. They have 5 semi trucks that deliver our products all over the United States.
>
> Their products range from septic tanks for homeowners to safety sheds and safety barriers for the military and municipalities.
>
> They specialize in making your concept into a reality with our 30 plus years experience in the precast business. ABC Concrete has over 30 years experience in the precast manufacturing business and can produce a product that will meet expectations.

(Doc. 74-1) at 43 (highlighting in original) (email from N. Cottington to A. Gill).   The EMC Insurance underwriter responded to Cottington on November 10, 2012, declining the auto coverage and indicating that Septic and Concrete may be the same entity.   *Id.* at 45 (email from

A. Gill to N. Cottington).

Cottington sent a version of the same email to Linda Scott, an underwriter with NAICO, on November 26, 2012.   (Doc. 68) at 47 (email from N. Cottington to L. Scott).   Cottington did not refer Scott to the FMCSA website or provide any additional information.   *Id.*   On its insurance application to NAICO, Concrete listed its mailing address as "ABC Septic Systems, Inc."   *Id.* at 45 (Concrete Commercial Insurance Application).

At all relevant times, NAICO and Woods operated under an "Agency/Company Agreement" by which Woods had "the authority to solicit, receive and transmit applications for insurance contracts for which a commission is specified," and under which Woods agreed to "[b]ind and execute insurance contracts subject to the underwriting rules and regulations of [NAICO]."   (Doc. 74-1) at 35-37 (NAICO/Woods agency agreement).

NAICO agreed to write the Concrete policy and issued policy number MP10570030 as a Symbol 1, all autos, policy effective February 9, 2013, through February 9, 2014.   NAICO renewed that policy as policy number MP10570130, effective February 9, 2014, through February 9, 2015.[2]   (Doc. 74-1) at 28 (NAICO Business Auto Declarations for Concrete).   For the commercial auto portion of the policy, NAICO received a premium of $10,501.00.   (Doc. 74-1) at 27 (NAICO Common Policy Declarations for Concrete).

NAICO admits that it did not run Concrete through the FMCSA SAFER[3] system, which

---

[2]  The Freightliner at issue is not listed as a "scheduled auto" on the NAICO policy.   This fact has no bearing on this case because NAICO wrote a Symbol 1 policy covering "any auto."

[3]  "SAFER" is the FMCSA's Safety and Fitness Electronic Records System, which maintains and publishes insurance and other mandatorily reported information on motor carriers.   *See* https://safer.fmcsa.dot.gov.

would have disclosed that Concrete and Septic were the same company.   (Doc. 74-1) at 48 (NAICO Answers to Requests for Admission).   Glaetta Ray, NAICO's underwriting supervisor, admits that NAICO failed to follow internal protocols during the underwriting and renewal process.   (Doc. 74-1) at 51 (Dep. G. Ray, 32:8-12 (Ray stating NAICO should have pulled SAFER report because underwriter aware Concrete operated in interstate commerce)).

Anita Marshall, the NAICO underwriter on the Concrete account, admits that she was aware Concrete was operating as a motor carrier in interstate commerce when Concrete applied for insurance.   (Doc. 74-1) at 56 (Dep. A. Marshall, 25:6-22 (Marshall stating she understood Concrete had five semis delivering its product throughout the United States and intended to insure this risk)), 54 (Dep. G. Ray, 95:25-96:6 (Ray stating NAICO aware it was insuring Concrete for interstate trucking based on Concrete's location in the Four Corners area)). Marshall further admits that NAICO intended to insure Concrete for "any interstate operations that it may engage upon or in."   (Doc. 68) at 51 (Dep. A. Marshall, 53:11-19) (Marshall stating NAICO intended to insure Concrete for interstate operations).

In March 2013 NAICO conducted a Loss Control Survey to determine Concrete's risk profile.   (Doc. 80-1) at 11 (Mar. 11, 2013, Loss Control Survey).   The Loss Control Survey makes abundantly clear that Concrete operated in interstate commerce, crossing into at least four different states.   *Id.*

In the policy issued to Concrete, NAICO included a description of the different Symbols available and what they cover:

| Symbol | Description Of Covered Auto Designation Symbols | |
|---|---|---|
| 1 | Any "Auto" | |
| 2 | Owned "Autos" Only | Only those "autos" you own (and for Liability Coverage any "trailers" you don't own while attached to power units you own). This includes those "autos" you acquire ownership of after the policy begins. |
| 3 | Owned Private Passenger "Autos" Only | Only the private passenger "autos" you own. This includes those private passenger "autos" you acquire ownership of after the policy begins. |
| 4 | Owned "Autos" Other Than Private Passenger "Autos" Only | Only those "autos" you own that are not of the private passenger type (and for Liability Coverage any "trailers" you don't own while attached to power units you own). This includes those "autos" not of the private passenger type you acquire ownership of after the policy begins. |
| 5 | Owned "Autos" Subject To No-fault | Only those "autos" you own that are required to have no-fault benefits in the state where they are licensed or principally garaged. This includes those "autos" you acquire ownership of after the policy begins provided they are required to have no-fault benefits in the state where they are licensed or principally garaged. |
| 6 | Owned "Autos" Subject To A Compulsory Uninsured Motorists Law | Only those "autos" you own that because of the law in the state where they are licensed or principally garaged are required to have and cannot reject Uninsured Motorists Coverage. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the same state uninsured motorists requirement. |
| 7 | Specifically Described "Autos" | Only those "autos" described in Item Three of the Declarations for which a premium charge is shown (and for Liability Coverage any "trailers" you don't own while attached to any power unit described in Item Three). |
| 8 | Hired "Autos" Only | Only those "autos" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your "employees", partners (if you are a partnership), members (if you are a limited liability company) or members of their households. |
| 9 | Non-owned "Autos" Only | Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "autos" owned by your "employees", partners (if you are a partnership), members (if you are a limited liability company) or members of their households but only while used in your business or your personal affairs. |

(Doc. 74-1) at 30 (highlighting in original) (Excerpt from NAICO policy). The policy NAICO issued to Concrete was a Symbol 1 "Any Auto" policy. (*Id.*) at 29 (NAICO policy showing Liability Symbol 1). NAICO also included language declaring the coverage territory for the Concrete policy:

> The coverage territory is:
> **(1)** The United States of America;
> **(2)** The territories and possessions of the United States of America;
>
> . . .

*Id.* at 2. Finally, the NAICO policy explains the coverage provided:

> a. For any covered "auto" you own, this cov-
> erage form provides primary insurance. For
> any covered "auto" you don't own, the in-
> surance provided by this coverage form is
> excess over any other collectible insurance.
> However, while a covered "auto" which is a
> "trailer" is connected to another vehicle, the
> Liability Coverage this coverage form pro-
> vides for the "trailer" is:
>
> (1) Excess while it is connected to a motor
> vehicle you do not own.
>
> (2) Primary while it is connected to a cov-
> ered "auto" you own.
>
> b. For Hired Auto Physical Damage Coverage,
> any covered "auto" you lease, hire, rent or
> borrow is deemed to be a covered "auto"
> you own. However, any "auto" that is
> leased, hired, rented or borrowed with a
> driver is not a covered "auto".
>
> c. Regardless of the provisions of Paragraph
> a. above, this coverage form's Liability
> Coverage is primary for any liability as-
> sumed under an "insured contract".
>
> . . .

*Id.*

At no time did NAICO include any geographic limitation on the policy issued to Concrete, nor did it exclude for-hire trucking activities. (Doc. 68) at 52 (Dep. A. Marshall, 55:1-22) (Marshall stating no restriction in NAICO policy for radius of operation).

To summarize, it is undisputed that in February 2013, when NAICO issued the Concrete policy, it was aware Concrete engaged in interstate trucking and required authority from the FCMSA. NAICO issued a Symbol 1 "Any Auto" policy without running a SAFER report on Concrete. Further, NAICO was aware that it was insuring Concrete for interstate trucking activities. In March 2013 NAICO commissioned a Loss Control Survey which confirmed that Concrete engaged in interstate trucking. NAICO renewed the policy in February 2014 without doing any additional diligence or running a SAFER report on Concrete.

Murray procured the NCC policy through a separate insurance agent to insure Septic's for-hire activities. NCC agreed to insure Septic's activities under Symbols 6 and 7, and charged a premium of $12,181.00. (Doc. 68) at 88-89 (NCC Policy excerpts).

IV.  Discussion

It is undisputed that the NAICO policy provides coverage for the July and August 2014

accidents. (Doc. 74-1) at 71 (Dep. P. Gilmore (NAICO General Counsel and Rule 30(b)(6) witness), 34:15-22) (Gilmore stating NAICO policy covers August 2014 accident unless reformed). It also is undisputed that, absent reformation of the NAICO policy, NAICO and NCC are co-primary insurers for the August 2014 accident. NAICO contends, however, that the Court should reform its insurance contract with Concrete on the basis of mutual mistake, to wit, that NAICO and Concrete agreed to exclude for-hire activities, but failed to include this term in the insurance contract.[4]

In diversity cases, courts look to the substantive law of the forum state. *Quaker State Minit-Lube v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995). When interpreting insurance policies, New Mexico looks to the law of the state where the policy was issued, in this case, New Mexico. *Id.*; *see also Winters v. Charter Oak Fire Ins. Co.*, 4 F. Supp. 2d 1288, 1291 (D.N.M. 1998) (applying *Quaker State* in New Mexico).

A. *Reformation*

Both NAICO and NCC move for summary judgment on NAICO's reformation claim. In New Mexico, a court may grant the equitable remedy of contract reformation based on mutual mistake of the parties when the written agreement fails to express the real agreement of the parties. *Buck v. Mountain States Inv. Corp.*, 1966-NMSC-090, ¶ 7, 414 P.2d 491, 493 (explaining circumstances where reformation may be appropriate). Reformation is an exception to the general rule that "each party to a contract has a duty to read and familiarize himself with the contents of the contract, each party generally is presumed to know the terms of the

---

[4] NAICO brought no claims against Woods and does not move for rescission of the Concrete policy.

12

agreements, and each is ordinarily bound thereby." *Ballard v. Chavez*, 1994-NMSC-007, ¶ 8, 868 P.2d 646, 648. "An action seeking reformation proceeds from the premise that the parties came to an understanding but, when it was reduced to writing, some provision was omitted or inserted through mutual mistake[.]" *Exxon Corp. v. Gann*, 21 F.3d 1002, 1005 (10th Cir. 1994) (citing *Evans v. Hartford Life Ins. Co.*, 704 F.2d 1177, 1179 (10th Cir. 1983)). "The party seeking to reform a writing must prove by clear and convincing evidence that a mutual mistake occurred." *Twin Forks Ranch, Inc. v. Brooks*, 1998-NMCA-129, ¶ 8, 964 P.2d 838, 841 (citing *Butler v. Butler*, 1969-NMSC-021, ¶ 8, 450 P.2d 922, 924; *Wright v. Brem*, 1970-NMCA-030, ¶ 6, 467 P.2d 736, 737). "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with abiding conviction that the evidence is true." *Id.* (quoting *In re Sedillo*, 1972-NMSC-050, ¶ 13, 498 P.2d 1353, 1355). The party seeking reformation must show that the existing agreement was not intended and also must show what was intended at the time the agreement was executed. *Id.* at ¶ 10, 964 P.2d at 841-42 (citing 13 Samuel Williston, *A Treatise on the Law of Contracts* § 1548, at 124-25 (3d ed. 1970)). Furthermore, clear evidence that the parties never discussed a topic or a term constitutes insufficient evidence to prove that the parties reached any agreement on such topic or term. *Id.* at ¶ 14, 964 P.2d at 842 (holding that clear and convincing evidence that parties did not discuss appurtenant water rights results in insufficient evidence to prove any agreement regarding same).

NAICO asks this Court to reform the Symbol 1 policy it issued to Concrete to include "an exclusion of coverage for 'for-hire trucking activities' defined as 'any trucking activity wherein the named insured engages in the transport of any cargo, other than its own products, materials,

or equipment, at the request of any person or entity, for a fee.'" (Doc. 68) at 20. NAICO asserts the reform is based on a mutual mistake that Concrete and Septic were legally distinct entities. NAICO further asserts that the mutual mistake was "the scope of risk for which NAICO had agreed to provide coverage." *Id.* at 13. NAICO claims that its true agreement with Concrete was to exclude for-hire activities.

NAICO cites Murray's testimony that he intended NAICO to cover Concrete's private trucking activities and that NCC would cover Septic's for-hire activities. *Id.* at 44 (Dep. D. Murray, 146:17-25). There is no evidence, however, regarding the parties' discussions or agreement as to Murray's intention, as required by *Twin Forks*.

NAICO relies on *Cabs, Inc. v. Hartford Insurance Group* to support its argument. 151 Fed. Appx. 604 (10th Cir. 2005). In that case the plaintiff owned two subsidiaries, Zone Cabs and Centennial Sedans. *Id.* at 606. The two businesses "functioned as independent businesses with different addresses and management." *Id.* Cabs held a tariff issued by the Colorado Public Utilities Commission, under which both businesses operated, listing the tariff-holder as "Cabs, Inc. dba Zone Cabs, Inc. and/or dba Centennial Sedans, Inc." *Id.* Zone Cabs held an insurance policy from Paratransit Risk Retention Group Insurance, Co., covering a taxi fleet of over 100 vehicles, for an annual premium of $108,946. *Id.* at 607. Centennial Sedans procured an insurance policy for its approximately fourteen limousines from Hartford Insurance for a premium of $23,879. *Id.* at 606-07. Hartford initially issued the policy to "Cabs, Inc. d/b/a Centennial Sedans, Inc." *Id.* at 606. Colorado law mandated that tariffed motor vehicle carriers submit proof of insurance "with the exact name, initials, corporate and trade name (if any), and address as shown in the Application or records of the [Public Utilities] Commission."

*Id.* at 607. To comply with this requirement, Hartford issued an amended policy naming the insured as "Cabs, Inc., dba Zone Cabs, Inc., and/or Centennial Sedans, Inc." *Id.*

After settlement of a claim in which a Zone Cabs taxi injured a pedestrian, Cabs and Zone Cabs demanded reimbursement from Hartford. *Id.* at 605-06. Hartford refused, and sought reformation of its policy on the basis that it was only intended to cover Centennial Sedans. *Id.* The court agreed with Hartford and granted reformation of the policy based on mutual mistake under Colorado law. *Id.* at 609.

*Cabs, Inc.* is factually distinguishable and does not apply here for at least three reasons. First, Centennial Sedans and Hartford had a prior agreement to which the policy could be reformed. The policy at issue originally listed the named-insured as "Cabs, Inc. d/b/a Centennial Sedans, Inc.," and was only altered to technically include Zone Cabs based on the reporting requirements of the Colorado Public Utilities Commission. Centennial Sedans and Hartford agreed to insure only Centennial Sedans. In fact, Centennial's insurance broker "took steps to assure Hartford that [Centennial] sought coverage for limousines, not taxis." *Id.* at 611. The mutual mistake regarded the impact of including Zone Cabs as an additional "dba" on the amended policy, and constituted a technical error or error in drafting. *Id.*

There is no evidence in the instant case to suggest Cottington or anyone else at Woods "took steps" to assure NAICO that it was not insuring a for-hire operation. The only note regarding for-hire operations comes from Cottington's ambiguous November 26, 2012, email to Linda Scott. The NAICO policy was, at all times, issued as a Symbol 1 policy to Concrete, with no exclusions and no additional diligence exercised. A reasonable jury, viewing the facts in the light most favorable to NAICO, could not find existence of a prior agreement to which the policy

15

can be reformed.

Second, Centennial Sedans and Zone Cabs operated as independent businesses with different management and different addresses.   It is undisputed here that Concrete and Septic both were owned by the Murray family, operated by Doug Murray, had the same business address, and operated with the same vehicles.   Moreover, Concrete's Commercial Insurance Applications dated February 7, 2014, and November 8, 2012, list Concrete's mailing address as "ABC Septic Systems, Inc."   (Doc. 68) at 45 (2014 application) and 66 (2012 application).

Third, the premiums charged by Paratransit and Hartford substantially differed, indicating that the two companies were insuring different risks.   In this case, the premium charged by NAICO for private carriage and the premium charged by NCC for for-hire carriage differed by $2,000.00.   While it could be argued that these premiums reflect that both policies are limited, Ray testified that NAICO's largest concern in underwriting was "the amount of travel over the road . . . the number of miles traveled."   (Doc. 80-1) at 21 (Dep. G. Ray, 82:25-83:20).   A reasonable jury viewing the evidence in the light most favorable to NAICO could not find that this difference in premiums indicates coverage for disparate risks, as advanced by NAICO.

NAICO also points to *State ex rel. State Highway & Transportation Dep't v. Garley*, 1991-NMSC-008, 806 P.2d 32, to illustrate by contrast how "the mutual mistake between NAICO and ABC Concrete is rooted in the contexts of the writing – the failure to exclude coverage for for-hire trucking activities."   (Doc. 68) at 12.   In *Garley*, the lessee of real property sought reformation of the lease based on a mutual mistake.   Prior to signing the lease, the lessor and lessee discussed their mutual belief that the State Highway and Transportation Department would partially condemn the land.   *Id.* at ¶ 2, 806 P.2d at 33.   To that end, the

parties included the following provision in the lease:

> Further, Lessee hereby covenants and agrees with Lessor that in the event the said demised premises, or any part thereof, are taken, damaged consequentially or otherwise, or condemned by public authority, this Lease shall terminate, as to the part so taken, as of the date title shall vest in the said public authority, and the rental reserved shall be adjusted * * * * All damages and payments resulting from the said taking, damaging, or condemnation of the said demised premises shall accrue to and belong to Lessor, and Lessee shall have no right to any part thereof.

*Id.* Ultimately, the Department condemned the entire tract of land. *Id.* at ¶ 5, 806 P.2d at 34. The Court in *Garley* concluded that "the [mutual] mistake was the assumption that the condemnation would be partial, whereas it turned out to be total." *Id.* at ¶ 22, 806 P.2d at 37. The Court rejected the lessee's argument for reformation on the basis that "[t]his was not a mistake as to the contents of the writing, the parties assuming that it expressed their intention whereas in fact it said something else." *Id.*

*Garley* is not helpful to NAICO's position. Nothing in NAICO's policy excluded coverage in the event that Concrete began conducting for-hire activities. Nothing in NAICO's policy limits the geographic area of coverage or the number of miles per year that Concrete trucks could travel, which is consistent with for-hire carriage. Even if NAICO somehow believed that Concrete operated only within New Mexico, and did not cross state boundaries, the basis for that belief vanished after the 2013 Loss Control Survey made abundantly clear that Concrete operated in at least four states. Aside from Murray's personal belief and intention, no evidence of record suggests that the parties contemplated excluding this risk. Notably, NAICO wrote a Symbol 1 "any auto" policy for Concrete not once, but twice. NAICO did not exclude for-hire trucking and there is no evidence NAICO engaged in any communication or clarification with Murray, directly or through Woods, regarding for-hire trucking.

17

Additionally, the mistake here, unlike that in *Garley*, amounts to conscious ignorance by assuming that Concrete and Septic were legally distinct entities. NAICO concedes it did no investigation of any kind during the underwriting period: it did not run a SAFER report, it did not contact Woods to follow-up on the required filings, and it did not contact Concrete. Furthermore, NAICO conducted no investigation of any kind regarding the business address listed on Concrete's applications: ABC Septic, Inc. "A party bears the risk of a mistake when . . . (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his knowledge as sufficient[.]" *Restatement (Second) of Contracts*, § 154(b) (1981); *see also Garley*, 1991-NMSC-008, ¶ 16, 806 P.2d at 36. Again, NAICO admits awareness of facts that warranted additional inquiry, yet it failed to do so and cannot now claim a mistake.

Rather, the Court considers *Twin Forks* more helpful in its analysis here. 1998-NMCA-129, 964 P.2d 838. That case involved a dispute over ownership of water rights appurtenant to land that the Twin Forks Ranch had sold. The parties negotiated the transfer of six water taps and an easement on the land. However, neither party ever mentioned appurtenant water rights during these negotiations. *Id.* at ¶ 2, 964 P.2d at 840. The two deeds drafted to effectuate the transfer failed to address the negotiated-for water taps. *Id.* at ¶ 3; 964 P.2d at 840. It was undisputed that neither party knew whether the land had appurtenant water rights. *Id.* at ¶ 4; 964 P.2d at 840. On appeal, the court held:

> Given that the parties did not know of the rights and never discussed water rights at all, we cannot say that there is clear and convincing evidence of an agreement either to sell or retain such rights. *Cf. Williston on Contracts, supra*, § 1548, at 128 n. 15 (when a "claim … was not in the mind of either party, for neither supposed it to exist, … their minds could not have met on the transfer of such a

claim….") (quoting *Curtis v. Albee*, 167 N.Y. 360, 60 N.E. 660 (1901)). Rather than reform the contract to include a provision *never contemplated* by the parties, we hold that there is no agreement to which the writings should be reformed. *See Williston on Contracts, supra*, § 1548, at 122 (equity insists "that the parties shall have come to a complete mutual understanding of all the essential terms of their bargain, for, otherwise, there would be no standard by which the writing could be reformed.").

*Id.* at ¶ 15, 964 P.2d at 842 (emphasis added).

There is no evidence in this case to suggest that NAICO and Concrete ever discussed a for-hire exclusion. NAICO's underwriter testified she understood that Concrete had five (5) semis delivering Concrete's product throughout the United States and that NAICO intended to insure Concrete for interstate trucking. (Doc. 74-1) at 56 (Dep. A. Marshall, 25:6-22), and 58 (Dep. A. Marshall, 53:11-19). NAICO was aware that Concrete engaged in interstate trucking and had several options: follow-up with Concrete to determine the extent of operations and include a for-hire exclusion; run a SAFER report on Concrete to determine the extent of authority and operations; or write a policy using a Symbol that would not insure for-hire trucking activities. Instead, NAICO wrote an all-inclusive Symbol 1 policy for Concrete, effective February 9, 2013, and renewed that policy, effective February 9, 2014.

Nevertheless, NAICO contends that its failures should not bar reformation because "[a] mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from . . . reformation . . . , unless his fault amounts to a failure to act in good faith *and* in accordance with reasonable standards of fair dealing." (Doc. 68) at 17 (emphasis in original) (quoting *Restatement (Second) of Contracts*, § 157 (1981)). This Court is not persuaded. NAICO failed to present clear and convincing evidence that an agreement exists to which the Court could reform the policy.

The parties also argue whether Woods was NAICO's agent for purposes of imputed knowledge, and whether Woods "knew" that Concrete and Septic were the same legal entity. It is immaterial what Woods knew and whether such knowledge passed to NAICO. As described above, NAICO's conduct and the lack of discussion between the parties, independent of Woods, prohibits the remedy of reformation. Assuming that Woods possessed no additional information, the outcome remains the same.

As discussed above, NAICO and Concrete or Murray never discussed excluding for-hire operations. Evidence that the contracting parties did not discuss a term constitutes insufficient evidence to prove that the parties reached any agreement on such topic or term. *Twin Forks*, 1998-NMCA-129, ¶ 14, 964 P.2d at 842. Without any discussion, as a matter of law, there could have been no meeting of the minds on this term. NAICO, therefore, is not entitled to summary judgment on the contract reformation claim, but NCC is entitled to summary judgment on that claim.

NAICO admits that it is not entitled to indemnification or reimbursement from NCC unless its contract with Concrete is reformed. Because NAICO fails on its claim for reformation, its claims for indemnification, subrogation, and reimbursement from NCC are moot and subject to dismissal for that reason.

B. *Equitable Contribution*

The parties agree that while NAICO funded half of the $850,000.00 settlement in the Underlying Lawsuit, it did not contribute to defending the Underlying Lawsuit. The parties further agree that NCC settled a claim arising out of the July 2014 Accident involving Septic and did not contact NAICO before settling this claim.

20

NCC moves for summary judgment on its counterclaim for equitable indemnification from NAICO for its share of the cost of defense and property damage settlement in the Underlying Lawsuit, as well as all costs, other than the physical damage settlement, associated with the July 2014 Accident.

"The duty of an insurer to defend arises from the allegations on the face of the complaint or from the known but unpleaded factual basis of the claim that brings it arguably within the scope of coverage." *Am. Gen. Fire & Cas. Co. v. Progressive Cas. Co.*, 1990-NMSC-094, ¶ 11, 799 P.2d 1113, 1116 (citing *Albuquerque Gravel Prods. Co. v. Am. Employers Ins. Co.*, 282 F.2d 218 (10th Cir. 1960)). "The duty may arise at the beginning of the litigation *or at some later stage* if the issues are changed so as to bring the dispute within the scope of policy coverage." *Id.* (emphasis added) (citing *Pendleton v. Pan Am. Fire & Cas. Co.*, 317 F.2d 96 (10th Cir.), *cert. denied*, 375 U.S. 905 (1963)).

1. Underlying Lawsuit

NAICO agrees that the unreformed policy it issued to Concrete provides coverage for the Underlying Lawsuit, and because NAICO's claim for reformation fails as described above, the Court must agree with NCC that NAICO, as a matter of law, wrongly refused to provide a defense in the Underlying Lawsuit. NAICO and NCC remain co-primary insurers for the Underlying Lawsuit.

As a co-primary insurer, NAICO was obligated to provide a defense in the Underlying Lawsuit. NAICO breached its duty to defend Concrete by refusing NCC's tender of defense. This breach of duty "did not relieve [NAICO] of its obligations, even though the defense was undertaken by the other insurer." *Am. Gen. Fire & Cas. Co.*, 1990-NMSC-094, ¶ 20, 799 P.2d

at 1118.   However, the "duty to defend did not arise until demand was made."   *Id.* at ¶ 24, 799 P.2d at 1119.   Until the demand was made, NCC acted pursuant to its own independent obligation to defend the Underlying Lawsuit.   *Id.*

NAICO, therefore, owes one-half of the costs associated with defending the Underlying Lawsuit from the time NCC tendered the defense until final settlement and for settling the property damage claim.

NCC did not submit any documentation substantiating the amount of this claim. Without documentation, the Court cannot order NAICO to reimburse specific costs.   To that end, NCC shall submit documentation supporting the defense costs and property damage settlement related to the Underlying Lawsuit that it claims should be shared equally by NAICO no later than fourteen days after the date of entry of this Order.   NAICO will have an opportunity to respond.

>2.   July 2014 Accident

NCC further contends that NAICO should be compelled to share equally in the defense and settlement costs related to the July 2014 Accident.   NAICO does not dispute that its policy provides coverage for this accident.   The parties further stipulate that no one put NAICO on notice of the July 2014 claim during the pendency of that case.

As noted above, NCC defended the July 2014 case pursuant to its independent obligation to do so.   At no point did NCC, Murray, or anyone else notify NAICO of the July 2014 case during the pendency of that case.   At no point did NCC or Murray demand that NAICO provide a defense.   As such, while NAICO would have been contractually obligated to provide a defense in that case, the duty to defend never arose because NAICO was never notified of the case.   *See*

*id.* at ¶ 24, 799 P.2d at 1119.   Therefore NCC cannot succeed on its claim for subrogation of the defense costs.   NCC's motion for summary judgment is denied as to the claim for subrogation of the costs of defense related to the July 2014 Accident.

While NAICO's duty to defend was not triggered based on the failure to notify NAICO of the case, the question regarding subrogation of settlement costs remains.   An insurer is not precluded from asserting as a defense that the settlement was unreasonable.   *Id.* at ¶ 18, 799 P.2d at 1118.   NAICO does not raise the defense of reasonableness to any settlement obligation. Instead, NAICO contends that it should not be required to subrogate NCC's payments because NAICO was not timely notified of the case.

NAICO's argument fails as a matter of law.   As a co-primary insurer, NAICO manages to avoid the cost of defense because it was never notified of the case and, therefore, did not trigger the duty to defend.   NAICO's duty to indemnify its insured, however, remains.

NCC did not submit any documentation substantiating the amount of this claim. Without documentation, the Court cannot order NAICO to reimburse a specific amount.   To that end, NCC shall submit documentation supporting the claimed settlement amount for the July 2014 Accident no later than fourteen days after the date of entry of this Order.   Again, NAICO will have an opportunity to respond.

V.     Conclusion

Viewing the factual record and making all reasonable inferences in favor of the nonmovants, the Court denies NAICO's motion for summary judgment and grants-in-part NCC's motion for summary judgment.

IT IS ORDERED that

1.      Plaintiff National American Insurance Company's motion for summary judgment (Doc. 68) is denied;

2.      Counts II and III of the Amended Complaint are dismissed with prejudice;

3.      Defendant National Casualty Company's motion for summary judgment (Doc. 74) is granted-in-part;

      a.   Summary judgment is entered against NAICO on Count I of its Amended Complaint, and Count I is dismissed with prejudice;

      b.   Summary judgment is entered against NCC on its counterclaim for subrogation related to the cost of defending the July 2014 Accident, and that counterclaim is dismissed with prejudice;

      c.   Summary judgment is entered against NAICO on NCC's counterclaim for subrogation of the settlement of the July 2014 Accident, the cost of defendant the Underlying Lawsuit, and the property damage settlement related to the Underlying Lawsuit;

4.      NCC shall file documentation substantiating the amount claimed for defending the Underlying Lawsuit and settling the July 2014 Accident within fourteen (14) days from the date of entry of this Memorandum Opinion and Order; and

5.      NAICO shall have fourteen (14) days from NCC's filing of documentation to respond to that documentation.

 

_____

UNITED STATES DISTRICT JUDGE